**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRG HARRISON LOFTS URBAN RENEWAL LLC,<br><br>            Plaintiff,<br><br>     vs.<br><br>GENERAL ELECTRIC COMPANY, ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC and ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC.,<br><br>            Defendants. | Civ. Act. No.<br><br><br>**COMPLAINT** |

Plaintiff BRG Harrison Lofts Urban Renewal LLC ("BRG"), by its attorneys, Chiesa Shahinian & Giantomasi PC and Sive, Paget & Riesel, PC, for its Complaint in the above-captioned action against General Electrical Company ("GE"), Environmental Waste Management Associates, LLC ("EWMA") and Accredited Environmental Technologies, Inc. ("AET"), alleges as follows:

1.      This matter arises out of defendant GE's unlawful refusal to remediate mercury contamination detected in and under certain buildings recently purchased by BRG in Harrison, New Jersey – contamination that GE and/or its predecessors caused from their prior operations on the subject site and which defendants EWMA and AET negligently failed to fully detect when retained to investigate the subject site as part of BRG's due diligence in connection with its purchase.  BRG has already incurred several hundreds of thousands of dollars of out of pocket expenses in necessary investigation costs, and stands to incur millions of dollars of additional out

of pocket expenses in necessary investigation and remediation costs based on Defendants' violation of their statutory, common law and contractual obligations to BRG.

2.      BRG therefore asserts statutory claims against GE pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq. ("CERCLA"), and New Jersey's Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a-23.11z ("Spill Act"), and asserts common law claims against GE for breach of contract, nuisance, negligence, strict liability, and restitution for specific performance and past, present and future investigation and remediation costs and consequential damages.  BRG further asserts breach of contract and professional negligence/malpractice claims against EWMA and AET for their careless work (on which BRG relied in moving forward with the purchase of the site) in failing to detect the extent of mercury contamination inside the buildings at the subject site.

## PARTIES

3.      Plaintiff BRG is a limited liability company formed under the laws of the state of New Jersey, with a principal place of business at 307 Frank E. Rodgers Boulevard South, Harrison, New Jersey.  BRG is the current owner of the subject site.

4.      Defendant GE is a business incorporated under the laws of the State of New York with its principal place of business located at 3135 Easton Turnpike, Fairfield, Connecticut 06825.  GE conducts business in New Jersey and is the corporate successor to RCA Radiotron Company, Inc., RCA Manufacturing, Inc., the Radio Corporation of America and RCA Corporation (collectively referred to as the "RCA Entities") as further alleged herein.  GE and/or its predecessors are responsible parties who caused environmental contamination at the site, including mercury contamination, and GE has refused to remediate it.

2

5.      Defendant EWMA is a limited liability company doing business in New Jersey and incorporated under the laws of the State of New Jersey, with a principal place of business at Lanidex Plaza, 100 Misty Lane, Parsippany, New Jersey 07054.  BRG retained EWMA to investigate environmental contamination at the subject site in connection with due diligence BRG was performing on the Site in connection with BRG's purchase thereof. EWMA investigated environmental contamination at the subject site in a negligent manner.

6.      Defendant AET is a corporation doing business in New Jersey and incorporated under the laws of Pennsylvania, with a principal place of business at 28 North Pennell Road, Media, Pennsylvania 19063.   AET was retained through EWMA to perform a mercury investigation on the subject site in connection with BRG's purchase thereof, and did so in a negligent manner.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2), and 28 U.S.C. §§ 1331 and 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b) insofar as the subject site is located in this District and GE, EWMA and AET transact business in this District.  In addition, the events, actions and omissions giving rise to this claim occurred in this District, including the operations by GE and its predecessors that caused mercury contamination as well as EWMA's and AET's negligent work at the site.

## FACTUAL ALLEGATIONS

### A.      The Site

9.      On or about June 9, 2015, BRG acquired two parcels of real property located at 400 South 5th Street in Harrison, Hudson County, New Jersey, and designated Block 131, Lots

17-24 (the "Parking Lot Parcel") and Block 156, Lot 1 (the "Main Parcel") on the Town of Harrison tax map (collectively, the "Site").

10.     BRG acquired the Site for the express purpose of redeveloping it for residential use – specifically as residential loft units.

11.     The Main Parcel is improved with three multi-story industrial buildings, referred to herein as "Building A", "Building B", and "Building C" and is approximately 2.1 acres in size.

12.     The Parking Lot Parcel is approximately 0.40 acres in size and asphalt-paved.

13.     The Parking Lot Parcel is bounded on the north by Bergen Street followed by the Harrison Plaza Shopping Center, on the south by Essex Street followed by Interstate I-280, municipal parking and railroad tracks, on the east by 5th Street followed by a vacant commercial property and Harrison Equipment & Industrial Supplies, and on the west by a commercial/retail development including a Seabra's grocery store and a Wendy's restaurant.

14.     The Main Parcel is bounded on the north by Sussex Street followed by residential properties, on the south by Bergen Street followed by two commercial buildings (one is vacant) and five residential properties, on the east by Sixth Street followed by residential properties, and on the west by Fifth Street followed by the Harrison Plaza Shopping Center.

**B.     Operations at GE's Lampworks**

15.     In approximately 1882, GE's predecessor, the Edison Lamp Company, acquired Building C at 420 South 5th Street, moved onto the Site and utilized the property to design, test and manufacture incandescent light bulbs.

4

16.     Lamp manufacturing operations on the Site by the Edison Lamp Company commenced around the spring of 1882 (these operations are referred to herein as "GE Lampworks").

17.     In 1882, the Edison Lamp Company employed approximately 150 people.

18.     In 1889, the Edison Lamp Company was consolidated into the Edison General Electric Company.

19.     In 1892, the Edison General Electric Company and the Thompson-Houston Electric Company were consolidated to create GE.

20.     GE constructed Building B at 530 Bergen Street in 1907.

21.     By 1912, GE employed almost 4,000 people at its Harrison, New Jersey facilities.

22.     GE constructed Building A at 400 South 5th Street in or around 1913 or 1914.

23.     GE managed, directed, and conducted the operations of GE Lampworks on the Site, manufacturing various types of lightbulbs, until approximately 1929.

24.     GE Lampworks operations produced materials and products related to incandescent light bulbs.

25.     The operations of GE Lampworks utilized mercury for manufacturing processes.

26.     GE's manufacturing process for incandescent light bulbs included the use of mercury pumps at the Site.

27.     The operations of GE Lampworks resulted in the release and/or disposal of mercury into the building materials, soil, groundwater and surface waters at the Site.

28.     Mercury was released and disposed of into the building materials, soil, groundwater and surface waters at the Site from the operations of GE Lampworks, including but

not limited to: (i) waste disposal activities, (ii) leaks from equipment, and/or (iii) spills during the use of mercury-containing equipment.

### C.   RCA Radiotron Company, Inc. Acquires GE's Lampworks

29.    The Radio Corporation of America was incorporated under the laws of the state of Delaware in 1917.  GE owned a controlling interest in the Radio Corporation of America when it was incorporated in 1917.

30.    In 1929, the RCA Radiotron Company, Inc. was incorporated to assume the operations of GE Lampworks and manufacture radio tubes.

31.    The RCA Radiotron Company, Inc. expanded its operations such that the Site was part of a 9.5-acre campus (the "Campus") consisting of 24 buildings and having a floor area of 626,000 square feet.

32.    The RCA Entities manufactured mercury-vapor rectifier tubes and mercury-vapor diodes at its Campus, which included the Site, as well as radio vacuum tubes, glass and metal radio receiving and power tubes, phototubes, gas triodes and tetrodes, cathode-ray and television tubes, voltage regulation tubes, acorn tubes, and special amplifier tubes.

33.    GE has stated that RCA produced "more than 65 different miniature tubes, the largest to be made by any tube manufacturer" at the Campus, which included the Site, and that they made "tube parts and machinery for other tube manufacturers, a comprehensive line of electronic components and accessories for the nation's leading producers of television and radio receivers, a wide assortment of test and measuring equipment, and a complete line of dry batteries."

34.     In a February 26, 1942 report regarding the security of the RCA Manufacturing Company, Inc.'s operations at Harrison, New Jersey, GE stated that "products manufactured by

6

the Harrison Works of the RCA Manufacturing Company, Incorporated consist of glass and metal radio receiving and power tubes; photo tubes, gas triodes and tetrodes; cathode-ray and television tubes; voltage regulation tubes; acorn tubes and special amplifier tubes."

35.     Materials used to manufacture RCA products at the Site included mercury.

36.     Mercury was released and disposed of into the soil, groundwater and surface waters at the Site from the operations of some or all of the RCA Entities as a result of activities and occurrences, including but not limited to: (i) waste disposal activities,, (ii) leaks from equipment, and/or (iii) spills during the use of mercury-containing equipment.

37.     The RCA Entities owned and operated the Site until approximately 1976.

38.     GE is the legal successor-in-interest to the RCA Entities as a result of GE's acquisition of RCA Corporation.

**D.     BRG Conducts Due Diligence Prior to Purchasing the Site**

39.     BRG retained EWMA in February 2012 to conduct environmental due diligence in connection with BRG's interest in purchasing the Site pursuant to an Environmental Services Agreement between BRG and EWMA, dated February 16, 2012 (the "Environmental Services Agreement") and certain proposals subsequently issued in accordance therewith.

40.     In June 2012, AET, under contract with EWMA and pursuant to a March 16, 2012 "Proposal for a Limited Asbestos Survey, Lead-Based Paint Survey & Mercury Assessment," surveyed the interior of Buildings A, B and C for the presence of mercury using a mercury vapor analyzer.

41.     AET negligently conducted the mercury vapor survey by failing to use the appropriate device and/or failing to properly set or calibrate the device used to detect mercury in the indoor air in Buildings A, B and C.

42.     AET reported mercury vapors in only two isolated locations on the third floor of Building C based on its June 2012 survey.  AET reported no mercury vapor detections on any floor in Buildings A and B.

43.     In August 2012, AET conducted additional mercury vapor survey work on the third floor of Building C.  AET further delineated the two isolated sections of the third floor of Building C where AET had detected mercury vapor concentrations during its June 2012 survey. The delineated areas measured 38 feet by 12 feet in the southwest corner of the third floor of Building C and 4 feet by 14 feet along the northern wall of the third floor of Building C.   In aggregate, the delineated areas totaled approximately 512 square feet.  As all of the floors of Buildings A, B and C total approximately 192,000 square feet, the delineated area was less than 0.3% of the total square footage of the Buildings.

44.     EWMA knew or should have known based on, among other things, the historical operations at the Site and the intended residential use of the Site, coupled with the unprofessional and deficient manner in which AET's mercury survey was presented, that the results and AET's methodology were highly questionable.   EWMA, as the consultant, therefore should have questioned the results and checked whether the correct instrument was used and properly calibrated, and either taken measures to ensure that AET conducted a proper mercury survey or retained another qualified professional to do so.

45.     In August 2012, EWMA issued an Asbestos Lead Paint and Mercury Vapor Survey Memo.

46.     In August 2012, EWMA performed a walkthrough of the Site with potential environmental abatement contractors to solicit proposals to perform mercury remediation.  The proposed scope of work included creating a plastic containment area, demolishing the wood floor

as necessary and vacuuming any free mercury in the limited area delineated on the third floor of Building C.

     **E.**     <u>**GE's Inadequate Investigation of the Site**</u>

     47.     In or around July 2013, Amec Foster Wheeler ("AMEC") was retained by GE to perform the environmental investigation and remediation. Theodore Toskos, an employee of AMEC, is the Licensed Site Remediation Professional ("LSRP") for remedial activities conducted at the Site pursuant to New Jersey's Site Remediation Reform Act, <u>N.J.S.A.</u> 58:10C-1 -29 ("SRRA").

     48.     AMEC, at the direction of GE, conducted Remedial Investigation Sampling from May through July of 2014 and collected slab samples, soil samples and groundwater samples at the Site, which were later incorporated into a Remedial Investigation Report issued in March 2015.

     49.     AMEC, at the direction of GE, issued a Preliminary Assessment to the New Jersey Department of Environmental Protection ("NJDEP") in September 2014.   This Preliminary Assessment did not include the data collected during the Remedial Investigation Sampling.

     50.     On November 5, 2014, BRG entered into an Indemnification and Settlement Agreement with GE ("Indemnification and Settlement Agreement").  Pursuant to this agreement, GE is required to obtain a Response Action Outcome for the Site ("Site-wide RAO") from its LSRP certifying that remediation of the Site is complete and that the Site is not a risk to human health or the environment.

     51.     BRG relied upon the information provided by AMEC (on behalf of GE) in negotiating the Indemnification and Settlement Agreement and would not have entered into this

agreement had AMEC provided accurate information regarding the mercury contamination at the Site within the Preliminary Assessment report provided to BRG prior to the execution of the Indemnification and Settlement Agreement.

52.     BRG further relied upon the information provided by EWMA and AET in negotiating the Indemnification and Settlement Agreement and would not have entered into this agreement had EWMA and AET provided accurate information regarding the mercury contamination at the Site.

53.     In August 2014, BRG retained Langan Engineering & Environmental Services, Inc. ("Langan") to conduct miscellaneous environmental consulting services.

54.     On October 9, 2015, in preparation for conducting the limited mercury abatement on the third floor of Building C, Langan conducted a mercury screening and obtained results inconsistent with the results of the EWMA/AET's investigation and mercury survey in 2012.

55.     On October 19, 2015, Langan returned to the Site to conduct a mercury survey in Buildings A and B.

56.     Further mercury vapor samples were collected in January 2016 by Site Remediation Group ("SRG"), a sub-contractor hired by EWMA.

57.     Mercury concentrations in vapor samples collected by Langan in October 2015 and SRG in January 2016 exceeded NJDEP Rapid Action Levels for Indoor Air ($1\mu g/m^3$) ("RALs"), and federal benchmarks including the Environmental Protection Agency's ("EPA's") reference concentration ($0.3\mu g/m^3$) and the Agency for Toxic Substances and Disease Registry's ("ATSDR's") chronic minimum risk level ($0.2\mu g/m^3$) ("MRL") on all floors of Buildings B and C.

58.     Mercury concentrations in vapor samples collected by SRG in January 2016 exceeded EPA's reference concentration and ATSDR's MRL on all three floors of Building A.

59.     Mercury concentrations in vapor samples collected by SRG in January 2016 exceeded NJDEP's RALs on the first floor of Building A, and in an overpass between Buildings A and B on the second and third floors.

60.     Mercury concentrations in vapor samples collected by Langan in October 2015 exceeded ATSDR's MRL on all three floors of Building A.

61.     Mercury concentrations in vapor samples collected by Langan in October 2015 exceeded EPA's reference concentration on the second and third floors of Building A.

62.     Mercury concentrations in vapor samples collected by Langan in October 2015 exceeded NJDEP's RALs on the second floor of Building A.

63.     In March 2016, elemental mercury was observed under the slab in Building B by BRG's consultant, Gradient (Gradco LLC d/b/a/ "Gradient").

64.     BRG has requested that GE fully investigate and remediate the full extent of mercury contamination at the Site, including in the building materials in Buildings A, B and C, and GE has declined to do so.

65.     Without a full investigation and remediation of mercury, it should not be possible for GE to obtain a Site-wide RAO.

**F.     GE's Recent Work at the Site Has Released Mercury to the Environment and Dispersed Mercury Throughout the Site**

66.     Between June and August 2012, various underground storage tanks ("USTs") were removed from the Site and visual evidence of a release of contamination was observed and removed from the soil, and NJDEP assigned case # 12-06-06-0920-51 (Program Interest # 020373) under the SRRA.

67.     In 2013, AMEC, at the direction of GE, conducted site reconnaissance, removed a stockpile generated by prior UST decommissioning activities on the Site, restored UST excavation areas which had not previously been back-filled, and conducted additional sampling for each UST on the Site.

68.     AMEC, at the direction of GE, conducted a Remedial Investigation to determine the extent of trichloroethylene ("TCE") in the soil and groundwater from a 3,000-gallon TCE UST that was decommissioned in 2012.

69.     As part of the remedial program to address the TCE contamination at the Site, the prior Site owner operated ventilation fans from October 2013 to June 2015, at the instruction and direction of GE and AMEC, that blew air from the interior of Buildings A and B out into the environment.

70.     The ventilation fans in Buildings A and B released mercury from within the Buildings into the environment throughout their two years of operation.

71.     Remedial Investigation Sampling conducted by AMEC, at the direction of GE, in the summer of 2014 showed mercury contamination in soil and building materials.

72.     Despite having knowledge of the mercury contamination at the Site, as set forth in AMEC's Remedial Investigation Report, GE did not stop operating ventilation fans in Buildings A and B.

73.     BRG provided mercury vapor results from Langan's October 9, 2015 and October 19, 2015 investigations and from SRG's January 2016 investigation to GE.

74.     Despite possessing evidence of mercury contamination at the Site, in December 2015 and January 2016, AMEC, at the direction of GE, saw cut (i.e., cut breaks in concrete using mechanical cutting tools) the floors in Buildings A, B and C.

75.     Despite possessing evidence of mercury contamination at the Site, in December 2015 and January 2016, AMEC, at the direction of GE, saw cut and commenced removing layers of wooden flooring located at the eastern section of Building B.

76.     Despite possessing evidence of mercury contamination at the Site, in December 2015 and January 2016, AMEC, at the direction of GE, saw cut and commenced removing concrete floor slabs on the south side of Building A.

77.     The saw cutting conducted by AMEC, at the direction of GE, released mercury into the environment, dispersing mercury-contaminated dust throughout all of the buildings at the Site, and releasing volatilized mercury from the sub-slab soils into and throughout the buildings.

78.     In June 2016, AMEC, at the direction of GE, conducted further work in Building B.

79.     AMEC's June 2016 work, conducted at the direction of GE, released mercury-contaminated dust to the environment.

80.     AMEC's June 2016 work, conducted at the direction of GE, caused mercury vapor concentrations to increase above applicable action levels in the AMEC Health and Safety Plan and work had to be stopped.

81.     AMEC was unable to perform work in Building C in June 2016 because mercury vapor levels in Building C were so high that additional protective equipment was required under AMEC's protocol.  AMEC did not obtain the additional protective equipment and therefore work was halted.

82.     GE has not covered the floors in Buildings A and C.

83.     GE's activities in late 2015, early 2016 and June 2016, as described above, have exacerbated mercury contamination throughout Buildings A, B and C, and have released or threatened to release mercury to the environment, including to the soil, groundwater, surface waters, and environment at the Site, and in the indoor air of Buildings A, B and C.

**G.     GE Breached the Indemnity and Settlement Agreement by Failing to Conduct Investigation and Remediation of the Mercury Contamination and Failing to Provide Site Data**

84.     In order to achieve a Site-wide RAO pursuant to the New Jersey SRRA as required under the Indemnity and Settlement Agreement, GE must fully investigate the extent of mercury contamination on the Site, including mercury in building materials.

85.     Mercury in the sub-slab soils is entering or may enter the buildings at the Site, and GE's actions and omissions have spread mercury throughout each Building.

86.     Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment through volatilization and deposition.

87.     Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment through the building slabs.

88.     Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment through any openings in the building exterior.

89.     EPA's Action Memorandum for the Grand Street Mercury Site in Hoboken, NJ, dated November 18, 1996, stated that there was "a threat of a release of mercury vapor from a major fire at the Grand Street Mercury site that would have significant adverse health effects on the surrounding population, possibly resulting in the death of some exposed individuals."

90.     Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment in the event in the event of a fire at the Site.

91.     BRG has repeatedly demanded that GE investigate and remediate the mercury contamination at the Site, including in building materials, and GE has refused and continues to refuse to do so.

92.     The Indemnity and Settlement Agreement obligates GE to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."

93.     BRG formally requested all data in GE's possession or control relating to mercury contamination on the Site on three occasions.

94.     GE refused and continues to refuse to provide the requested data.

95.     GE has refused to either undertake an investigation and remediation of the mercury contamination at the Site, or to provide the requested data, despite its insistence that BRG comply with the dispute resolution provisions contained in Section 3(g) of the Indemnity and Settlement Agreement and provide thirty days' notice to GE (the "Dispute Resolution Procedure"), so that GE could address BRG's demands. GE has not responded within 30 days and has neither undertaken an investigation and remediation of the mercury contamination at the Site nor provided the requested data.

96.     BRG is entitled to attorneys' fees to enforce the Indemnity and Settlement Agreement with respect to GE's obligations to investigate and remediate mercury contamination at the Site in order to achieve a Site-wide RAO, and with respect to GE's obligation to share Site data reasonably requested by BRG.

97.     BRG complied with the Dispute Resolution Procedure outlined in the Indemnity and Settlement Agreement, Section 3(g), by using reasonable good faith efforts for longer than

30 days to negotiate a resolution of the issues relating to completing work necessary to achieve a Site-wide RAO and BRG obtaining Site data.

## COUNT ONE

### (CERCLA – Cost Recovery:  Against GE)

98.      BRG repeats and realleges the allegations set forth in the previous paragraphs as if set forth fully herein.

99.      CERCLA § 107(a)(1)-(4)(B), empowers "any . . . person" to recover "necessary costs of response" incurred "consistent with the national contingency plan," plus interest, "notwithstanding any other provision or rule of law."  42 U.S.C. § 9607(a)(1)-(4)(B).

100.     Persons incurring costs of response ("Response Costs") can recover from any entity that falls within the four categories of parties under CERCLA in the event of (1) a release or threatened release, (2) from a facility, (3) of a hazardous substance, (4) which causes incurrence of Response Costs.  *Id*.

101.     The four classes of responsible parties under CERCLA include: any person who owned or operated any facility at the time of disposal of hazardous substances at the facility and any person who arranged for disposal or treatment of hazardous substances at any facility.  42 U.S.C. § 9607 (a)(2) and (3).

102.     "Hazardous substances" under CERCLA are listed at 40 C.F.R. § 302.4 and include substances that the EPA has listed, or with respect to which the EPA has taken action, under a variety of other environmental laws.  42 U.S.C. § 9601(14)(A), (C)-(F).

103.     Mercury (and thus the mercury contamination on the Site) is a "hazardous substance" within the meaning of CERCLA § 101(14).  42 U.S.C. § 9601(14).

104.    TCE is a "hazardous substance" within the meaning of CERCLA § 101(14).  42 U.S.C. § 9601(14).

105.    The Site is a "facility" within the meaning of CERCLA § 101(9) because it is a place "where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).  GE, its predecessor the Edison Lamp Company, and the RCA Entities are "persons" within the meaning of CERCLA § 101(21).  42 U.S.C. § 9601(21).

106.    GE, its predecessor the Edison Lamp Company, and the RCA Entities were, at the relevant times of disposal of mercury at the Site, entities who managed, directed, and conducted operations at the Site, and therefore are "operators" within the meaning of CERCLA §§ 101(20)(A) and 107(a).  42 U.S.C. § 9601(20)(A), § 9607(a).

107.    GE, its predecessor the Edison Lamp Company, and the RCA Entities were the owners of the Site at the time of disposal of hazardous substances, and as such are "owners" within the meaning of CERCLA §§ 101(20)(A), 107(a).  42 U.S.C. §§ 9601(20)(A), 9607(a).

108.    GE, its predecessor the Edison Lamp Company, and the RCA Entities arranged for disposal of hazardous substances at the Site with intent to dispose.  As such GE and the RCA Entities "arranged for disposal" of mercury on the Site within the meaning of CERCLA § 107(a)(3).  42 U.S.C. § 9607(a)(3).

109.    There has been a "release" or threatened "release" and "disposal" of mercury at the Site within the meaning of CERCLA §§ 101(22) and 107(a).  42 U.S.C. §§ 9601(22), 9607(a).

110.    There has been a "release" or threatened "release" and "disposal" of TCE at the Site within the meaning of CERCLA §§ 101(22) and 107(a).  42 U.S.C. §§ 9601(22), 9607(a).

111.    BRG is a "person" within the meaning of CERCLA §§ 101(21) and 107(a).  42 U.S.C. §§ 9601(21), 9607(a).

112.    The release and/or disposal of mercury at the Site, and GE's failure to investigate and/or remediate that mercury contamination, has caused BRG to incur necessary Response Costs within the meaning of CERCLA §§ 101(25) and 107(a)(4)(B).  42 U.S.C. §§ 9601(25), 9607(a)(4)(B).

113.    BRG has incurred Response Costs and will incur additional Response Costs.

114.    All of BRG's Response Costs have been and will be incurred in order to investigate and/or remediate the mercury contamination.

115.    All Response Costs incurred and to be incurred by BRG have been and will be consistent with the National Contingency Plan, 40 C.F.R. § 300 et seq.

116.    GE has succeeded to the liabilities of the RCA Entities.

117.    GE has succeeded to the liabilities of the Edison Lamp Company.

118.    GE is therefore liable to BRG, jointly and severally, for BRG's Response Costs plus interest in an amount to be determined at trial, including the costs of ongoing operation and maintenance of any remedial system and/or site management activities until such time as any such action is no longer required, pursuant to CERCLA § 107(a).  42 U.S.C. § 9607(a).

119.    BRG is entitled to a declaratory judgment that GE shall be liable for necessary future Response Costs consistent with the National Contingency Plan in subsequent actions for further costs relating to the mercury contamination, pursuant to CERCLA § 113(g)(2).  42 U.S.C. § 9613(g)(2).

**WHEREFORE**, BRG demands judgment against Defendant GE for the following relief:

a.      A declaration that GE is jointly and severally liable under CERCLA for any Response Costs that BRG has incurred or may incur in the future in relation to the Site, as well as any judgments, damages, costs, legal fees or any other expenses arising from or relating to the mercury contamination at the Site;

b.      Compensatory damages for all Response Costs incurred and to be incurred at the Site;

c.      For attorneys' fees and costs; and

d.      For such other relief as the Court deems just and equitable.

## COUNT TWO

### (Breach of Contract:  Against GE)

120.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

121.    Pursuant to Section 4(a) of the Indemnity and Settlement Agreement, GE undertook to "perform the Environmental Response Activities in a good and workmanlike manner and in accordance with customary industry standards, the direction of the LSRP and then prevailing laws, including Environmental Laws."

122.    Section 1(c) of the Indemnity and Settlement Agreement defines "Environmental Response Activities" as "all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the [Site] . . . all as required to obtain an RAO . . . from an LSRP, and to comply with any and all requirements after issuance of such RAO."

123.    Pursuant to Section 4(b) of the Indemnity and Settlement Agreement, GE must "repair or replace any and all damage resulting from its Environmental Response Activities and

shall leave the Property in substantially the same condition as it was prior to the commencement of work."

124.   Pursuant to Section 4(c) of the Indemnity and Settlement Agreement, GE is obliged to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."

125.   GE has stopped performing Environmental Response Activities at the Site that are required to obtain a Site-wide RAO, in breach of the Indemnity and Settlement Agreement.

126.   GE has refused to perform Environmental Response Activities in connection with conditions arising out of GE's prior use and discharge of mercury at the Site, including the mercury contamination, in breach of the Indemnity and Settlement Agreement.

127.   GE has refused to provide to BRG copies of final data that has not been included in any final report, in breach of the Indemnity and Settlement Agreement.

128.   As a direct and proximate result of the breaches of the Indemnity and Settlement Agreement by GE, BRG has suffered damages.

**WHEREFORE**, BRG demands judgment against Defendant GE for the following relief:

a.   Compensatory and consequential damages, including but not limited to carrying costs and all past and future investigatory, cleanup and removal costs, including natural resource damages, and compensation for the diminution in value of the Site and attorneys' fees associated therewith to which BRG is entitled at law;

b.   To the extent that the Environmental Response Activities include demolition of any or all of the Buildings on the Site (or portions thereof), a declaration that GE is obligated to restore the Site, including erecting buildings substantially similar to the existing Buildings A, B and/or C;

    c.   A declaration that GE is liable, jointly and severally, for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances and/or environmentally unsound conditions at or on the Site;

    d.   Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

    e.   Such other and further relief as this Court deems just, equitable, and appropriate.

## **COUNT THREE**

### **(Breach of Contract - Specific Performance: Against GE)**

129.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

130.    Pursuant to Section 4(a) of the Indemnity and Settlement Agreement, GE undertook to "perform the Environmental Response Activities in a good and workmanlike manner and in accordance with customary industry standards, the direction of the LSRP and then prevailing laws, including Environmental Laws."

131.    Section 1(c) of the Indemnity and Settlement Agreement defines "Environmental Response Activities" as "all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the [Site] . . . all as required to obtain an RAO . . . from an LSRP, and to comply with any and all requirements after issuance of such RAO."

132.    Pursuant to Section 4(b) of the Indemnity and Settlement Agreement, GE must "repair or replace any and all damage resulting from its Environmental Response Activities and shall leave the Property in substantially the same condition as it was prior to the commencement of work."

133.    Pursuant to Section 4(c) of the Indemnity and Settlement Agreement, GE is obliged to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."

134.    BRG has duly performed all terms and conditions of the Indemnity and Settlement Agreement.

135.    GE has stopped performing Environmental Response Activities at the Site that are required to obtain a Site-wide RAO, in breach of the Indemnity and Settlement Agreement.

136.    GE has refused to perform Environmental Response Activities in connection with conditions arising out of GE's prior use and discharge of mercury at the Site, including the mercury contamination, in breach of the Indemnity and Settlement Agreement.

137.    GE has refused to provide to BRG copies of final data that has not been included in any final report, in breach of the Indemnity and Settlement Agreement.

138.    BRG has no adequate remedy at law for obtaining the data or obtaining a Site-wide RAO from GE's LSRP.

**WHEREFORE**, BRG demands judgment against Defendant GE for the following relief:

a.  Specific performance of the above-mentioned agreement by conveying to BRG all requested data, investigating and remediating the Site, and obtaining a Site-wide RAO;

b.  To the extent that the Environmental Response Activities include demolition of any or all of the Buildings on the Site (or portions thereof), a declaration that GE is obligated to restore the Site, including erecting buildings substantially similar to the existing Buildings A, B and/or C;

c.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

d.   Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT FOUR

### (Contribution Under the New Jersey Spill Compensation and Control Act: Against GE)

139.   BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

140.   Pursuant to the Spill Act, any person who cleans up and removes a discharge of Hazardous Substances has the right of contribution against all other dischargers and persons who are in any way responsible for a discharge of Hazardous Substances.

141.   Under N.J.S.A. 58:10-23.1lf(a)(2), persons may recover certain cleanup and removal costs. The statute provides in pertinent part:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A, 58:10-23.1 lg]....

142.   The mercury discharged at the Site by GE meets the definition of Hazardous Substances under the Spill Act, N.J.S.A. 58:10-23.11b.

143.   GE is a person within the meaning of N.J.S.A. 58:10-23.11b.

144.   GE is a discharger and person in any way responsible for Hazardous Substances discharged at the Site, and is strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by BRG, including, but not limited to, the costs of investigation, cleanup and removal of hazardous substances, consulting fees, legal fees and other costs incurred pursuant to the Spill Act, N.J.S.A. 58:10-23.11a-23.11z.

145.    In connection with the discharges of Hazardous Substances, BRG has acted to investigate and delineate contamination at the Site.  As a result, BRG has incurred costs and expenses associated therewith and may in the future incur costs and expenses associated therewith.

146.    By reason of the foregoing, Defendant GE is strictly liable, jointly and severally, without regard to fault, for investigatory, cleanup and removal costs incurred, or to be incurred by BRG.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.  All past and future investigatory, cleanup and removal costs, including attorneys' fees associated therewith, to be allocated by the Court using such equitable factors as the Court determines appropriate;

b.  A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c.  Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e.  Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT FIVE

### (Nuisance: Against GE)

147.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

148.    GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' acts and omissions caused or contributed to the discharge of Hazardous Substances at the Site or portions thereof including the Buildings, which constituted an interference with the use and enjoyment of the Site by BRG.

149.    BRG, as the current owner, has a possessory interest in the Site.

150.    GE's acts and omissions at the Site substantially interfered with BRG's use and enjoyment of the Site.

151.    GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' acts and omissions were reckless, negligent, intentional, abnormally dangerous, or done with malice and with a wanton and willful disregard for any harm to the Site or BRG.

152.    As a direct, proximate and foreseeable consequence of the private nuisance GE, its predecessor the Edison Lamp Company, and the RCA Entities created, BRG has sustained damages.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.    All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

25

b.   A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c.   Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d.   Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e.   Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT SIX

### (Negligence:  Against GE)

153.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

154.    GE, its predecessor the Edison Lamp Company, and the RCA Entities owed BRG and the public a duty of care to conduct their business in a sound manner avoiding the creation of property damage or environmental harm.

155.    GE, its predecessor the Edison Lamp Company, and the RCA Entities breached this duty of care by negligently causing, permitting or allowing the improper and illegal discharge of Hazardous Substances at, on, from or under the Site or portions thereof including the buildings.

156.    As a result of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' negligent acts and omissions, the Site and the public have been and may continue to be damaged.

157.    BRG has incurred, and may continue to incur, costs to investigate and remedy the environmental contamination at the Site, including the mercury contamination.

158.    GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' negligence is the direct cause of the environmental contamination at the Site and the direct cause of BRG's damages.

159.    Because of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' negligence and the resultant discharge of Hazardous Substances, including mercury, BRG has suffered damages including a diminution in the value of the Site.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.  All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

b.  A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c.  Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e.  Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT SEVEN

### (Strict Liability: Against GE)

160.   BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

161.   GE, its predecessor the Edison Lamp Company, and the RCA Entities owed BRG and the public a duty of care to conduct its business in a sound manner avoiding the creation of property damage or environmental harm.

162.   GE, its predecessor the Edison Lamp Company, and the RCA Entities brought onto or permitted the presence and use of Hazardous Substances at, on, from or under the Site or portions thereof that are not naturally occurring on the Site.

163.   GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' use or discharge of such Hazardous Substances at the Site or portions thereof, under all of the relevant circumstances, constituted an abnormally dangerous activity.

164.   As a result of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' abnormally dangerous activity, i.e., the use of Hazardous Substances, the Site became contaminated, including the mercury contamination.

165.   Because of the contamination caused by GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' abnormally dangerous activities, BRG has incurred, and may continue to incur, substantial costs to investigate and remedy the environmental contamination, including the mercury contamination, at, on, from or under the Site.

166.   Because of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' abnormally dangerous activity, and the resultant discharge of Hazardous Substances, BRG has suffered damages including a diminution in the value of the Site.

28

167.    By reason of the foregoing, GE is strictly liable, jointly and severally, to BRG for its damages and injuries.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.  All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

b.  A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c.  Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e.  Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT EIGHT

### (Legal and/or Equitable Restitution: Against GE)

168.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

169.    In the event BRG does not recover in whole or part on Counts One through Seven, BRG pleads in the alternative cause(s) of action for legal and/or equitable restitution.

170.    GE is and was aware that BRG has incurred and will incur costs and expenses in response to mercury contamination on the Site released and disposed of by GE and its predecessors.

171.    GE owes a continuing duty to remedy the harm caused by the mercury contamination on the Site caused by GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' actions and inactions.

172.    The costs and expenses incurred and to be incurred by BRG in response to the mercury contamination on the Site should be borne by GE.

173.    GE has received a benefit as a result of BRG's actions to investigate the mercury contamination on the Site insofar as GE should have borne the costs and expenses of such investigation.

174.    GE has accepted the benefit of BRG's actions to investigate the mercury contamination on the Site.

175.    GE has failed, and continues to fail to remedy the harm caused by GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' actions and inactions.

176.    Because BRG has suffered harm and incurred past costs and will incur future costs and expenses that should be borne by GE, GE has been unjustly enriched at BRG's expense.

177.    An injustice would result if GE did not reimburse and make whole BRG for costs and expenses incurred and to be incurred in response to the mercury contamination on the Site.

178.    By reason of the foregoing, GE is liable to BRG in restitution by law, statute, equity, or otherwise for damages in an amount to be determined at trial, including but not limited to the Response Costs.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.  A declaration that GE is liable to BRG for legal and/or equitable restitution and ordering GE to pay BRG recompense and damages;

b.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

c.  Such other and further relief as this Court deems just, equitable, and appropriate.

**COUNT NINE**

**(Negligence/Malpractice:  Against EWMA and AET)**

179.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

180.    EWMA and AET, as environmental engineers/consultants, were required to exercise due care in the performance of their duties at the Site, including with respect to all aspects of the detection and surveying of mercury.

181.    AET failed to exercise due care in sampling and detecting and surveying the mercury, including, but not limited to, failing to use the proper equipment.

182.    EWMA was negligent in failing to question AET's mercury survey results in light of the historical operations at the Site and the planned residential use of the Site, coupled with the manner in which those survey results were presented, and, in turn, to either take measures to ensure that AET conducted proper mercury surveying at the Site or retain another qualified professional to do so.

183.    BRG has been damaged as a result of EWMA's and AET's negligence.

**WHEREFORE**, BRG demands judgment against EWMA and AET for the following relief:

a.  A declaration that EWMA and AET are liable to BRG for negligence/malpractice and ordering EWMA and AET to pay BRG recompense and damages;

b.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

c.  Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT TEN

### (Breach of Contract: Against EWMA)

184.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

185.    EWMA and BRG were parties to the Environmental Services Agreement, under which EWMA agreed to perform certain services in accordance with proposals to be issued in accordance therewith and to do so in a good and workmanlike manner, and in accordance with professional and industry standards prevailing at the time the Work (as defined therein) was performed and in accordance with Law.

186.    The Environmental Services Agreement further provided that EWMA "shall indemnify, defend and hold [BRG], its subsidiaries, affiliates, officers, directors, agents and employees and such other parties in interest specified by [BRG], harmless, from and against any and all claims, liabilities, losses, damages, penalties and costs, arising from the negligent or willful acts of [EWMA]."

187.    In the Environmental Services Agreement, EWMA acknowledged that "the services to be performed pursuant to this Agreement are unique and personal in nature, and [EWMA] shall not assign its rights or obligations under this Agreement."

188.    EWMA breached the Environmental Services Agreement by failing to perform in a workmanlike manner the services BRG compensated EWMA to perform.  EWMA's breach included failing to question AET's mercury sampling results in light of the historical operations at the Site and planned residential use, coupled with the manner in which those results were presented, and, in turn, to either take measures to ensure that AET conducted proper mercury sampling at the Site or retain another qualified professional to do so.

189.    BRG has been damaged as a result of EWMA's breach of the Environmental Services Agreement, and EWMA is obligated to indemnify BRG in addition to being liable for any and all damages resulting from EWMA's breach of the Environmental Services Agreement.

**WHEREFORE**, BRG demands judgment against EWMA for the following relief:

a.  Specific performance of the Environmental Services Agreement;

b.  All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

c.  A declaration that EWMA is liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site and EWMA's breach of the Environmental Services Agreement;

d.  Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for Hazardous Substances for which EWMA is legally responsible;

e.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

f.   Such other and further relief as this Court deems just, equitable, and appropriate.

Dated:  New York, New York
          October 6, 2016

                              Respectfully submitted,


                              CHIESA SHAHINIAN & GIANTOMASI PC
                              Attorneys for BRG Harrison Lofts Urban Renewal LLC


                              s/Dennis M. Toft
                              DENNIS M. TOFT, ESQ.
                              dtoft@csglaw.com
                              One Boland Drive
                              West Orange, NJ 07052

                              SIVE, PAGET & RIESEL, P.C.
                              Attorneys for BRG Harrison Lofts Urban Renewal LLC
                              MARK A. CHERTOK, ESQ.
                              mchertok@sprlaw.com
                              MARGARET C. MACDONALD, ESQ.
                              mmacdonald@sprlaw.com
                              460 Park Avenue
                              New York, New York 10022
                              (212) 421-2150
                              (212) 421-1891 (fax)
                              *Pro hac vice admission pending*

<u>**LOCAL CIVIL RULE 11.2 CERTIFICATION**</u>

I, Dennis M. Toft, admitted to the bars of the State of New Jersey and this Court, and a member of the law firm of Chiesa Shahinian & Giantomasi PC, attorneys for Plaintiff BRG Harrison Lofts Urban Renewal LLC with respect to the above-referenced matter, hereby certify, upon information and belief, that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated:  October 6, 2016

CHIESA SHAHINIAN & GIANTOMASI PC
Attorneys for Plaintiff BRG Harrison Lofts Urban
Renewal LLC

By: <u>s/Dennis M. Toft            </u>
    DENNIS M. TOFT

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 201.1</u>

1.      I am an attorney-at-law of the State of New Jersey, and a Member of the law firm of Chiesa Shahinian & Giantomasi PC, in the above-captioned matter.  I submit this certification pursuant to L. Civ. R. 201.1.

2.      Based upon my review of the file in this matter, it appears that the damages recoverable exceed the sum of $150,000.00, exclusive of interest and costs.

3.      Accordingly, it is respectfully submitted that this matter is not subject to compulsory arbitration, pursuant to L. Civ. R. 201.1.

I hereby certify that the foregoing is true and correct.

Dated:  October 6, 2016

CHIESA SHAHINIAN & GIANTOMASI PC
Attorneys for Plaintiff BRG Harrison Lofts Urban
Renewal LLC

By: <u>s/Dennis M. Toft                 </u>
     DENNIS M. TOFT