# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BRG HARRISON LOFTS URBAN
RENEWAL LLC,

                 Plaintiff,

      v.

GENERAL ELECTRIC COMPANY,
ENVIRONMENTAL WASTE
MANAGEMENT ASSOCIATES, LLC and
ACCREDITED ENVIRONMENTAL
TECHNOLOGIES, INC.,

                Defendants.

Civil Action No: 2:16-06577

---

## DEFENDANT GENERAL ELECTRIC COMPANY'S
## BRIEF IN SUPPORT OF ITS MOTION TO DISMISS COUNTS ONE,
## FOUR, FIVE, SIX, SEVEN, EIGHT, ELEVEN AND TWELVE OF THE
## FIRST AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12(b)(6)

---

**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

Attorneys for Defendant,
General Electric Company

On the Brief:

Ira Gottlieb
Forrest Jones
Natalie S. Watson
Cynthia S. Betz

ME1 23868380v.1

## <u>TABLE OF CONTENTS</u>

<u>***Page***</u>

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ..............................................................................4

ARGUMENT....................................................................................................17

    POINT I

             STANDARD OF REVIEW ON A MOTION TO DISMISS
             FOR FAILURE TO STATE A CLAIM UNDER FEDERAL
             RULE OF CIVIL PROCEDURE 12(B)(6) ..................................17

    POINT II

             PURSUANT TO THE AGREEMENT, BRG
             RELINQUISHED ALL CAUSES OF ACTION AGAINST
             GE RELATING TO THE SITE EXCEPT THE RIGHT TO
             ENFORCE "CLAIMS UNDER THIS AGREEMENT"..............20

             A.   BRG relinquished the statutory and common law claims
                 asserted here........................................................................21

             B.   BRG's relinquishment of its past, present and future
                 causes of action was valid and should be enforced. ..............27

CONCLUSION ................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................17, 18

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)...........................................10, 18, 20

*Cohen v. Indep. Blue Cross,*
    820 F. Supp. 2d 594 (D.N.J. 2011)................................................28

*Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util.,*
    206 N.J. Super. 523 (App. Div. 1985)......................................30, 31

*Fisher Dev. Co. v. Boise Cascade Corp.,*
    37 F.3d 104 (3d Cir. 1994).............................................20, 28, 29

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009).........................................................17

*Giaccone v. Canopius U.S. Ins. Co.,*
    133 F. Supp. 3d 668 ....................................................................30

*Hofman v. Time Warner Cable Inc.,*
    No. 12-cv-00978 (ES), 2013 WL 2460121 (D.N.J. June 6, 2013) ...................19

*Inst'l Investors Grp. v. Avaya, Inc.,*
    564 F.3d 242 (3d Cir. 2009).........................................................19

*Leveto v. Lapina,*
    258 F.3d 156 (3d Cir. 2001).........................................................18

*Marchak v. Claridge Commons, Inc.,*
    134 N.J. 275 (1993) ....................................................................29

*McTernan v. City of York,*
    564 F.3d 636 (3d Cir. 2009).........................................................17

*Medtronic AVE, Inc.. v. Advanced Cardiovascular Sys., Inc.,*
    247 F.3d 44 (3d Cir. 2001).......................................................21, 30

iii

*Motino v. Toys "R" Us., Inc.*,
   No. 06-cv-370 (SRC), 2007 WL 2123698 (D.N.J. July 19, 2007) ................... 20

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
   288 F.3d 548 (3d Cir. 2002) ................................................................. 18

*Red Bank Reg'l Ed. Ass'n v. Red Bank Reg'l High Sch. Bd.*,
   78 N.J. 122 (1978) ...................................................................... 20, 29

*In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*,
   184 F.3d 280 (3d Cir. 1999) ................................................................ 10

*Shane v. Fauver*,
   213 F.3d 113 (3d Cir. 2000) ................................................................. 20

*Smith v. Merck & Co., Inc.*,
   No. 13-cv-2970, 2014 WL 5026321 (D.N.J. Oct. 8, 2014) ............................ 20

*Weisman v. N.J. Dep't of Human Servs.*,
   982 F. Supp. 2d 386 (D.N.J. 2013) ........................................................ 30

*WHY ASAP, LLC v. Compact Power*,
   461 F. Supp. 2d 308 (D.N.J. 2006) ........................................................ 30

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ................................................................. 18

**FEDERAL STATUTES**

28 U.S.C. § 1367(c)(3) ............................................................................ 19

**STATE STATUTES**

N.J.S.A. 58:10C-2 ................................................................................. 25

N.J.S.A. 58:10C-7 ................................................................................... 6

N.J.S.A. 58:10C-14 (a) ............................................................................ 6

N.J.S.A. 58:10C-17 ................................................................................. 6

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ...................................... *passim*

iv

## PRELIMINARY STATEMENT

This action arises out of a contract dispute between BRG Harrison Lofts Urban Renewal LLC ("BRG") and General Electric Company ("GE"). Despite BRG's multi-count complaint against three parties regarding alleged newly-discovered and unexpected levels of mercury found within the superstructure of buildings it owns at a property located in Harrison, New Jersey, and its allegations of dissatisfaction with its own and GE's consultants' remedial work; as well as its invocation of various statutory and common law claims to address those problems, at root this matter is essentially a disagreement regarding which party is responsible to pay for the characterization and potential abatement of mercury within the buildings' structures.

With respect to its claims against GE, BRG expressly waived, released, and covenanted not to sue, and discharged GE for all but potential future breach of contract claims and, therefore, the bulk of BRG's claims[1] should be dismissed under the Indemnification and Settlement Agreement between GE and BRG. As a result of that agreement, which specifically addressed the circumstances and claims

---

[1]   The counts that should be dismissed are: Counts One (CERCLA cost recovery); Count Four (New Jersey Spill Act cost recovery); Count Five (nuisance); Count Six (negligence); Count Seven (strict liability); Count 8 (legal and equitable restitution); Count Eleven (RCRA injunctive relief); and Count Twelve (New Jersey Environmental Rights Act relief). GE reserves the right to otherwise challenge the legal validity and viability of these and the remaining claims on other grounds at a later time, if necessary.

1

at issue in this case, BRG cannot state viable claims for relief pursuant to the various statutes and common law causes of action it attempts to assert in its Amended Complaint because those claims would be futile.  The only claims that *may* survive under the parties' agreement – at least at this early pleadings stage – are BRG's breach of contract claims.[2]

As BRG's own Amended Complaint admits, it entered into the Indemnity and Settlement Agreement with GE after a lengthy and thorough due diligence investigation during which it and its third-party environmental consultants performed a pre-purchase study of the property.  *See* Am. Compl. ¶¶ 40-52, Declaration of Cynthia S. Betz ("Betz Decl."), Ex. 1.  Further, BRG's Amended Complaint demonstrates that, as a result of its own due diligence, it was aware of the background, history, uses and operations at the property, including the presence of mercury in the soils beneath the property and within the interior of a building on the property.  *Id.* ¶¶ 15-38.[3]  It was with this knowledge and understanding that

---

[2]   Counts Two and Three.  GE reserves the right to otherwise challenge the legal validity and viability of these claims on other grounds at a later time.

[3]   BRG's Amended Complaint also admits, as it must, that the property is the subject of ongoing environmental response activities.  (*See, e.g., id.* ¶¶ 40-49 (factual allegations concerning environmental due diligence), ¶¶ 73-84 (factual allegations describing GE's remedial activities), ¶¶ 113-117 (factual allegations concerning a mercury sampling report as recent as October 2016)).  These environmental response activities have proceeded under New Jersey Department of Environmental Protection ("NJDEP") case number 12-06-06-0920-51 (Program Interest identification number 020373), pursuant to the New Jersey Site

BRG relinquished all claims – except for "contractual claims" – with respect to future environmental response actions that BRG now alleges GE is required to undertake at the property. BRG relinquished these claims in order to obtain GE's agreement to perform the remediation of the soils and subsurface conditions at the property in a manner that would not "unreasonably interfere with its redevelopment." Indemnity and Settlement Agreement, §4(a) (Betz Decl., Ex. 2). Indeed, the agreement makes clear that BRG agreed to "waive, release, covenant not to sue and forever discharge" past, present and future claims and causes of action relating to a broadly-defined category of "Environmental Response Activities" – subject to a preservation of its contractual remedies under that agreement – and did so in the explicit context of a settlement agreement that resolved the parties' prior, present and future disputes concerning environmental conditions at the property.

Now faced with seemingly unanticipated project costs, perhaps as the result of gaps in its own due diligence (*see* Am. Compl., Count Nine), BRG wishes to ignore its contractual relinquishment of past and future claims against GE. But BRG's own Amended Complaint and the express terms of the parties' agreement

---

Remediation Reform Act, N.J.S.A. 58:10C-1 *et seq.*, (*see* Am. Compl. ¶ 73) and under the supervision of a New Jersey Licensed Site Remediation Professional (*see, e.g., id.* ¶¶ 50-51), and with the knowledge of NJDEP, the United States Environmental Protection Agency ("EPA"), as well local agencies.

demonstrate that BRG knowingly relinquished all but its potential future contract claims.

Despite its own admissions in the Amended Complaint, and in the face of a clear, bargained-for agreement, BRG is now attempting to revive the very claims it relinquished by alleging conditions on the property that it was either aware of or capable of knowing of at the time of its agreement. This is nothing more than a transparent effort to distract attention from its own obligations and to force GE to undertake characterization and remediation of mercury present in certain building materials in contravention of the terms and conditions of the parties' Settlement and Indemnity Agreement. While BRG *may* have viable contact claims, by its own express agreement and admissions, it has nothing more. Accordingly, Counts One, Four through Eight, and Counts Eleven and Twelve are futile and should be dismissed with prejudice because they fail to state a claim upon which this court can grant relief.

## FACTUAL BACKGROUND

The facts and claims in this case, as alleged by BRG, concern the condition of property located in Harrison, New Jersey, as well as the adequacy of BRG's environmental due diligence, and the terms of an Indemnity and Settlement Agreement between BRG and GE. The property is the former location of the Edison Lamp Works where, according to the Plaintiff, GE's predecessors

4

commenced operations in 1882. (Am. Compl. ¶ 15.) From 1882 to 2014, operations at the property changed several times as did its ownership. (*Id.* ¶¶ 29-37.) The last entity (RCA Corporation) related to GE to own or operate at the property ceased operations and sold the property in 1976. (*Id.* ¶ 37.)

On or about June 9, 2015, Plaintiff BRG acquired two parcels that were once part (but not all) of the former Edison Lamp Works property (collectively, the "Site"). (*Id.* ¶ 9-12.) BRG executed a contract for the purchase of the property in February of 2012. (*Id.* ¶ 39.) "BRG acquired the Site for the express purpose of redeveloping it for residential use - specifically as residential loft apartment units and related parking." (*Id.* ¶ 10.) Between February 2012 and March 2014, BRG conducted due diligence and other environmental investigations at the Site. (*Id.* ¶¶ 40-49.)

Long before acquiring the Site, in February 2012, BRG engaged Environmental Waste Management Associates, LLC ("EWMA") to perform "environmental due diligence in connection with BRG's interest in purchasing the Site," which included a survey of "the interior of Buildings A, B and C for the presence of mercury using a mercury vapor analyzer." (*Id.* ¶¶ 40-41.) This survey identified "mercury vapors in only two isolated locations on the third floor of Building C." (*Id.* ¶ 42.)

ME1 23868380v.1

Thereafter, on November 5, 2014, BRG entered into an Indemnification and Settlement Agreement with GE. (*Id.* ¶ 55.) According to BRG, pursuant to this agreement, GE was required to obtain a Response Action Outcome for the Site (a so-called "Site-wide RAO") from a Licensed Site Remediation Professional ("LSRP"),[4] certifying that remediation of the Site is complete and that the Site is not a risk to human health or the environment. *Id.* BRG alleges that in order to achieve a "Site-wide RAO" pursuant to the New Jersey Site Remediation Reform Act ("SRRA"), N.J.S.A. 58:10C-1 *et seq.*, as required under the Indemnity and Settlement Agreement, GE must fully investigate the extent of mercury on the Site, including mercury in building materials. (Am. Compl. ¶ 103.) BRG asserts that it relied on information provided by GE, as well as its own consultant EWMA, regarding the presence of mercury at the Site. (*Id.* ¶¶ 57-58.)

---

[4]   A "Licensed Site Remediation Professional" ("LSRP") is an individual licensed by the New Jersey Site Remediation Professional Licensing Board, N.J.S.A. 58:10C-7, who must manage, supervise or perform the work required for the remediation of a contaminated site in New Jersey. N.J.S.A. 58:10C-14 (a). To obtain regulatory closure on a contaminated site, an LSRP must issue to the New Jersey Department of Environmental Protection ("NJDEP") a document known as a "response action outcome" ("RAO"), certifying that "the site has been remediated so that it is in compliance with all applicable statutes, rules and regulations protective of public health and safety and the environment." N.J.S.A. 58:10C-14 (d). The Board audits a certain fraction of RAOs issued by LSRPs and has the authority to revoke the LSRP's license if the RAO was issued improperly. N.J.S.A. 58:10C-17.

ME1 23868380v.1

BRG alleges that, following its acquisition of the Site in June 2015, it engaged a new consultant to perform additional mercury surveys "in preparation for conducting the limited mercury abatement on the third floor of Building C." (*Id.* ¶¶ 59-60.)  According to BRG, this consultant found concentrations of mercury vapor exceeding chronic minimum risk levels on all floors of Buildings A, B and C.  (*Id.* ¶¶ 63-66.)  Following this finding, BRG apparently elected not to proceed with the previously planned "mercury abatement" of the building interior because of the increased scale of the apparent mercury conditions within the buildings.

BRG asserts that it has repeatedly demanded that GE investigate and remediate the mercury contamination at the Site, including in building materials, and GE has refused and continues to refuse to do so.  (*Id.* ¶ 110.)

As a fundamental basis of all of its claims against GE, and in particular its contract claims, BRG alleges that GE has refused to either undertake an investigation and remediation of the mercury contamination at the Site, or to provide requested data.  (*Id.* ¶ 120).  BRG's various allegations concerning the parties' contractual rights and obligations evidence that the essence and source of its claims arise from its contract with GE.  For example, BRG maintains that the Indemnity and Settlement Agreement obligates GE to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."  (*Id.* ¶ 111.)  It asserts that it formally requested all data in GE's

7

possession or control relating to mercury contamination on the Site on three occasions, but that GE failed to timely provide such data. (*Id.* ¶ 112.) BRG further maintains that it has complied with the Dispute Resolution Procedure outlined in the Indemnity and Settlement Agreement, Section 3(g), by using reasonable good faith efforts for longer than 30 days to negotiate a resolution of the issues relating to the scope of work necessary to achieve a Site-wide RAO. (*Id.* ¶ 120.)

In Counts Two and Three of its Amended Complaint, BRG asserts causes of action for breach of contract under the Indemnification and Settlement Agreement. In this regard, BRG alleges that pursuant to Section 4(a) of the Indemnity and Settlement Agreement, GE undertook to "perform the Environmental Response Activities in a good and workmanlike manner and in accordance with customary industry standards, the direction of the LSRP and then prevailing laws, including Environmental Laws." (*Id.* ¶ 146.) BRG then asserts that Section 1(c) of the Indemnity and Settlement Agreement defines "Environmental Response Activities" as "all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the [Site] ... all as required to obtain an RAO . . . from an LSRP, and to comply with any and all requirements after issuance of such RAO." (*Id.* ¶ 147.)

BRG maintains that, in breach of its obligations under the Settlement and Indemnity Agreement, "GE has stopped performing Environmental Response Activities at the Site in connection with conditions arising out of GE's prior use and discharge of [hazardous substances] at the Site that are required to obtain a Site-wide RAO," and that this is "in breach of the Indemnity and Settlement Agreement. (*Id.* ¶ 150.)  In this regard it further asserts that "GE has refused to perform Environmental Response Activities in connection with conditions arising out of GE's prior use and discharge of mercury at the Site, including the mercury contamination, in breach of the Indemnity and Settlement Agreement." (*Id.* ¶ 151.) And further that "GE has refused to provide to BRG copies of final data that has not been included in any final report, in breach of the Indemnity and Settlement Agreement." (*Id.* ¶ 152.)  Thus,  BRG alleges that as a direct and proximate result of the breaches of the Indemnity and Settlement Agreement by GE, BRG has suffered damages. (*Id.* ¶ 153.)

Section 2 of the Indemnity and Settlement Agreement provides:

2.   Release.

(a) The Parties agree to and hereby do waive, release, covenant not to sue and forever discharge each other with respect to any and all claims for Past Costs, as well as any damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Parties ever had, now have, or may have in the future arising out of or relating in any

9

way to Past Costs, Prior Environmental Investigations or GE Response Activities.

(b) For the purpose of limiting the nature of any claims between the Parties relating to any Environmental Response Activities to contractual claims under this Agreement, from and after the Indemnity Effective Date, the Parties agree to and hereby do specifically waive, release, covenant not to sue and forever discharge each other with respect to any and all past and present costs, damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Parties ever had, now have, or may have in the future arising out of or relating in any way to the Environmental Response Activities, except for those contractual claims set forth in Section 2(c) below. This release applies to anything which has happened prior to the Effective Date, and expressly absolutely, unconditionally and irrevocably applies to any and all past and present costs, damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Parties ever had, now have, or may have in the future (other than to enforce the obligations and requirements of this Agreement) arising out of or relating in any way to the Environmental Response Activities.

(c) For the avoidance of doubt, the releases contained in Sections 2(a) and 2(b) of this Agreement are not intended, and shall not be construed, to cover or discharge any of the Parties' respective obligations under this Agreement.

*See* Indemnity and Settlement Agreement, Section 2 (Betz Decl., Ex. 2).[5]

Under the Definitions Section of the Indemnity and Settlement Agreement,

the following terms are defined:

---

[5]   BRG did not append this agreement to its pleading, but the Court may consider it for purposes of this motion because it is "integral to [and] explicitly relied upon in the complaint." *See In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). The agreement is widely referred to in the Amended Complaint and it forms the basis of at least two of BRG's causes of action.

(b) "<u>Environmental Laws</u>" shall mean all federal, regional, state, county or local laws, statutes, ordinances, decisional law (including common law), rules, regulations, codes, orders, decrees, directives, applicable guidance and judgments relating to health or safety, pollution, damage to or protection of the environment and natural resources, environmental conditions, releases or threatened releases of hazardous substances into the environment or the use, manufacture, processing, distribution, treatment, storage, generation, disposal, transport or handling of hazardous substances, existing as of the Effective Date or thereafter enacted, rendered, adopted or promulgated. Environmental Laws shall include, but are not limited to: the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq. ("RCRA"); the Clean Air Act, 42 U.S.C. 7401, et seq.; the Clean Water Act, 33 U.S.C. 1251, et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 2629; the SRRA; the Spill Act; the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq.; the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1, et seq.; and the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1, et seq.; and any and all rules and regulations promulgated thereunder.

(c) "<u>Environmental Response Activities</u>" shall mean all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the Former RCA Facility, including on-Site investigations or activities, off-Site investigations or activities, response actions, remedial actions, mitigation or abatement investigations or activities, cleanup and removal costs, which activities shall also include all required actions of any kind with regard to VI investigation and mitigation, installation, operation and maintenance of all Controls, obtaining any required remedial action permits and posting required financial assurances, conducting all maintenance, monitoring and reporting requirements related to such Environmental Response Activities and paying all costs and expenses related thereto, all as required to obtain an RAO (as

11

defined below) from an LSRP, and to comply with any and all requirements after issuance of such RAO.

(d) "Former RCA Facility" shall mean the former RCA receiving tube manufacturing facility with an address of 415 South Fifth Street, in Harrison, New Jersey, situated generally (but not exclusively), between Fourth and Seventh Streets, and Sussex and Essex Streets, in Harrison, Hudson County, New Jersey, as depicted on the figure attached hereto as **Exhibit "C"**.

Betz Decl., Ex. 2.

Section 9 of the Indemnity and Settlement Agreement provides, in part, that:

9.   Deed and Lease Notices/Environmental Deed Covenant.

(a)  BRG covenants and agrees to cause all deeds, leases, grants, easements, covenants and other written transfers of any interest in the Site to a successor or permitted assign or to a Subsequent Grantee to contain a notice concerning the presence of residual environmental impacts at the Site, GE's rights with respect to the performance of Environmental Response Activities at the Site, the restrictions on the use of the Site and the Deed Covenant (as such term is defined in Section 9(b) below), and an acknowledgment of such successor's, permitted assign's or Subsequent Grantee's acceptance of the terms thereof, substantially in the form attached hereto as **Exhibit "E"**, provided that any failure to include such notice in any such instrument shall not constitute a release or waiver of any of the terms, conditions, restrictions or access rights contained herein or in the Deed Covenant.

Betz Decl., Ex. 2.

In the Deed Covenant referenced as Exhibit E in Section 9 of the Indemnity and Settlement Agreement, which GE recorded in the Hudson County Registrar's Office with BRG's consent (Indemnity and Settlement Agreement, §9(b)), the parties agreed that:

The Grantor acknowledges that GE has, among other things, engaged a Licensed Site Remediation Professional (as such term is defined at N.J.A.C. 7:26C-1.3) ("**LSRP**") and has conducted Environmental Response Activities and VI Activities (as such terms are defined in the Indemnity Agreement) and will conduct in the future Environmental Response Activities and will satisfy GE's Continuing Obligations (as such terms are defined in the Indemnity Agreement) at and with respect to the Property.

The Grantor [BRG] acknowledges that the terms and conditions of the Indemnity Agreement are intended to facilitate GE's performance of the Environmental Response Activities, GE's Continuing Obligations and GE's other obligations under the Indemnity Agreement and to allow Grantor to redevelop the Property in accordance with a Redevelopment Plan (as such term is defined in the Indemnity Agreement) and consistent with the Environmental Response Activities and any Controls (as such term is defined in the Indemnity Agreement) implemented at the Property by GE.

Pursuant to the Indemnity Agreement, the Grantor is obligated to record this Deed Covenant in order to memorialize, and give notice to Grantor's successors and permitted assigns and Subsequent Grantees (as such term is defined below) of, certain restrictions on the use and development of the Property and certain terms and conditions of the Indemnity Agreement that are intended to run with the Property and constitute obligations of, and conditions on the ownership or use of any interest in the Property by, Grantor and its successors and permitted assigns, and all future assignees, purchasers, transferees, grantees, operators, lessees and other persons taking any property right or interest in the Property (the "**Subsequent Grantees**").

Betz Decl., Ex. 2 (reference to sub exhibit within ISA).

BRG, as Grantor, then restates in the Deed Covenant its release of claims:

1. Release.

(a) The Grantor agrees to and hereby does waive, release, covenant not to sue and forever discharges GE with respect to

13

any and all claims for Past Costs, as well as any damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted that the Grantor ever had, now has, or may have in the future arising out of or relating in any way to Past Costs, Prior Environmental Investigations or GE Response Activities (as such terms are defined in the Indemnity Agreement).

(b) For the purpose of limiting the nature of any claims between the Grantor and GE relating to any Environmental Response Activities to contractual claims under the Indemnity Agreement, from and after the Effective Date of the Indemnity Agreement, Grantor agrees to and hereby does specifically waive, release, covenant not to sue and forever discharge GE with respect to any and all past and present costs, damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Grantor ever had, now has, or may have in the future arising out of or relating in any way to the Environmental Response Activities, except for those contractual claims set forth in Section 1(c) below.  This release applies to anything which has happened prior to the Effective Date of the Indemnity Agreement, and expressly absolutely, unconditionally and irrevocably applies to any and all past and present costs, damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Grantor ever had, now has, or may have in the future (other than to enforce GE's obligations under the Indemnity Agreement) arising out of or relating in any way to the Environmental Response Activities.

(c) For the avoidance of doubt, the Grantor's releases set forth above are not intended, and shall not be construed, to cover or discharge any of GE's obligations under the Indemnity Agreement.

Both the Engineering Controls and Soil Management Plans, which are annexed to the Indemnity and Settlement Agreement, mention that "remedial actions for the site are planned including excavation of accessible soils impacted

14

by TCE, Mercury and PCBs …." Engineering Controls and Remediation Management Plan, p. 2 (Nov. 2014), Ex. B to Indemnity and Settlement Agreement.

BRG was well aware that under the Indemnity and Settlement Agreement it accepted primary responsibility for addressing building materials, including building materials containing contaminants such as asbestos, lead and mercury. Indeed, the agreement specifically excluded from GE's indemnity obligation contaminants that might be found in building materials, specifically including lead, asbestos and mercury. Section 3 (b) of the agreement states:

> GE shall not be obligated to indemnify the Indemnified Parties with respect to any losses, costs, liabilities, damages, claims, actions, lawsuits, investigations, fees, penalties, fines or assessments and expenses arising out of any of the following (collectively, "Excluded Losses"): *(i) the investigation, removal, disposal or remediation of any existing or residual building materials which might be present at the Site, or of any contaminant which might be present in building materials at the Site (e.g., asbestos, lead, mercury, mold, or any other building material or contaminant of building material)*; provided, however, that GE shall be responsible for the cost of handling and disposing of any building materials removed by GE in connection with the implementation of the Environmental Response Activities; (ii) the non-compliance by BRG, any Indemnified Party or any Subsequent Grantees with applicable law or any of the terms of this Agreement, including, without limitation, the Non-Disturbance Covenant (as such term is defined in Section 5(a) hereof), the Non-Interference Covenant (as such term is defined in Section 5(b) hereof), the Deed Covenant (as such term is defined in Section 9(b) hereof); (iii) any Incremental Liability (as defined below), or (iv) costs and

15

> fees incurred in cooperating with GE as provided in Section 10(b) of this Agreement.

Betz Decl., Ex. 2 (emphasis added).

Finally, BRG attached to its Amended Complaint in this action its Notice of Intent to sue GE pursuant to the Citizen Suit provision of Resource Conservation and Control Act ("RCRA"), 42 U.S.C. § 6972 (a)(1)(B).[6] *See* Am. Compl., Ex. A. Presumably, BRG included a copy of the notice so the Court would have a record of its notice and the basis of its claims as described in that notice letter. However, BRG did not include a copy of GE's response to that notice, which would have rounded out the record. Also strikingly absent from BRG's Amended Complaint is any description of the response of the EPA and NJDEP after being informed of BRG's allegations. In particular, BRG does <u>not</u> allege that the environmental

---

[6] The Court need not be concerned about preserving BRG's statutory causes of action in order to address the "threat" that is alleged in the Complaint. As BRG's Amended Complaint makes clear (as indeed it must under the terms of the statutes it seeks to invoke), it issued a "notice letter," dated August 2, 2016, making the same allegations it later made in the Amended Complaint and sent that letter to both the EPA and NJDEP. Am. Compl. ¶ 102. Thus, these regulatory agencies have had information regarding the presence of mercury contamination within building materials at the Site for at least four months. In fact, as BRG acknowledges, NJDEP has known about the Site even longer as the result of a Preliminary Assessment that GE's consultant submitted in September 2014 and a Remedial Investigation Report that GE's consultant submitted in March 2015. *See* Am. Compl. ¶¶ 53-54. Indeed, BRG also refers to the October 7, 2016 Anchor QEA Mercury Report that was provided to BRG and NJDEP. Am. Compl. ¶¶ 113-14. When and if the substantive merits of this matter are addressed, GE will be prepared to present ample evidence why the property presents no threat to human health or the environmental in its present state.

16

agencies BRG notified of its allegations failed to inspect the property, review the matter or otherwise evaluate BRG's allegations.  *See, e.g.,* Am. Compl. ¶¶ 102; 225-226; 234.  In the end, despite all of BRG's factual, statutory and common law assertions, the issue at the core of this case is a disagreement over what GE must do to obtain the RAO and which party is responsible to address contaminants in the building materials under the Indemnity and Settlement Agreement.

## ARGUMENT

### POINT I

### STANDARD OF REVIEW ON A MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

"To survive a motion to dismiss" for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted); *see also McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009).  "In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

17

The applicable plausibility standard, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

"[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense appears on its face." *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) (citing *ALA, Inc. v. CCAir, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) and 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §1357). Wright & Miller confirm: "As the case law makes clear, the complaint is also subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy." Federal Practice and Procedure §1357, p. 708 (2004). "In a situation involving the barring effect of an affirmative defense … the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim." *Id.* at 713.

In deciding a motion to dismiss, a court's review is not limited solely to the documents attached to the complaint by plaintiff. Review of "a 'document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment.'" *Winer Family Trust v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426); *see also Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) ("Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the

ME1 23868380v.1

plaintiff's complaint and are central to the claim; as such, they may be considered by the court." (emphasis omitted)); *see also Hofman v. Time Warner Cable Inc.*, No. 12-cv-00978 (ES), 2013 WL 2460121, at *4 (D.N.J. June 6, 2013) (taking notice of Residential Subscriber Agreement and Terms of Service incorporated therein, because they were "integral to Mr. Hoffman's breach of contract claim"). Instead, courts are obligated to "'consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007)).  Here, BRG explicitly refers to and relies on the Indemnity and Settlement Agreement in its Amended Complaint.  Indeed, the Agreement is the sole basis for the breach of contract causes of action BRG pleaded in Counts Two and Three of its Amended Complaint.  Accordingly, the Court is entitled to consider the Agreement on this motion under F.R.C.P. 12(b)(6) and base a dismissal of BRG's Amended Complaint (except Counts Two and Three) on its terms.[7]

---

[7]  If the Court were to grant GE's motion, it could decline to exercise supplemental jurisdiction over the remaining claims (against both GE and the other defendants), which are only grounded in state law.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction ... [once] the district court has dismissed all claims over which it has original jurisdiction").

Finally, dismissal with prejudice is appropriate where the plaintiff fails to state a claim and amending the claim would be inequitable or futile. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434; *Motino v. Toys "R" Us., Inc.*, No. 06-cv-370 (SRC), 2007 WL 2123698, at *2 (D.N.J. July 19, 2007); *see also Smith v. Merck & Co., Inc.*, No. 13-cv-2970, 2014 WL 5026321, at *6 (D.N.J. Oct. 8, 2014) (stating on Rule 12(b)(6) motion that court may dismiss complaint <u>with prejudice</u> where it finds bad faith, undue delay, prejudice or futility). Where, as here, "it is clear that the complaint cannot be saved by amendment, the proposed amendment will not supply the deficiencies of the complaint, or it is patently obvious that the plaintiff cannot prevail on the facts alleged," dismissal without leave to amend is proper. 35B C.J.S. Federal Civil Procedure § 866 (citations omitted).

## POINT II

### <u>PURSUANT TO THE AGREEMENT, BRG RELINQUISHED ALL CAUSES OF ACTION AGAINST GE RELATING TO THE SITE EXCEPT THE RIGHT TO ENFORCE "CLAIMS UNDER THIS AGREEMENT"</u>

Where parties have contractually extinguished rights of action relating to certain liabilities as among themselves – including under environmental statutes – those agreements are binding on the parties and are enforced. *See Red Bank Reg'l Ed. Ass'n v. Red Bank Reg'l High Sch. Bd.*, 78 N.J. 122, 140 (1978); *Fisher Dev.*

*Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 1994); *Medtronic AVE, Inc.. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 n. 4 (3d Cir. 2001).

Here, under the parties' Settlement and Indemnity Agreement ("Agreement"), BRG broadly relinquished all claims – except for "contractual claims" – with respect to the future environmental response actions that BRG now alleges in its Amended Complaint that GE is required to undertake at the Site. The terms of the Agreement[8] and the allegations in BRG's own pleading create a bar to the relief BRG now seeks – except under Counts Two and Three (for Breach of Contract against GE).

A.   **BRG relinquished the statutory and common law claims asserted here.**

In the lengthy preamble that preceded the substantive covenants of the Agreement, BRG and GE noted that the parties had asserted and disputed various claims relating to the Site and declared that "the Parties wish to <u>fully resolve</u> their differences concerning responsibility for (i) all Past Costs, and (ii) <u>all future actions and costs related to Environmental Response Activities</u>." Agreement, "Whereas" Recital Clauses (emphasis added).

In accordance with this stated intent, following a short provision by which parties agreed to mutually release all "past costs" and claims relating to prior

---

[8]   The terms of the Agreement are referenced and relied upon throughout BRG's Amended Complaint. *See, e.g.,* ¶¶ 55-56, 103, 111, 121-22, as well as Counts Two and Three of the Amended Complaint.

environmental response actions at the Site, *id.* at ¶2(a), the Agreement broadly

extinguished the parties' present and future claims and causes of action – except

breach of contract – with respect to "Environmental Response Activities" to be

performed thereafter:

> For the purpose of limiting the nature of any claims between the
> Parties relating to any Environmental Response Activities to
> contractual claims under this Agreement, from and after the
> Indemnity Effective Date, the Parties agree to and hereby do
> specifically waive, release, covenant not to sue and forever
> discharge each other with respect to any and all past and present
> costs, damages, claims, penalties and causes of action and/or
> allegations of liability, whether asserted or unasserted, that the
> Parties ever had, now have, or may have in the future arising out
> of or relating in any way to the Environmental Response
> Activities, except for those contractual claims set forth in Section
> 2(c) below.  This release applies to anything which has happened
> prior to the Effective Date, and expressly, absolutely,
> unconditionally and irrevocably applies to any and all past and
> present costs, damages, claims, penalties and causes of action
> and/or allegations of liability, whether asserted or unasserted,
> that the Parties ever had, now have, or may have in the future
> (other than to enforce the obligations and requirements of this
> Agreement) arising out of or relating in any way to the
> Environmental Response Activities.

*Id.* at ¶2 (b) (underlined emphasis added).

The underlined and emphasized language from this provision – "[f]or the

purpose of limiting the nature of any claims between the Parties … to contractual

claims" – could not make more clear the parties' intent that the sole and exclusive

remedy as between BRG and GE relating in any way to the "Environmental

Response Activities" would be an action for breach of the Agreement.[9]

The term "Environmental Response Activities" was, in turn, broadly defined

by the Agreement:

> "Environmental Response Activities" shall mean all
> environmental activities of any kind carried out, in the past or the
> future, at or near the Site in connection with conditions arising
> out of GE's or RCA's prior activities at the Former RCA
> Facility, including on-Site investigations or activities, off-Site
> investigations or activities, response actions, remedial actions,
> mitigation or abatement investigations or activities, cleanup and
> removal costs, which activities shall also include all required
> actions of any kind with regard to VI investigation and
> mitigation, installation, operation and maintenance of all
> Controls, obtaining any required remedial action permits and
> posting required financial assurances, conducting all
> maintenance, monitoring and reporting requirements related to
> such Environmental Response Activities and paying all costs and
> expenses related thereto, all as required to obtain an RAO (as
> defined below) from an LSRP, and to comply with any and all
> requirements after issuance of such RAO.

Agreement at ¶1(c) (emphasis added).

---

[9]   While Paragraph 2(b) of the Agreement extinguished any and all of BRG's
statutory and common law causes of action relating to "Environmental Response
Activities," Paragraph 2(c) makes clear "the releases contained in Sections 2(a)
and 2(b) of this Agreement are not intended, and shall not be construed, to cover or
discharge any of the Parties' respective obligations under this Agreement." *Id.* at
¶2(c) (emphasis added).  The extent of GE's preserved contractual obligations are
defined in Paragraph 3 of the Agreement, by which GE agreed to indemnify and
hold BRG harmless with respect to "Environmental Response Activities"
(expressly subject, however, to the exclusions set forth at Paragraph 3(b)).

23

By the express language of this definition, the term "Environmental Response Activities" encompasses the activities that BRG seeks to compel GE to perform or pay for pursuant to the statutory or common law causes of action asserted in the Amended Complaint.[10]   Thus, pursuant to the terms of the Agreement, BRG has contractually extinguished the claims that it seeks to assert in Counts One, Four through Eight, and Eleven and Twelve.

In fact, BRG's own allegations in the Amended Complaint confirm the broad scope of the term "Environmental Response Activities."  BRG asserts that the term "Environmental Response Activities" includes all of the activities that GE would be required to perform to obtain a "Response Action Outcome" (or "RAO") for the Site:[11]

---

[10]  By its statutory and common law causes of action against GE, BRG seeks: Count One - "Response Costs" under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601 *et seq*. (CERCLA); by Counts Four, Five, Six and Seven - "past and future investigatory, cleanup and removal costs" under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, Nuisance, Negligence and Strict Liability, respectively; under Count Eight - restitution for "costs and expenses incurred and to be incurred in response to the mercury contamination on the Site" (Amended Complaint, ¶ 202).  Through Counts Eleven (RCRA Injunctive Relief, pursuant to 42 U.S.C. §6901 *et seq*.), and Twelve (New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1, *et seq.)* BRG seeks to compel GE to undertake future Environmental Response Activities that are plainly subject to the parties' Agreement.

[11]  Obtaining an "RAO" is the objective of a remediation under the SRRA.  A "Response Action Outcome" is defined as "a written determination by a licensed site remediation professional that the contaminated site was remediated in accordance with all applicable statutes and regulations …."  N.J.S.A. 58:10C-2.

ME1 23868380v.1

> 147.   Section 1(c) of the Indemnity and Settlement Agreement
> defines "Environmental Response Activities" as "all
> environmental activities of any kind carried out, in the past or the
> future, at or near the Site in connection with conditions arising
> out of GE's or RCA's prior activities at the [Site] . . . all as
> required to obtain an RAO . . from an LSRP, and to comply with
> any and all requirements after issuance of such RAO."

Am. Compl. ¶ 147.

While the ellipses in BRG's quotation here might render it misleading in

another context, BRG's quotation correctly makes clear that the definition of

"Environmental Response Activities" includes every action required to obtain an

RAO.

BRG has further alleged that GE must "fully investigate and remediate the

full extent of mercury contamination" at the Site to obtain an RAO:

> 70.   BRG has requested that GE fully investigate and remediate
> the full extent of mercury contamination at the Site, including in
> the building materials in Buildings A, B and C, and GE has
> declined to do so.
>
> 71.   Without a full investigation and remediation of mercury, it
> should not be possible for GE to obtain a Site-wide RAO.

Am. Compl. ¶¶ 70-71.

Moreover, BRG has asserted that GE's alleged failure to perform all of the

response actions it seeks to compel GE to perform or pay for pursuant to the

Amended Complaint is a breach of GE's obligation to perform "Environmental

Response Activities":

150.    GE has stopped performing Environmental Response Activities at the Site in connection with conditions arising out of GE's prior use and discharge of TCE at the Site that are required to obtain a Site-wide RAO, in breach of the Indemnity and Settlement Agreement.

151.    GE has refused to perform Environmental Response Activities in connection with conditions arising out of GE's prior use and discharge of mercury at the Site, including the mercury contamination, in breach of the Indemnity and Settlement Agreement.

*Id.* ¶¶ 150-151.

On a different day, when the substantive merit of BRG's contract claims are considered, GE will dispute the specific details of BRG's allegations quoted above concerning the requirements under New Jersey law to obtain an RAO,[12] the Environmental Response Activities that GE has conducted and continues to undertake on the property and in the surrounding area (*see, e.g.,* Am. Compl. ¶¶53-54), and the nature of GE's affirmative obligations under the Agreement.[13]

---

[12]    The applicable guidance document of the NJDEP states that the agency "does not regulate the remediation of building interiors unless there is a known or suspected discharge of a hazardous substance or hazardous waste that may result in a discharge to the environment, or if a discharge from outside of the building is determined to be entering the building."  NJDEP, *Guidance for the Issuance of Response Action Outcomes*, p. 14 (April. 12, 2016), *available at* www.nj.gov/dep/srp/guidance/srra/rao_guidance.pdf (last visited Dec. 12, 2016). At the appropriate procedural juncture, GE will demonstrate that the sole circumstances identified by the NJDEP when building interiors must be addressed to obtain an RAO are not present here.

[13]    GE will show that BRG's construction of the Agreement ignores the limitations on the scope of GE's obligations established by the exclusions from the indemnity. Agreement ¶ 3(b).

ME1 23868380v.1

However, for purposes of this motion under F.R.C.P. 12(b)(6), BRG's allegations are assumed to be true. For now, the subjects of these disputes are not relevant to the issue presented on this motion, which is limited to the scope of the defined term "Environmental Response Activities" and, hence, the scope of the release established by the Agreement.

Based on both the allegations of BRG's Amended Complaint and the clear terms of the Agreement itself, it is undisputed and, moreover, indisputable that this term encompasses "all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the Former RCA Facility" (Agreement at §1(c)), and thus all of the relief that BRG seeks by its pleaded statutory and common law causes of action.

**B.     BRG's relinquishment of its past, present and future causes of action was valid and should be enforced.**

By their Agreement, the parties agreed to "waive, release, covenant not to sue and forever discharge" past, present and future claims and causes of action relating to a broadly-defined category of "Environmental Response Activities" – subject to a preservation of their contractual remedies – and did so in the explicit context of a settlement agreement that resolved the parties' prior disputes and

27

future obligations.[14]   Under applicable law, these are effective, enforceable and overlapping means of accomplishing the parties' stated objective:  extinguishing or relinquishing the right to enforce statutory and common law or equitable remedies the Parties might have otherwise possessed to assure that the terms of the Agreement would <u>exclusively</u> govern the parties' obligations regarding the measures necessary to address the contamination of the Site.  The indisputable fact that the parties applied these legal tools as part of a settlement provides a strong additional policy ground for full enforcement of the parties' Agreement here.

Under New Jersey law, parties have a well-settled power to contractually waive causes of action.  "The propriety of a contractual waiver of statutory rights is well-established in the private sector.  To be given effect, any such waiver must be clearly and unmistakably established, and contractual language alleged to constitute a waiver will not be read expansively."  *Red Bank Reg'l Ed. Ass'n*, 78

---

[14]   New Jersey law governs the effect of the Agreement, which expressly provides that it "shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey, without regard to its conflict of laws principles." Agreement ¶ 16.  Courts of this Circuit, "tend to enforce choice-of-law provisions in contracts provided the public policies of New Jersey are not offended and the contract bears some relation to the chosen jurisdiction."  *Cohen v. Indep. Blue Cross*, 820 F. Supp. 2d 594, 602 (D.N.J. 2011).  As for BRG's federal causes of action, although "[i]t is, of course, well settled that federal law governs issues relating to the validity of a release of a federal cause of action," the Third Circuit Court of Appeals in *Fisher Development*, observing that "courts can look to state law and incorporate it into the federal law," held that "New Jersey release and contract law" would be applied to determine the effect of a release on CERCLA liability for a site located in New Jersey.  37 F.3d at 108.  There is no reason to depart from the rule of *Fisher Development* here.

N.J. at 140.  Even in the consumer context, parties otherwise entitled by law to assert various rights of action "remain free to limit those remedies by mutual agreement."  *Marchak v. Claridge Commons, Inc.*, 134 N.J. 275, 281-82 (1993) ("We perceive no policy consideration that would prevent homeowners and builders from agreeing to arbitrate their disputes").  Moreover, here (unlike *Marchak*) the parties were not entirely relinquishing their right to a judicial forum, but merely limiting the causes of action and claims that they could assert there.  In this commercial context, where sophisticated parties represented by counsel negotiated a tailor-made agreement, there is no reason to disturb the arrangement they made to "limit[] the nature of any claims between the Parties relating to any Environmental Response Activities to contractual claims under this Agreement." Agreement, ¶ 2(b).

Where warranted by its language, a release construed under New Jersey law bars assertion of claims for future unknown liabilities, even where the parties' written agreement "does not use the words 'future unknown liability.'"  *Fisher Dev. Co.*, 37 F.3d at 107 (language of release between owner of property and former operator of property executed in 1981 compelled dismissal of owner's later CERCLA claims for contamination discovered after date of the release).  Here, however, the parties explicitly provided that the release would have future effect by agreeing to "waive, release [etc.]… any and all … causes of action [etc.] … the

29

Parties <u>ever had, now have or may have in the future arising out of or relating in</u> <u>any way to the Environmental Response Activities</u>."   Agreement at ¶ 2(b) (emphasis added).  *See also Weisman v. N.J. Dep't of Human Servs.*, 982 F. Supp. 2d 386, 391 (D.N.J. 2013) ("A release of claims pursuant to a settlement agreement is a legal contract that should be enforced"); *Giaccone v. Canopius U.S. Ins. Co.*, 133 F. Supp. 3d 668, 674 (D.N.J. 2015) (broad release of insurance claims will be honored and enforced as the court would any other contract).

A "covenant not to sue" is what the term implies.  It "applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue." *Medtronic AVE, Inc.*, 247 F.3d at 55 n. 4 (*quoting McMahan & Co. v. Bass*, 673 N.Y.S. 2d 19, 21 (1998)); *WHY ASAP, LLC v. Compact Power*, 461 F. Supp. 2d 308, 313-14 (D.N.J. 2006) (enforceable covenant not to sue eliminates  any "actual controversy between the parties"); *see also*, 66 Am. Jur. 2d, *Release* § 4 (2011).  In the context here, where the parties had the capacity to waive and release their future statutory and common law claims – and did so -- the covenant not to sue provides a "belts and suspenders" additional basis to preclude BRG from maintaining an action asserting statutory or common law causes of action in breach of the Agreement.

Finally, it is important to note that the parties entered into the Agreement in the explicit context of a settlement.  New Jersey has a strong policy favoring the

enforcement of agreements by which the parties settle their disputes. *Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util.*, 206 N.J. Super. 523, 528 (App. Div. 1985). The basis of this policy is that the parties themselves are in the best position for sorting out the best resolution with respect to disputed obligations:

> The point of this policy is not the salutary effect of settlements on our overtaxed judicial and administrative calendars (although this is an undeniable benefit) but the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone. In recognition of this principle, <u>courts will strain to give effect to the terms of a settlement wherever possible</u>.

*Id.* (emphasis added).

* * * *

BRG initiated this lawsuit in a patent attempt to circumvent the arrangements that the parties contractually established in their Agreement to settle their prior claims. However, as outlined above, the plain terms of the Agreement itself preclude this gambit. To enforce those terms and effectuate the manifest intent of the parties, Counts One, Four through Eight, and Eleven and Twelve of the Amended Complaint must be dismissed with prejudice.

## **CONCLUSION**

For all the foregoing reasons, General Electric respectfully requests this Court grant its Motion To Dismiss with prejudice as to Counts One, Four through Eight, and Eleven and Twelve of BRG's First Amended Complaint, and for an award of fees, costs, and such other relief the Court deems just and appropriate.

Dated:  December 16, 2016                 Respectfully Submitted,

                                  By:      */s/ Ira Gottlieb*
                                           Ira Gottlieb
                                           Forrest Jones
                                           Natalie Watson
                                           Cynthia S. Betz
                                           McCarter & English, LLP
                                           *Attorneys for Defendant,*
                                           *General Electric Company*

32