NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BRG HARRISON LOFTS URBAN RENEWAL LLC, : : : : Plaintiff, : : v. : : GENERAL ELECTRIC COMPANY et al. : : Defendants. : : | Civil Action No. 16-6577 (SRC)  **OPINION & ORDER** |

**CHESLER, U.S.D.J.**

This matter comes before this Court on the motion to dismiss the First Amended Complaint ("FAC"), pursuant to Federal Rule of Civil Procedure 12(b)(6), by Defendant General Electric Company ("GE"). For the reasons stated below, the motion will be denied.

This case arises from a dispute between a buyer and seller of real estate over environmental remediation of mercury contamination. The full history involves some very famous names. According to the FAC, Thomas Edison established a light bulb factory in Harrison, New Jersey in 1882. In 1892, GE was created, and it owned and operated the factory. Fast forward to 2012, when Plaintiff BRG Harrison Lofts Urban Renewal LLC ("BRG") executed a contract to purchase the site from GE. The parties entered into the Indemnification and Settlement Agreement ("ISA") in 2014, and the sale closed in 2015. In 2016, BRG filed the Complaint which initiated this case, since amended to the FAC. At issue on this motion are eight of the twelve claims: 1) Count One, for cost recovery under CERCLA; 2) Count Four, for contribution under the New Jersey Spill Compensation and Control Act; 3) Count Five, for nuisance; 4) Count Six, for negligence; 5) Count Seven, for strict liability for an abnormally

dangerous activity; 6) Count Eight, for restitution; 7) Count Eleven, for injunctive relief under the Resource Conservation and Recovery Act; and 8) Count Twelve, for violation of the New Jersey Environmental Rights Act.

GE moves to dismiss these eight claims on the ground that, in executing the ISA, BRG expressly waived and released them. The parties do not dispute that this Court may, on this motion, consider the text of the ISA, which states in pertinent part:

> 2. Release.
>
> (a) The Parties agree to and hereby do waive, release, covenant not to sue and forever discharge each other with respect to any and all claims for Past Costs, as well as any damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Parties ever had, now have, or may have in the future arising out of or relating in any way to Past Costs, Prior Environmental Investigations or GE Response Activities.
>
> (b) For the purpose of limiting the nature of any claims between the Parties relating to any Environmental Response Activities to contractual claims under this Agreement, from and after the Indemnity Effective Date, the Parties agree to and hereby do specifically waive, release, covenant not to sue and forever discharge each other with respect to any and all past and present costs, damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Parties ever had, now have, or may have in the future arising out of or relating in any way to the Environmental Response Activities, except for those contractual claims set forth in Section 2(c) below. This release applies to anything which has happened prior to the Effective Date, and expressly absolutely, unconditionally and irrevocably applies to any and all past and present costs, damages, claims, penalties and causes of action and/or allegations of liability, whether asserted or unasserted, that the Parties ever had, now have, or may have in the future (other than to enforce the obligations and requirements of this Agreement) arising out of or relating in any way to the Environmental Response Activities.

(Betz Dec. Ex. 2.) GE contends that the eight claims at issue have been waived by this release

provision.

BRG agrees that ISA § 2(b) contains a key release provision, but argues that it cannot be properly understood without the ISA's definition of "Environmental Response Activities," which states:

> "Environmental Response Activities" shall mean all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the Former RCA Facility, including on-Site investigations or activities, off-Site investigations or activities, response actions, remedial actions, mitigation or abatement investigations or activities, cleanup and removal costs, which activities shall also include all required actions of any kind with regard to VI investigation and mitigation, installation, operation and maintenance of all Controls, obtaining any required remedial action permits and posting required financial assurances, conducting all maintenance, monitoring and reporting requirements related to such Environmental Response Activities and paying all costs and expenses relating thereto, all as required to obtain an RAO (as defined below) from an LSRP, and to comply with any and all requirements after issuance of such RAO.

ISA § 1(c). BRG argues that the entire definition is qualified by the ultimate phrase, "all as required to obtain an RAO (as defined below) from an LSRP, and to comply with any and all requirements after issuance of such RAO." BRG asserts that "RAO" is an acronym for "Response Action Outcome," defined by the New Jersey Administrative Code § 7:26C-1.3. Thus, BRG argues, the ISA release covers only noncontractual claims based on part or future remedial activities required to obtain a RAO; it does not cover such activities that are *not* required to obtain a RAO. As such, BRG contends, the ISA release provision did not waive the eight claims at issue.

In reply, GE argues principally that the ultimate phrase does not qualify the entire definition, but rather only clarifies the meaning of "required" actions in the definition.

The bottom line is that both GE and BRG have proposed plausible interpretations of the relevant contractual language. The Court finds that the contractual language at issue is at least

3

arguably ambiguous, and that further inquiry is needed to ascertain its meaning.  In Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 522 (3d Cir. 1999), the Third Circuit held: "When interpreting a contract, a court may consider extrinsic evidence of surrounding circumstances to ascertain the intended meaning of the parties."  The present record has not yet been developed sufficiently to permit this Court to conduct this inquiry.  Discovery must be allowed so that the parties may look for such evidence.  The parties should have the opportunity for discovery, which may provide useful evidence to help decide this question of the meaning of the contract.

Similarly, in Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 164 (3d Cir. 2001), the Third Circuit held: "The determination whether a contract term is ambiguous is a question of law that requires a court to hear the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."  Thus, under Emerson, this Court conducts an inquiry into the question of a contract's ambiguity itself by hearing the parties proffer evidence that may demonstrate the possibility of different interpretations.  See also IBEW Local Union No. 102 v. Star-Lo Elec., Inc., 444 Fed. Appx. 603, 607 (3d Cir. 2011) (reversing this Court on this point).

This perspective has its foundation in the Third Circuit's decision in Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980).  In Mellon, the Third Circuit held:

> It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If a reasonable alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder.

(Id.)  Mellon makes clear how this contract interpretation inquiry must proceed: after discovery, this Court will consider the evidence, including extrinsic evidence, offered in support of the differing interpretations.[1]  At that point, the Court will be better able to determine whether there is more than one reasonable alternative interpretation of the ISA, as well as whether objective evidence should be considered.

The motion to dismiss will be denied.  The issues raised in this motion shall be the subject of discovery.

For these reasons,

**IT IS** on this 3rd day of April, 2017

**ORDERED** that Defendant's motion to dismiss the FAC (Docket Entry No. 20) is **DENIED**.

          s/ Stanley R. Chesler
          STANLEY R. CHESLER, U.S.D.J.

---

[1] It is worth noting that, in Mellon, the Third Circuit explained its rejection of a strict "four corners" approach to contract interpretation, stating that a judge who does not hear extrinsic evidence of meaning might never "realize an ambiguity can exist."  Id. at 1011 n.12.