Timothy E. Corriston, Esq.
CONNELL FOLEY LLP
56 Livingston Avenue
Roseland, NJ 07068
(973) 535-0500
Fax: (973) 535-9217
*Attorneys for Defendant,*
*Environmental Waste Management Associates, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRG HARRISON LOFTS URBAN RENEWAL LLC,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC and ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC.<br><br>Defendants. | Civ. Act. No. 2:16-cv-06577<br><br>***Electronically Filed***<br><br>**THIRD PARTY COMPLAINT** |
| ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC.,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>FIELD ENVIRONMENTAL INSTRUMENTS, INC. and ARIZONAINSTRUMENT LLC,<br><br>Third-Party Defendants. | |
| ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC,<br><br>Third-Party Plaintiff,<br><br>v. | |

LANGAN ENGINEERING AND
ENVIRONMENTAL SERVICES, INC.;
JOHN WOOD GROUP PLC as successor-
in-interest to AMEC PLC,

        Third-Party Defendants.

EVANSTON INSURANCE COMPANY,                Civil Action No: 2:17-CV-01584

        Plaintiff,

v.

ENVIRONMENTAL WASTE
MANAGEMENT ASSOCIATES, LLC,
ACCREDITED ENVIRONMENTAL
TECHNOLOGIES, INC., and BRG
HARRISON LOFTS URBAN RENEWAL

LLC,

        Defendants.

ACCREDITED
ENVIRONMENTALTECHNOLOGIES,
INC.,

        Third-Party Plaintiff,
v.

J.S. BRADDOCK AGENCY,

        Third-Party Defendant.

J.S. BRADDOCK AGENCY,

        Fourth-Party Plaintiff,

v.

EDGEHILL SPECIAL RISK, INC.,

        Fourth-Party Defendant.

5418451-1

Defendant/Third Party Plaintiff, Environmental Waste Management Associates, LLC, by and through its attorneys Connell Foley LLP, against third-party defendants Langan Engineering and Environmental Services, Inc. and John Wood Group PLC as successor in interest to AMEC PLC (collectively "Third Party Defendants"), hereby respectfully states and alleges:

## BACKGROUND AND PARTIES

1.    Defendant/Third Party Plaintiff Environmental Waste Management Associates, LLC ("EWMA" or "Third Party Plaintiff") is a limited liability company organized and existing under the law of the State of New Jersey with its principal place of business located in Parsippany, New Jersey.

2.    Third Party Defendant Langan Engineering and Environmental Services, Inc. ("Langan") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located at 300 Kimball Drive, Parsippany, New Jersey 07054.

3.    Third Party Defendant John Wood Group PLC, as successor in interest to AMEC PLC ("AMEC"), is a foreign public limited company with places of business in New Jersey.

## JURISDICTION AND VENUE

4.    Plaintiff BRG Harrison Lofts Urban Renewal, LLC ("Plaintiff") instituted this litigation (the "Litigation") under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA"), and Resource Conservation and Recovery Act, 42 U.S.C. § 6901 ("RCRA") in the District of New Jersey asserting claims against defendant General Electric Company, and asserted various state law claims against the remaining defendants, including EWMA, related to alleged mercury contamination involving real property and improvements located in Harrison, New Jersey (the "Property").

5418451-1

5.      The Court has subject matter jurisdiction over the claims against General Electric Company in this Litigation pursuant to 28 U.S.C.  § 1331, and has supplemental jurisdiction over the claims against EWMA and this Third Party Complaint pursuant to 28 U.S.C. § 1367(a) and because these claims are joined with and arise out of the same common nucleus of facts as Plaintiff's federal law claims against General Electric Company and supplemental state law claims asserted as to EWMA and the other defendants in the Litigation.

6.      Venue is proper in this Court as to the Third Party Complaint pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b) as the Property which is the subject of this Litigation is located in this District and the events giving rise to the claims at issue occurred in this District.

7.      At all times relevant and material to the claims asserted herein, Langan was the environmental consultant and its employee was the Licensed Site Remediation Professional ("LSRP") for Plaintiff with regard to the Property.

8.      Langan is subject to the personal jurisdiction of this Court and venue is proper in this District under 28 U.S.C. 1391(b) as the acts, conduct or omissions of Langan at issue in this matter occurred in this District, Langan is incorporated in and has its principal place of business in this District, and Langan transacts, does and/or solicits business in this District.

9.      At all times relevant and material to the claims asserted herein, AMEC was the environmental consultant and/or LSRP for defendant GE with regard to the Property.

10.      AMEC is a foreign public limited company with places of business in New Jersey and is authorized to do business in and/or otherwise transacts, does, or solicits business in the State of New Jersey.

5418451-1

11.     At all times relevant and material, AMEC regularly conducted business in the State of New Jersey, and derived substantial revenue therefrom.

12.     At all times relevant and material, AMEC expected or should reasonably have expected its actions to have consequences in the State of New Jersey and derives substantial revenue from interstate and/or international commerce.

13.     At all times relevant and material, AMEC purposefully availed itself of the privilege of conducting business and/or placed products into the stream of commerce within the State of New Jersey.

14.     AMEC is subject to the personal jurisdiction of this Court and venue is proper in this District under 28 U.S.C. 1391(b) as the acts, conduct or omissions of Langan at issue in this matter occurred in this District, and Langan transacts, does and/or solicits business in this District.

## FACTUAL BACKGROUND

15.     As set forth in the First Amended Complaint ("FAC"), Plaintiff alleges damages against various defendants, including EWMA, related to Plaintiff's purchase of the Property, which purportedly contained mercury contamination in certain buildings and subsurface areas caused by defendant General Electric Company's ("GE") historic operations on the Property. A true and correct copy of the First Amended Complaint is attached hereto as Exhibit "A".

16.     EWMA and Plaintiff entered into an Environmental Services Agreement ("ESA") for certain Phase I and II environmental due diligence services related to the Property in or around 2012.

17.     EWMA retained defendant Accredited Environmental Technologies, Inc. ("AET") to conduct a mercury vapor survey of the buildings on the Property.

5418451-1

18.     The FAC alleges that AET negligently conducted the mercury vapor survey and failed to identify the complete scope of the contamination in the building interiors.

19.     The FAC claims that EWMA and AET negligently failed to fully detect the extent of the mercury contamination in the buildings, that EWMA knew or should have known the methodology of AET's mercury vapor survey were "questionable", and that EWMA should have "taken measures to ensure that AET conducted a proper mercury survey or retained another qualified professional to do so."

20.     EWMA filed an Answer, Affirmative Defenses and Cross Claims in response to the FAC, whereby EWMA denied the allegations and claims asserted by Plaintiff in this matter.

21.     AMEC was retained by GE to act as LSRP of record for the Property and to assume the lead role in implementing certain interim remedial actions related to soil, groundwater and vapor intrusion pathway concerns on the Property.

22.     At all relevant times from AMEC's retention through the date the Property was sold to Plaintiff, AMEC as the LSRP responsible for the investigative and remedial actions associated with the Property.

23.     In or around July 2013, Plaintiff provided GE and AMEC with EWMA's environmental investigation work, including the mercury vapor survey by AET.

24.     In August 2013, sampling performed by AMEC on the first floor of Building C identified traces of mercury vapor, which was not identified in AET's reporting.

25.     The results of AMEC's August 2013 sampling were shared with Plaintiff in August 2013.

6

26.     Based upon AMEC's confirmatory sampling, AMEC should have conducted an evaluation of indoor air for the entire facility for mercury.

27.     In or around 2014, AMEC issued a Preliminary Assessment Report ("PAR") regarding the Property. As part of AMEC's PAR, (1) mercury was identified on the floor surface in connection with sumps and pits in the basement (or ground level) of Building B that had not previously been identified; and (2) mercury was detected in floor swipe samples within Building B at concentrations an order of magnitude above the Non-Residential Direct Contact Soil Remediation Standards ("NRDCSRS").  Subsequent soil samples beneath the floor detected mercury exceeding the Residential Direct Contact Soil Remediation Standards ("RDCSRS") which prompted additional sampling of the underlying soils.

28.     A draft of this PAR prepared in September 2014 identified mercury vapors as a separate Area of Concern ("AOC") within the building, but it was not included in the final PAR submitted to the New Jersey Department of Environmental Protection ("NDJEP") in November 2014.

29.     Further, the November 2014 PAR did not include a recommendation to remediate the third floor of Building C, and no further investigations for indoor air mercury vapors were recommended by AMEC as to the other buildings and floors.

30.     Pursuant to statements in the November 2014 PAR, AMEC was aware that the future use of the buildings was going to be residential.

31.     AMEC conducted Remedial Investigation Sampling in 2014, including slab, soil and groundwater samples at the Property, which were incorporated along with the other prior sampling into a March 2015 Remedial Investigation Report issued by AMEC ("RIR").

7

32.     The RIR indicated surficial concentrations of mercury above the NRDCSRS in the area of the Building B pits and soils beneath the floor of Building B exceeding the RDCSRS.

33.     Based upon the concentrations of mercury in the surficial samples, subsurface soils samples and/or other samples from AMEC's 2014 Residential Investigation Sampling or otherwise known to AMEC, and the known proposed use of the buildings for residential purposes, AMEC should have conducted additional mercury vapor indoor air sampling.

34.     The FAC alleges that AMEC's PAR was provided to Plaintiff prior to Plaintiff entering into an Indemnification and Settlement Agreement with GE regarding remediation of the mercury contamination at the Property.

35.     Based upon the Remedial Investigation Sampling, 2013 sampling, and information available to AMEC by and through its client, GE, AMEC knew or should have known that the results of AET's mercury vapor survey were potentially inconsistent with later sampling and/or testing or otherwise needed further investigation.

36.     AMEC failed to advise EWMA of the Remedial Investigation Sampling or results thereof.

37.     AMEC failed to advise EWMA that the results of the AET mercury vapor survey were potentially inaccurate or otherwise inconsistent with the sampling and investigation of AMEC with regard to mercury contamination on the Property.

38.     The FAC alleges that Plaintiff relied upon information provided by AMEC in negotiating an Indemnity and Settlement Agreement with GE and would not have entered into such an agreement had AMEC provided accurate information regarding the mercury contamination at the Property within the PAR.

39.     Despite knowledge of the mercury vapor intrusion concerns outlined above, AMEC adopted and appended AET's analysis from EWMA's January 2013 PAR into its own report, which was shared with Plaintiff for an opportunity to review and comment prior to its submission to the NJDEP.  AMEC not only had the same information and data pertaining to AET's manner and method of sampling as EWMA, it had significant additional information which EWMA did not have.

40.     AMEC did not raise any issues or objections to the manner or methods of AET's mercury sampling.

41.     To the extent Plaintiff alleges that its review of AMEC's draft PAR did not include the soil data, it had no obligation to enter into the Indemnity and Settlement Agreement with GE when it did, and Plaintiff should have waited until such data was received as the due diligence feasibility period had no definitive end-date.  EWMA is not liable for Plaintiff's hasty decision to enter the Indemnity and Settlement Agreement at this time, or for GE's failure to provide Plaintiff with the data in light of the negotiations between the parties.

42.     The FAC further alleges that work and or services performed by AMEC with regard to stockpiles and underground storage tanks on the Property released mercury from the buildings into the environment, including but not limited to the use of ventilation fans in Buildings A and B on the Property over two years, cutting into and removing flooring in the buildings on the Property, and failing to take proper protective measures to prevent or minimize the release of mercury into the environment.

43.     AMEC knew or should have known that the work or services performed at the Property had a likelihood of releasing mercury into the environment and building interiors, and

failed to take such measures necessary to prevent or minimize the release of mercury into the environment and buildings.

44.     In or around 2014, Plaintiff retained third party defendant Langan to conduct environmental consulting services in connection with the Property.

45.     EWMA Director and employee, Anthony Kaufman, who was responsible for managing and overseeing EWMA's work with Plaintiff at the Property, resigned from EWMA on or about June 12, 2014.

46.     Mr. Kaufman subsequently commenced employment with Langan in August 2014, and took the Plaintiff's business to Langan.

47.     Langan was formally retained by Plaintiff in August 2014.

48.     Langan, and in particular Mr. Kaufman, reviewed the August 2014 AMEC draft PAR and March 2015 RIR on behalf of Plaintiff, and provided consulting services and insight to Plaintiff regarding the environmental conditions at the Property.

49.     Langan not only had the same information and data pertaining to AET's manner and method of sampling as EWMA, it had significant additional information which EWMA did not have.

50.     Langan did not raise any issues or objections to the manner or methods of AET's mercury sampling.

51.     Further, Langan continued to advise Plaintiff throughout its negotiations with GE that ultimately resulted in the parties' entry into the Indemnity and Settlement Agreement.

52.    Langan and Mr. Kaufman continued to provide consulting services to Plaintiff as it received additional environmental reports and data from GE and AMEC in early 2015, and in connection with Plaintiff's entry into the Settlement Agreement and Release in June of 2015.

53.    Langan should have advised Plaintiff of the impact of the new data and the need to perform additional testing as to potential mercury contamination.

## FIRST COUNT

54.    EWMA repeats and reiterates the allegations of the Third Party Complaint as if same were set forth at length herein.

55.    At the time and place mentioned in the FAC, the damages allegedly sustained by Plaintiff resulted solely from the Third Party Defendants' negligence and/or other wrongful conduct, acts or omissions, and responsibility for the subject claims and alleged damages are therefore upon the Third Party Defendants, or if there was any negligence on the part of EWMA, which it denies, the negligence of the Third Party Defendants was a major contributing factor therein, and the Third Party Defendants are therefore jointly liable.

56.    By reason of Third Party Defendants' negligence and pursuant to the provisions of the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53a-1 *et seq.,* and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 *et seq.,* EWMA is entitled to recover from the Third Party Defendants a proportionate share of any and all amounts which Plaintiff may recover.

## SECOND COUNT

57.    EWMA repeats and reiterates each and every allegation of the Third Party Complaint as though fully set forth at length herein.

5418451-1

58.     While EWMA denies liability for the damages alleged by Plaintiff, if judgment is recovered by Plaintiff as against EWMA, it hereby asserts that the negligence, breach or other alleged wrongful conduct or omission of EWMA was merely constructive, technical, imputed or vicarious and Plaintiff's damages arose through the Third Party Defendants' direct, active and primary negligence, breach and/or other wrongful conduct or omission.

59.     In the event that EWMA is found liable to Plaintiff, in any respect, EWMA is entitled to be defended, indemnified and held harmless by the Third Party Defendants, whether said right to be defended, indemnified and held harmless arose pursuant to contract, common law or statutory law.

60.     Accordingly, the Third Party Defendants are obligated by operation of law to indemnify and hold EWMA harmless from any and all claims which are the subject of this lawsuit and brought on behalf of Plaintiff or the other parties to this action.

**WHEREFORE**, EWMA demands judgment against the Third Party Defendants pursuant to the Joint Tortfeasors Contribution Law and the Comparative Negligence Act, together with full indemnification and/or contribution and/or insurance coverage, including the cost of defense, attorneys' fees and expenses incurred in the defense of this suit, with interest thereon.

<u>**NOTICE AS TO SETTLING DEFENDANTS**</u>

Pursuant to the holding of <u>Young v. Latta</u>, 123 N.J. 584 (1991), EWMA hereby places the parties, including plaintiff, on notice that EWMA intends to have the jury allocate fault between any and all settling and non-settling defendants and third-party defendants in the above-captioned lawsuit.

## JURY DEMAND

EWMA hereby demands a trial by jury.

## LOCAL CIVIL RULE 11.2

I, Timothy E. Corriston, hereby certify pursuant to Local Civil Rule 11.2, that the above-captioned matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

CONNELL FOLEY LLP

BY:   /s/*Timothy E. Corriston*
      TIMOTHY E. CORRISTON, ESQ
Date:   May 4, 2020          Connell Foley LLP
                             56 Livingston Avenue
                             Roseland, New Jersey 07068
                             Tel.: (973) 535-0500
                             Fax: (973) 533-9217
                             Email: tcorriston@connellfoley.com
                             *Attorneys for Defendant/Third Party Plaintiff*
                             *Environmental Waste Management Associates, LLC*

# EXHIBIT A
## (9/2/20)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BRG HARRISON LOFTS URBAN RENEWAL LLC,<br><br>        Plaintiff,<br><br>        vs.<br><br>GENERAL ELECTRIC COMPANY, ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC and ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC.,<br><br>        Defendants. | Civ. Act. No. 2:16-CV-06577<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff BRG Harrison Lofts Urban Renewal LLC ("BRG"), by its attorneys, Chiesa Shahinian & Giantomasi PC and Sive, Paget & Riesel, PC, for its First Amended Complaint in the above-captioned action against General Electrical Company ("GE"), Environmental Waste Management Associates, LLC ("EWMA") and Accredited Environmental Technologies, Inc. ("AET"), alleges as follows:

    1.    This matter arises out of defendant GE's unlawful refusal to remediate mercury contamination detected in and under certain buildings recently purchased by BRG in Harrison, New Jersey – contamination that GE and/or its predecessors caused from their prior operations on the subject site and which defendants EWMA and AET negligently failed to fully detect when retained to investigate the subject site as part of BRG's due diligence in connection with its purchase. BRG has already incurred several hundreds of thousands of dollars of out of pocket expenses in necessary investigation costs, and stands to incur millions of dollars of additional out of pocket expenses in necessary investigation and remediation costs, and carry, legal and

redesign costs, based on Defendants' violation of their statutory, common law and contractual obligations to BRG.

2.     BRG therefore asserts statutory claims against GE pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq. ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq. ("RCRA"), New Jersey's Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a-23.11z ("Spill Act"), and New Jersey's Environmental Rights Act, N.J.S.A. 2A:35A-1-14 ("ERA"), and asserts common law claims against GE for breach of contract, nuisance, negligence, strict liability, and restitution for specific performance and past, present and future investigation and remediation costs and consequential damages. BRG further asserts breach of contract and professional negligence/malpractice claims against EWMA and AET for their careless work (on which BRG relied in moving forward with the purchase of the site) in failing to detect the extent of mercury contamination inside the buildings at the subject site.

## PARTIES

3.     Plaintiff BRG is a limited liability company formed under the laws of the state of New Jersey, with a principal place of business at 307 Frank E. Rodgers Boulevard South, Harrison, New Jersey. BRG is the current owner of the subject site.

4.     Defendant GE is a business incorporated under the laws of the State of New York with its principal place of business located at 3135 Easton Turnpike, Fairfield, Connecticut 06825. GE conducts business in New Jersey and is the corporate successor to RCA Radiotron Company, Inc., RCA Manufacturing, Inc., the Radio Corporation of America and RCA Corporation (collectively referred to as the "RCA Entities") as further alleged herein. GE and/or

its predecessors are responsible parties who caused environmental contamination at the site, including mercury contamination, and GE has refused to remediate it.

5. Defendant EWMA is a limited liability company doing business in New Jersey and incorporated under the laws of the State of New Jersey, with a principal place of business at Lanidex Plaza, 100 Misty Lane, Parsippany, New Jersey 07054. BRG retained EWMA to investigate environmental contamination at the subject site in connection with due diligence BRG was performing on the Site in connection with BRG's purchase thereof. EWMA investigated environmental contamination at the subject site in a negligent manner.

6. Defendant AET is a corporation doing business in New Jersey and incorporated under the laws of Pennsylvania, with a principal place of business at 28 North Pennell Road, Media, Pennsylvania 19063. AET was retained through EWMA to perform a mercury investigation on the subject site in connection with BRG's purchase thereof, and did so in a negligent manner.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2), 6972(a) and 28 U.S.C. §§ 1331 and 1367.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b) insofar as the subject site is located in this District and GE, EWMA and AET transact business in this District. In addition, the events, actions and omissions giving rise to this claim occurred in this District, including the operations by GE and its predecessors that caused mercury contamination as well as EWMA's and AET's negligent work at the site.

## FACTUAL ALLEGATIONS

### A.    The Site

9.     On or about June 9, 2015, BRG acquired two parcels of real property located at 400 South 5th Street in Harrison, Hudson County, New Jersey, and designated Block 131, Lots 17-24 (the "Parking Lot Parcel") and Block 156, Lot 1 (the "Main Parcel") on the Town of Harrison tax map (collectively, the "Site").

10.     BRG acquired the Site for the express purpose of redeveloping it for residential use – specifically as residential loft apartment units and related parking.

11.     The Main Parcel is improved with three multi-story industrial buildings, referred to herein as "Building A", "Building B", and "Building C" and is approximately 2.1 acres in size.

12.     The Parking Lot Parcel is approximately 0.40 acres in size and asphalt-paved.

13.     The Parking Lot Parcel is bounded on the north by Bergen Street followed by the Harrison Plaza Shopping Center, on the south by Essex Street followed by Interstate I-280, municipal parking and railroad tracks, on the east by 5th Street followed by a vacant commercial property and Harrison Equipment & Industrial Supplies, and on the west by a commercial/retail development including a Seabra's grocery store and a Wendy's restaurant.

14.     The Main Parcel is bounded on the north by Sussex Street followed by residential properties, on the south by Bergen Street followed by two commercial buildings (one is vacant) and five residential properties, on the east by Sixth Street followed by residential properties, and on the west by Fifth Street followed by the Harrison Plaza Shopping Center.

B.    **Operations at GE's Lampworks**

15.    In approximately 1882, GE's predecessor, the Edison Lamp Company, acquired Building C at 420 South 5th Street, moved onto the Site and utilized the property to design, test and manufacture incandescent light bulbs.

16.    Lamp manufacturing operations on the Site by the Edison Lamp Company commenced around the spring of 1882 (these operations are referred to herein as "GE Lampworks").

17.    In 1882, the Edison Lamp Company employed approximately 150 people.

18.    In 1889, the Edison Lamp Company was consolidated into the Edison General Electric Company.

19.    In 1892, the Edison General Electric Company and the Thompson-Houston Electric Company were consolidated to create GE.

20.    GE constructed Building B at 530 Bergen Street in 1907.

21.    By 1912, GE employed almost 4,000 people at its Harrison, New Jersey facilities.

22.    GE constructed Building A at 400 South 5th Street in or around 1913 or 1914.

23.    GE managed, directed, and conducted the operations of GE Lampworks on the Site, manufacturing various types of lightbulbs, until approximately 1929.

24.    GE Lampworks operations produced materials and products related to incandescent light bulbs.

25.    The operations of GE Lampworks utilized mercury for manufacturing processes.

26.    GE's manufacturing process for incandescent light bulbs included the use of mercury pumps at the Site.

27.    The operations of GE Lampworks resulted in the release and/or disposal of mercury into the building materials, soil, groundwater and surface waters at the Site.

5

28.     Mercury was released and disposed of into the building materials, soil, groundwater and surface waters at the Site from the operations of GE Lampworks, including but not limited to: (i) waste disposal activities, (ii) leaks from equipment, and/or (iii) spills during the use of mercury-containing equipment.

**C.      RCA Radiotron Company, Inc. Acquires GE's Lampworks**

29.     The Radio Corporation of America was incorporated under the laws of the state of Delaware in 1917.  GE owned a controlling interest in the Radio Corporation of America when it was incorporated in 1917.

30.     In 1929, the RCA Radiotron Company, Inc. was incorporated to assume the operations of GE Lampworks and manufacture radio tubes.

31.     The RCA Radiotron Company, Inc. expanded its operations such that the Site was part of a 9.5-acre campus (the "Campus") consisting of 24 buildings and having a floor area of 626,000 square feet.

32.     The RCA Entities manufactured mercury-vapor rectifier tubes and mercury-vapor diodes at its Campus, which included the Site, as well as radio vacuum tubes, glass and metal radio receiving and power tubes, phototubes, gas triodes and tetrodes, cathode-ray and television tubes, voltage regulation tubes, acorn tubes, and special amplifier tubes.

33.     GE has stated that RCA produced "more than 65 different miniature tubes, the largest to be made by any tube manufacturer" at the Campus, which included the Site, and that they made "tube parts and machinery for other tube manufacturers, a comprehensive line of electronic components and accessories for the nation's leading producers of television and radio receivers, a wide assortment of test and measuring equipment, and a complete line of dry batteries."

34.     In a February 26, 1942 report regarding the security of the RCA Manufacturing Company, Inc.'s operations at Harrison, New Jersey, GE stated that "products manufactured by the Harrison Works of the RCA Manufacturing Company, Incorporated consist of glass and metal radio receiving and power tubes; photo tubes, gas triodes and tetrodes; cathode-ray and television tubes; voltage regulation tubes; acorn tubes and special amplifier tubes."

35.     Materials used to manufacture RCA products at the Site included mercury.

36.     Mercury was released and disposed of into the soil, groundwater and surface waters at the Site from the operations of some or all of the RCA Entities as a result of activities and occurrences, including but not limited to: (i) waste disposal activities, (ii) leaks from equipment, and/or (iii) spills during the use of mercury-containing equipment.

37.     The RCA Entities owned and operated the Site until approximately 1976.

38.     GE is the legal successor-in-interest to the RCA Entities as a result of GE's acquisition of RCA Corporation.

**D.      BRG Conducts Due Diligence Prior to Purchasing the Site**

39.     BRG executed a contract to purchase the Site in February 2012.

40.     BRG retained EWMA in February 2012 to conduct environmental due diligence in connection with BRG's interest in purchasing the Site pursuant to an Environmental Services Agreement between BRG and EWMA, dated February 16, 2012 (the "Environmental Services Agreement") and certain proposals subsequently issued in accordance therewith.

41.     In June 2012, AET, under contract with EWMA and pursuant to a March 16, 2012 "Proposal for a Limited Asbestos Survey, Lead-Based Paint Survey & Mercury Assessment," surveyed the interior of Buildings A, B and C for the presence of mercury using a mercury vapor analyzer.

42.     AET negligently conducted the mercury vapor survey by failing to use the appropriate device and/or failing to properly set or calibrate the device used to detect mercury in the indoor air in Buildings A, B and C.

43.     AET reported mercury vapors in only two isolated locations on the third floor of Building C based on its June 2012 survey.  AET reported no mercury vapor detections on any floor in Buildings A and B.

44.     In August 2012, AET conducted additional mercury vapor survey work on the third floor of Building C.  AET further delineated the two isolated sections of the third floor of Building C where AET had detected mercury vapor concentrations during its June 2012 survey. The delineated areas measured 38 feet by 12 feet in the southwest corner of the third floor of Building C and 4 feet by 14 feet along the northern wall of the third floor of Building C.  In aggregate, the delineated areas totaled approximately 512 square feet.  As all of the floors of Buildings A, B and C total approximately 192,000 square feet, the delineated area was less than 0.3% of the total square footage of the Buildings.

45.     EWMA knew or should have known based on, among other things, the historical operations at the Site and the intended residential use of the Site, coupled with the unprofessional and deficient manner in which AET's mercury survey was presented, that the results and AET's methodology were highly questionable.  EWMA, as the consultant, therefore should have questioned the results and checked whether the correct instrument was used and properly calibrated, and either taken measures to ensure that AET conducted a proper mercury survey or retained another qualified professional to do so.

46.     In August 2012, EWMA issued an Asbestos Lead Paint and Mercury Vapor Survey Memo.

47.     In August 2012, EWMA performed a walkthrough of the Site with potential environmental abatement contractors to solicit proposals to perform mercury remediation. The proposed scope of work included creating a plastic containment area, removing layers of the wood floor as necessary and vacuuming any free mercury in the limited area delineated on the third floor of Building C.

48.     On March 21, 2013, EWMA provided BRG an estimated cost to remediate the mercury of $15,000 to $25,000.

49.     On March 18, 2014, EWMA provided BRG a written proposal to remediate the mercury for $34,300.

**E.      GE's Inadequate Investigation of the Site**

50.     In or around July 2013, Amec Foster Wheeler ("AMEC") was retained by GE to perform the environmental investigation and remediation. Theodore Toskos, an employee of AMEC, is the Licensed Site Remediation Professional ("LSRP") for remedial activities conducted at the Site pursuant to New Jersey's Site Remediation Reform Act, N.J.S.A. 58:10C-1 -29 ("SRRA").

51.     Toskos was retained by GE as the LSRP for the Site on August 2, 2013, and his LSRP Retention Form for the Site was filed with NJDEP on August 9, 2013.

52.     In or around July 2013, BRG provided GE and AMEC with all of EWMA's environmental investigation work, including the AET mercury survey, and provided EWMA personnel access to the Site.

53.     AMEC, at the direction of GE, conducted Remedial Investigation Sampling from May through July of 2014 and collected slab samples, soil samples and groundwater samples at

the Site, which were later incorporated into a Remedial Investigation Report issued in March 2015.

54.     AMEC, at the direction of GE, issued a Preliminary Assessment to the New Jersey Department of Environmental Protection ("NJDEP") in September 2014.    This Preliminary Assessment did not include the data collected during the Remedial Investigation Sampling.

55.     On November 5, 2014, BRG entered into an Indemnification and Settlement Agreement with GE ("Indemnification and Settlement Agreement").  Pursuant to this agreement, GE is required to obtain a Response Action Outcome for the Site ("Site-wide RAO") from its LSRP certifying that remediation of the Site is complete and that the Site is not a risk to human health or the environment.

56.     GE provided AMEC's Preliminary Assessment to BRG in advance of entering into the Indemnity and Settlement Agreement.

57.     BRG relied upon the information provided by AMEC (on behalf of GE) in negotiating the Indemnification and Settlement Agreement and would not have entered into this agreement had AMEC provided accurate information regarding the mercury contamination at the Site within the Preliminary Assessment.

58.     BRG further relied upon the information provided by EWMA and AET in negotiating the Indemnification and Settlement Agreement and would not have entered into this agreement had EWMA and AET provided accurate information regarding the mercury contamination at the Site.

59.     In August 2014, BRG retained Langan Engineering & Environmental Services, Inc. ("Langan") to conduct miscellaneous environmental consulting services.

60. On October 9, 2015, following its purchase of the Site in June 2015 and in preparation for conducting the limited mercury abatement on the third floor of Building C, Langan conducted a mercury screening and obtained results inconsistent with the results of the EWMA/AET's investigation and mercury survey in 2012.

61. On October 19, 2015, Langan returned to the Site to conduct a mercury survey in Buildings A and B.

62. Further mercury vapor samples were collected in January 2016 by Site Remediation Group ("SRG"), a sub-contractor hired by EWMA.

63. Mercury concentrations in vapor samples collected by Langan in October 2015 and SRG in January 2016 exceeded NJDEP Rapid Action Levels for Indoor Air ($1\mu g/m^3$) ("RALs"), and federal benchmarks including the Environmental Protection Agency's ("EPA's") reference concentration ($0.3\mu g/m^3$) and the Agency for Toxic Substances and Disease Registry's ("ATSDR's") chronic minimum risk level ($0.2\mu g/m^3$) ("MRL") on all floors of Buildings B and C.

64. Mercury concentrations in vapor samples collected by SRG in January 2016 exceeded EPA's reference concentration and ATSDR's MRL on all three floors of Building A.

65. Mercury concentrations in vapor samples collected by SRG in January 2016 exceeded NJDEP's RALs on the first floor of Building A, and in an overpass between Buildings A and B on the second and third floors.

66. Mercury concentrations in vapor samples collected by Langan in October 2015 exceeded ATSDR's MRL on all three floors of Building A.

67. Mercury concentrations in vapor samples collected by Langan in October 2015 exceeded EPA's reference concentration on the second and third floors of Building A.

11

68.     Mercury concentrations in vapor samples collected by Langan in October 2015 exceeded NJDEP's RALs on the second floor of Building A.

69.     In March 2016, elemental mercury was observed under the slab in Building B by BRG's consultant, Gradient (Gradco LLC d/b/a/ "Gradient").

70.     BRG has requested that GE fully investigate and remediate the full extent of mercury contamination at the Site, including in the building materials in Buildings A, B and C, and GE has declined to do so.

71.     Without a full investigation and remediation of mercury, it should not be possible for GE to obtain a Site-wide RAO.

72.     Without a site-wide RAO, BRG cannot proceed with the redevelopment of the property.

**F.      GE's Recent Work at the Site Has Released Mercury to the Environment and Dispersed Mercury Throughout the Site**

73.     Between June and August 2012, various underground storage tanks ("USTs") were removed from the Site and visual evidence of a release of contamination was observed and removed from the soil, and NJDEP assigned case # 12-06-06-0920-51 (Program Interest # 020373) under the SRRA.

74.     In 2013, AMEC, at the direction of GE, conducted site reconnaissance, removed a stockpile generated by prior UST decommissioning activities on the Site, restored UST excavation areas which had not previously been back-filled, and conducted additional sampling for each UST on the Site.

75.     AMEC, at the direction of GE, conducted a Remedial Investigation to determine the extent of trichloroethylene ("TCE") in the soil and groundwater from a 3,000-gallon TCE UST that was decommissioned in 2012.

12

76.     As part of the remedial program to address the TCE contamination at the Site, the prior Site owner operated ventilation fans from October 2013 to June 2015, at the instruction and direction of GE and AMEC, that blew air from the interior of Buildings A and B out into the environment.

77.     The ventilation fans in Buildings A and B released mercury from within the Buildings into the environment throughout their two years of operation.

78.     Remedial Investigation Sampling conducted by AMEC in the summer of 2014, at the direction of GE, showed mercury contamination in soil and building materials.

79.     Despite having knowledge of the mercury contamination at the Site, as set forth in AMEC's Remedial Investigation Report, GE did not stop operating ventilation fans in Buildings A and B.

80.     BRG provided mercury vapor results from Langan's October 9, 2015 and October 19, 2015 investigations and from SRG's January 2016 investigation to GE.

81.     Despite possessing evidence of mercury contamination at the Site, in December 2015 and January 2016, AMEC, at the direction of GE, saw cut (i.e., cut breaks in concrete using mechanical cutting tools) the floors in Buildings A, B and C.

82.     Despite possessing evidence of mercury contamination at the Site, in December 2015 and January 2016, AMEC, at the direction of GE, saw cut and commenced removing layers of wooden flooring located at the eastern section of Building B.

83.     Despite possessing evidence of mercury contamination at the Site, in December 2015 and January 2016, AMEC, at the direction of GE, saw cut and commenced removing concrete floor slabs on the south side of Building A.

84.    The saw cutting and partial floor removal activities conducted by AMEC, at the direction of GE, released mercury into the environment, dispersing mercury-contaminated dust throughout all of the buildings at the Site, and releasing volatilized mercury from the sub-slab soils into and throughout the buildings.

85.    In response to a proposed work plan prepared by BRG to conduct sampling requested by NJDEP, Theodore Toskos sent a letter to GE (Roy Blickwedel) dated October 19, 2016, which was forwarded to BRG's counsel, identifying ways in which BRG's proposed investigation work may result in a release of mercury to the environment, and directing BRG not to conduct the proposed work until implementing certain protective measures to prevent such release from occurring.

86.    The remedial investigation sampling conducted by AMEC, at the direction of GE, utilized none of the protective measures identified in Toskos' October 19th, 2016 letter.

87.    GE's saw cutting activities and partial floor removal activities in Buildings A, B, and C conducted in December 2015 and January 2016 utilized none of the protective measures identified in Toskos' October 19th, 2016 letter.

88.    According to Toskos' opinions expressed in his October 19th, 2016 letter, AMEC risked causing cross-contamination and a release of mercury to the environment by saw cutting and partial floor removal activities in the Buildings at the Site.

89.    In June 2016, AMEC, at the direction of GE, conducted further work in Building B.

90.    AMEC's June 2016 work, conducted at the direction of GE, released mercury-contaminated dust to the environment.

91.     AMEC's June 2016 work, conducted at the direction of GE, caused mercury vapor concentrations to increase above applicable action levels in the AMEC Health and Safety Plan and work had to be stopped.

92.     AMEC was unable to perform work in Building C in June 2016 because mercury vapor levels in Building C were so high that additional protective equipment was required under AMEC's protocol.  AMEC did not obtain the additional protective equipment and therefore work was halted.

93.     GE has not covered the floors in Buildings A and C.

94.     GE's actions and omissions in late 2015, early 2016 and June 2016, as described above, have exacerbated mercury contamination throughout Buildings A, B and C, and have released or threatened to release mercury to the environment, including to the soil, groundwater, surface waters, and environment at the Site, and in the indoor air of Buildings A, B and C.

**G.      GE's Contamination at the Site Constitutes a Present and Ongoing Threat to Public Health and the Environment**

95.     By reason of GE's operations at, and ownership of the Site, GE has stored, handled and disposed of mercury at the Site.

96.     GE has refused to investigate the nature and extent of mercury contamination at the Site, including in building materials.

97.     GE has refused to remediate mercury contamination at the Site, including in building materials.

98.     The Site, including building materials, is an ongoing source of mercury contamination and may present an imminent and substantial endangerment to health or the environment.

15

99.     The mercury in subsurface soils at the Site represents an ongoing source of mercury contamination to the environment and building materials, and may present an imminent and substantial endangerment to health or the environment.

100.    To date no governmental entity has commenced any administrative or judicial proceeding or action seeking to compel GE to fully address the mercury contamination at the Site, including in building materials.

101.    The continued presence of mercury at the Site may constitute an imminent and substantial endangerment to health or the environment.

102.    In a letter dated August, 2, 2016 (the "Notice Letter", attached hereto as Exhibit "A"), BRG placed GE, EPA, and NJDEP on notice that BRG intended to sue GE as past owners and operators of the Site in compliance with 42 U.S.C. § 6972(b), for "contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment...." 42 U.S.C. § 6972(a)(1)(B).

**H.      GE Breached the Indemnity and Settlement Agreement by Failing to Conduct Investigation and Remediation of the Mercury Contamination and Failing to Provide Site Data**

103.    In order to achieve a Site-wide RAO pursuant to the New Jersey SRRA as required under the Indemnity and Settlement Agreement, GE must fully investigate the extent of mercury contamination on the Site, including mercury in building materials.

104.    Mercury in the sub-slab soils is entering or may enter the buildings at the Site, and GE's actions and omissions have spread mercury throughout each Building.

105.    Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment through volatilization and deposition.

16

106.    Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment through the building slabs.

107.    Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment through any openings in the building exterior.

108.    EPA's Action Memorandum for the Grand Street Mercury Site in Hoboken, NJ, dated November 18, 1996, stated that there was "a threat of a release of mercury vapor from a major fire at the Grand Street Mercury site that would have significant adverse health effects on the surrounding population, possibly resulting in the death of some exposed individuals."

109.    Mercury in the building materials throughout Buildings A, B and C is entering or may enter the environment in the event in the event of a fire at the Site.

110.    BRG has repeatedly demanded that GE investigate and remediate the mercury contamination at the Site, including in building materials, and GE has refused and continues to refuse to do so.

111.    The Indemnity and Settlement Agreement obligates GE to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."

112.    BRG formally requested all data in GE's possession or control relating to mercury contamination on the Site on three occasions.

113.    On October 7, 2016, one day after the Complaint was filed in the present action, Anchor QEA, at the direction of GE, provided BRG with a Mercury Data Summary Report dated October 2016 ("Anchor QEA Mercury Report").

114.    The Anchor QEA Mercury Report includes mercury data that previously had not been provided to BRG.

115.    BRG had made previous requests for data that encompassed the mercury data in the Anchor QEA Mercury Report.

116.    The Anchor QEA Mercury Report includes off-site mercury vapor monitoring data which shows that the Site is a source of mercury to off-site areas.

117.    The data in the Anchor QEA Mercury Report demonstrates that the Site is an ongoing source of mercury contamination that threatens public health or the environment.

118.    Inconsistencies in the Anchor QEA Mercury Report indicate that mercury data may be missing.

119.    BRG has requested all mercury data and GE continues to refuse to provide the requested data to the extent such data exists that was not included in the Anchor QEA Mercury Report.

120.    GE has refused to either undertake an investigation and remediation of the mercury contamination at the Site, or to provide the requested data, despite its insistence that BRG comply with the dispute resolution provisions contained in Section 3(g) of the Indemnity and Settlement Agreement and provide thirty days' notice to GE (the "Dispute Resolution Procedure"), so that GE could address BRG's demands. GE has not responded within 30 days and has neither undertaken an investigation and remediation of the mercury contamination at the Site nor provided the requested data.

121.    BRG is entitled to attorneys' fees to enforce the Indemnity and Settlement Agreement with respect to GE's obligations to investigate and remediate mercury contamination at the Site in order to achieve a Site-wide RAO, and with respect to GE's obligation to share Site data reasonably requested by BRG.

122.    BRG complied with the Dispute Resolution Procedure outlined in the Indemnity and Settlement Agreement, Section 3(g), by using reasonable good faith efforts for longer than 30 days to negotiate a resolution of the issues relating to completing work necessary to achieve a Site-wide RAO and BRG obtaining Site data.

## COUNT ONE

## (CERCLA – Cost Recovery:  Against GE)

123.    BRG repeats and realleges the allegations set forth in the previous paragraphs as if set forth fully herein.

124.    CERCLA § 107(a)(1)-(4)(B), empowers "any . . . person" to recover "necessary costs of response" incurred "consistent with the national contingency plan," plus interest, "notwithstanding any other provision or rule of law."  42 U.S.C. § 9607(a)(1)-(4)(B).

125.    Persons incurring costs of response ("Response Costs") can recover from any entity that falls within the four categories of parties under CERCLA in the event of (1) a release or threatened release, (2) from a facility, (3) of a hazardous substance, (4) which causes incurrence of Response Costs.  *Id.*

126.    The four classes of responsible parties under CERCLA include: any person who owned or operated any facility at the time of disposal of hazardous substances at the facility and any person who arranged for disposal or treatment of hazardous substances at any facility.  42 U.S.C. § 9607 (a)(2) and (3).

127.    "Hazardous substances" under CERCLA are listed at 40 C.F.R. § 302.4 and include substances that the EPA has listed, or with respect to which the EPA has taken action, under a variety of other environmental laws. 42 U.S.C. § 9601(14)(A), (C)-(F).

128.     Mercury (and thus the mercury contamination on the Site) is a "hazardous substance" within the meaning of CERCLA § 101(14).  42 U.S.C. § 9601(14).

129.     TCE is a "hazardous substance" within the meaning of CERCLA § 101(14).  42 U.S.C. § 9601(14).

130.     The Site is a "facility" within the meaning of CERCLA § 101(9) because it is a place "where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).  GE, its predecessor the Edison Lamp Company, and the RCA Entities are "persons" within the meaning of CERCLA § 101(21).  42 U.S.C. § 9601(21).

131.     GE, its predecessor the Edison Lamp Company, and the RCA Entities were, at the relevant times of disposal of mercury at the Site, entities who managed, directed, and conducted operations at the Site, and therefore are "operators" within the meaning of CERCLA §§ 101(20)(A) and 107(a).  42 U.S.C. § 9601(20)(A), § 9607(a).

132.     GE, its predecessor the Edison Lamp Company, and the RCA Entities were the owners of the Site at the time of disposal of hazardous substances, and as such are "owners" within the meaning of CERCLA §§ 101(20)(A), 107(a).  42 U.S.C. §§ 9601(20)(A), 9607(a).

133.     GE, its predecessor the Edison Lamp Company, and the RCA Entities arranged for disposal of hazardous substances at the Site with intent to dispose.  As such GE and the RCA Entities "arranged for disposal" of mercury on the Site within the meaning of CERCLA § 107(a)(3). 42 U.S.C. § 9607(a)(3).

134.     There has been a "release" or threatened "release" and "disposal" of mercury at the Site within the meaning of CERCLA §§ 101(22) and 107(a).   42 U.S.C. §§ 9601(22), 9607(a).

135.    There has been a "release" or threatened "release" and "disposal" of TCE at the Site within the meaning of CERCLA §§ 101(22) and 107(a).  42 U.S.C. §§ 9601(22), 9607(a).

136.    BRG is a "person" within the meaning of CERCLA §§ 101(21) and 107(a).  42 U.S.C. §§ 9601(21), 9607(a).

137.    The release and/or disposal of mercury at the Site, and GE's failure to investigate and/or remediate that mercury contamination, has caused BRG to incur necessary Response Costs within the meaning of CERCLA §§ 101(25) and 107(a)(4)(B).  42 U.S.C. §§ 9601(25), 9607(a)(4)(B).

138.    BRG has incurred Response Costs and will incur additional Response Costs.

139.    All of BRG's Response Costs have been and will be incurred in order to investigate and/or remediate the mercury contamination.

140.    All Response Costs incurred and to be incurred by BRG have been and will be consistent with the National Contingency Plan, 40 C.F.R. § 300 et seq.

141.    GE has succeeded to the liabilities of the RCA Entities.

142.    GE has succeeded to the liabilities of the Edison Lamp Company.

143.    GE is therefore liable to BRG, jointly and severally, for BRG's Response Costs plus interest in an amount to be determined at trial, including the costs of ongoing operation and maintenance of any remedial system and/or site management activities until such time as any such action is no longer required, pursuant to CERCLA § 107(a).  42 U.S.C. § 9607(a).

144.    BRG is entitled to a declaratory judgment that GE shall be liable for necessary future Response Costs consistent with the National Contingency Plan in subsequent actions for further costs relating to the mercury contamination, pursuant to CERCLA § 113(g)(2).  42 U.S.C. § 9613(g)(2).

**WHEREFORE,** BRG demands judgment against Defendant GE for the following relief:

a.      A declaration that GE is jointly and severally liable under CERCLA for any Response Costs that BRG has incurred or may incur in the future in relation to the Site, as well as any judgments, damages, costs, legal fees or any other expenses arising from or relating to the mercury contamination at the Site;

b.      Compensatory damages for all Response Costs incurred and to be incurred at the Site;

c.      For attorneys' fees and costs; and

d.      For such other relief as the Court deems just and equitable.

## COUNT TWO

### (Breach of Contract:  Against GE)

145.      BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

146.      Pursuant to Section 4(a) of the Indemnity and Settlement Agreement, GE undertook to "perform the Environmental Response Activities in a good and workmanlike manner and in accordance with customary industry standards, the direction of the LSRP and then prevailing laws, including Environmental Laws."

147.      Section 1(c) of the Indemnity and Settlement Agreement defines "Environmental Response Activities" as "all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the [Site] . . . all as required to obtain an RAO . . . from an LSRP, and to comply with any and all requirements after issuance of such RAO."

148.      Pursuant to Section 4(b) of the Indemnity and Settlement Agreement, GE must "repair or replace any and all damage resulting from its Environmental Response Activities and

shall leave the Property in substantially the same condition as it was prior to the commencement of work."

149. Pursuant to Section 4(c) of the Indemnity and Settlement Agreement, GE is obliged to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."

150. GE has stopped performing Environmental Response Activities at the Site in connection with conditions arising out of GE's prior use and discharge of TCE at the Site that are required to obtain a Site-wide RAO, in breach of the Indemnity and Settlement Agreement.

151. GE has refused to perform Environmental Response Activities in connection with conditions arising out of GE's prior use and discharge of mercury at the Site, including the mercury contamination, in breach of the Indemnity and Settlement Agreement.

152. GE has refused to provide to BRG copies of final data that has not been included in any final report, in breach of the Indemnity and Settlement Agreement.

153. As a direct and proximate result of the breaches of the Indemnity and Settlement Agreement by GE, BRG has suffered damages.

**WHEREFORE**, BRG demands judgment against Defendant GE for the following relief:

a. Compensatory and consequential damages, including but not limited to carrying costs and all past and future investigatory, cleanup and removal costs, including natural resource damages, and compensation for the diminution in value of the Site and attorneys' fees associated therewith to which BRG is entitled at law;

b. To the extent that the Environmental Response Activities include demolition of any or all of the Buildings on the Site (or portions thereof), a declaration that GE is

23

obligated to restore the Site, including erecting buildings substantially similar to the existing Buildings A, B and/or C;

c. A declaration that GE is liable, jointly and severally, for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances and/or environmentally unsound conditions at or on the Site;

d. Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e. Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT THREE

### (Breach of Contract - Specific Performance: Against GE)

154.	BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

155.	Pursuant to Section 4(a) of the Indemnity and Settlement Agreement, GE undertook to "perform the Environmental Response Activities in a good and workmanlike manner and in accordance with customary industry standards, the direction of the LSRP and then prevailing laws, including Environmental Laws."

156.	Section 1(c) of the Indemnity and Settlement Agreement defines "Environmental Response Activities" as "all environmental activities of any kind carried out, in the past or the future, at or near the Site in connection with conditions arising out of GE's or RCA's prior activities at the [Site] . . . all as required to obtain an RAO . . . from an LSRP, and to comply with any and all requirements after issuance of such RAO."

157.	Pursuant to Section 4(b) of the Indemnity and Settlement Agreement, GE must "repair or replace any and all damage resulting from its Environmental Response Activities and

shall leave the Property in substantially the same condition as it was prior to the commencement of work."

158.    Pursuant to Section 4(c) of the Indemnity and Settlement Agreement, GE is obliged to provide "from time to time, at BRG's reasonable request, copies of final data that has not been included in any final report."

159.    BRG has duly performed all terms and conditions of the Indemnity and Settlement Agreement.

160.    GE has stopped performing Environmental Response Activities at the Site in connection with conditions arising out of GE's prior use and discharge of TCE at the Site that are required to obtain a Site-wide RAO, in breach of the Indemnity and Settlement Agreement.

161.    GE has refused to perform Environmental Response Activities in connection with conditions arising out of GE's prior use and discharge of mercury at the Site, including the mercury contamination, in breach of the Indemnity and Settlement Agreement.

162.    GE has refused to provide to BRG copies of final data that has not been included in any final report, in breach of the Indemnity and Settlement Agreement.

163.    BRG has no adequate remedy at law for obtaining the data or obtaining a Site-wide RAO from GE's LSRP.

**WHEREFORE**, BRG demands judgment against Defendant GE for the following relief:

a.    Specific performance of the above-mentioned agreement by conveying to BRG all requested data, investigating and remediating the Site, and obtaining a Site-wide RAO;

b.    To the extent that the Environmental Response Activities include demolition of any or all of the Buildings on the Site (or portions thereof), a declaration that GE is

obligated to restore the Site, including erecting buildings substantially similar to the existing Buildings A, B and/or C;

c.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

d.  Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT FOUR

### (Contribution Under the New Jersey Spill Compensation and Control Act: Against GE)

164.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

165.    Pursuant to the Spill Act, any person who cleans up and removes a discharge of Hazardous Substances has the right of contribution against all other dischargers and persons who are in any way responsible for a discharge of Hazardous Substances.

166.    Under N.J.S.A. 58:10-23.11f(a)(2), persons may recover certain cleanup and removal costs. The statute provides in pertinent part:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A, 58:10-23.1 lg]....

167.    The mercury discharged at the Site by GE meets the definition of Hazardous Substances under the Spill Act, N.J.S.A. 58:10-23.11b.

168.    GE is a person within the meaning of N.J.S.A. 58:10-23.11b.

169.    GE is a discharger and person in any way responsible for Hazardous Substances discharged at the Site, and is strictly liable, jointly and severally, without regard to fault, for all

cleanup and removal costs incurred by BRG, including, but not limited to, the costs of investigation, cleanup and removal of hazardous substances, consulting fees, legal fees and other costs incurred pursuant to the Spill Act, N.J.S.A. 58:10-23.11a-23.11z.

170.    In connection with the discharges of Hazardous Substances, BRG has acted to investigate and delineate contamination at the Site.  As a result, BRG has incurred costs and expenses associated therewith and may in the future incur costs and expenses associated therewith.

171.    By reason of the foregoing, Defendant GE is strictly liable, jointly and severally, without regard to fault, for investigatory, cleanup and removal costs incurred, or to be incurred by BRG.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.    All past and future investigatory, cleanup and removal costs, including attorneys' fees associated therewith, to be allocated by the Court using such equitable factors as the Court determines appropriate;

b.    A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c.    Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d.    Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e.    Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT FIVE

### (Nuisance: Against GE)

172. BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

173. GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' acts and omissions caused or contributed to the discharge of Hazardous Substances at the Site or portions thereof including the Buildings, which constituted an interference with the use and enjoyment of the Site by BRG.

174. BRG, as the current owner, has a possessory interest in the Site.

175. GE's acts and omissions at the Site substantially interfered with BRG's use and enjoyment of the Site.

176. GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' acts and omissions were reckless, negligent, intentional, abnormally dangerous, or done with malice and with a wanton and willful disregard for any harm to the Site or BRG.

177. As a direct, proximate and foreseeable consequence of the private nuisance GE, its predecessor the Edison Lamp Company, and the RCA Entities created, BRG has sustained damages.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a. All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

b. A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c. Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d. Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e. Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT SIX

### (Negligence:  Against GE)

178.     BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

179.     GE, its predecessor the Edison Lamp Company, and the RCA Entities owed BRG and the public a duty of care to conduct their business in a sound manner avoiding the creation of property damage or environmental harm.

180.     GE, its predecessor the Edison Lamp Company, and the RCA Entities breached this duty of care by negligently causing, permitting or allowing the improper and illegal discharge of Hazardous Substances at, on, from or under the Site or portions thereof including the buildings.

181.     As a result of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' negligent acts and omissions, the Site and the public have been and may continue to be damaged.

182.     BRG has incurred, and may continue to incur, costs to investigate and remedy the environmental contamination at the Site, including the mercury contamination.

183.     GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' negligence is the direct cause of the environmental contamination at the Site and the direct cause of BRG's damages.

184.     Because of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' negligence and the resultant discharge of Hazardous Substances, including mercury, BRG has suffered damages including a diminution in the value of the Site.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.  All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

b.  A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c.  Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e.  Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT SEVEN

### (Strict Liability: Against GE)

185.     BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

186.     GE, its predecessor the Edison Lamp Company, and the RCA Entities owed BRG and the public a duty of care to conduct its business in a sound manner avoiding the creation of property damage or environmental harm.

187.     GE, its predecessor the Edison Lamp Company, and the RCA Entities brought onto or permitted the presence and use of Hazardous Substances at, on, from or under the Site or portions thereof that are not naturally occurring on the Site.

188.     GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' use or discharge of such Hazardous Substances at the Site or portions thereof, under all of the relevant circumstances, constituted an abnormally dangerous activity.

189.     As a result of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' abnormally dangerous activity, i.e., the use of Hazardous Substances, the Site became contaminated, including the mercury contamination.

190.     Because of the contamination caused by GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' abnormally dangerous activities, BRG has incurred, and may continue to incur, substantial costs to investigate and remedy the environmental contamination, including the mercury contamination, at, on, from or under the Site.

191.     Because of GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' abnormally dangerous activity, and the resultant discharge of Hazardous Substances, BRG has suffered damages including a diminution in the value of the Site.

192.     By reason of the foregoing, GE is strictly liable, jointly and severally, to BRG for its damages and injuries.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.  All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

31

b. A declaration that GE is solely liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site;

c. Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for claims arising from Hazardous Substances for which GE is legally responsible;

d. Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

e. Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT EIGHT

### (Legal and/or Equitable Restitution: Against GE)

193. BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

194. In the event BRG does not recover in whole or part on Counts One through Seven, BRG pleads in the alternative cause(s) of action for legal and/or equitable restitution.

195. GE is and was aware that BRG has incurred and will incur costs and expenses in response to mercury contamination on the Site released and disposed of by GE and its predecessors.

196. GE owes a continuing duty to remedy the harm caused by the mercury contamination on the Site caused by GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' actions and inactions.

197. The costs and expenses incurred and to be incurred by BRG in response to the mercury contamination on the Site should be borne by GE.

198.    GE has received a benefit as a result of BRG's actions to investigate the mercury contamination on the Site insofar as GE should have borne the costs and expenses of such investigation.

199.    GE has accepted the benefit of BRG's actions to investigate the mercury contamination on the Site.

200.    GE has failed, and continues to fail to remedy the harm caused by GE's, its predecessor the Edison Lamp Company's, and the RCA Entities' actions and inactions.

201.    Because BRG has suffered harm and incurred past costs and will incur future costs and expenses that should be borne by GE, GE has been unjustly enriched at BRG's expense.

202.    An injustice would result if GE did not reimburse and make whole BRG for costs and expenses incurred and to be incurred in response to the mercury contamination on the Site.

203.    By reason of the foregoing, GE is liable to BRG in restitution by law, statute, equity, or otherwise for damages in an amount to be determined at trial, including but not limited to the Response Costs.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a.    A declaration that GE is liable to BRG for legal and/or equitable restitution and ordering GE to pay BRG recompense and damages;

b.    Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

c.    Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT NINE

### (Negligence/Malpractice: Against EWMA and AET)

204.    BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

205.    EWMA and AET, as environmental engineers/consultants, were required to exercise due care in the performance of their duties at the Site, including with respect to all aspects of the detection and surveying of mercury.

206.    AET failed to exercise due care in sampling and detecting and surveying the mercury, including, but not limited to, failing to use the proper equipment.

207.    EWMA was negligent in failing to question AET's mercury survey results in light of the historical operations at the Site and the planned residential use of the Site, coupled with the manner in which those survey results were presented, and, in turn, to either take measures to ensure that AET conducted proper mercury surveying at the Site or retain another qualified professional to do so.

208.    BRG has been damaged as a result of EWMA's and AET's negligence.

**WHEREFORE**, BRG demands judgment against EWMA and AET for the following relief:

a.  A declaration that EWMA and AET are liable to BRG for negligence/malpractice and ordering EWMA and AET to pay BRG recompense and damages;

b.  Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

c.  Such other and further relief as this Court deems just, equitable, and appropriate.

Case 2:16-cv-06557-SRC-CLW Document 192 Filed 09/02/20 Page 49 of 114 PageID: 2095

## COUNT TEN

### (Breach of Contract: Against EWMA)

209.     BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

210.     EWMA and BRG were parties to the Environmental Services Agreement, under which EWMA agreed to perform certain services in accordance with proposals to be issued in accordance therewith and to do so in a good and workmanlike manner, and in accordance with professional and industry standards prevailing at the time the Work (as defined therein) was performed and in accordance with Law.

211.     The Environmental Services Agreement further provided that EWMA "shall indemnify, defend and hold [BRG], its subsidiaries, affiliates, officers, directors, agents and employees and such other parties in interest specified by [BRG], harmless, from and against any and all claims, liabilities, losses, damages, penalties and costs, arising from the negligent or willful acts of [EWMA]."

212.     In the Environmental Services Agreement, EWMA acknowledged that "the services to be performed pursuant to this Agreement are unique and personal in nature, and [EWMA] shall not assign its rights or obligations under this Agreement."

213.     EWMA breached the Environmental Services Agreement by failing to perform in a workmanlike manner the services BRG compensated EWMA to perform.  EWMA's breach included failing to question AET's mercury sampling results in light of the historical operations at the Site and planned residential use, coupled with the manner in which those results were presented, and, in turn, to either take measures to ensure that AET conducted proper mercury sampling at the Site or retain another qualified professional to do so.

214. BRG has been damaged as a result of EWMA's breach of the Environmental Services Agreement, and EWMA is obligated to indemnify BRG in addition to being liable for any and all damages resulting from EWMA's breach of the Environmental Services Agreement.

**WHEREFORE**, BRG demands judgment against EWMA for the following relief:

a. Specific performance of the Environmental Services Agreement;

b. All past and future investigatory, cleanup and removal costs, including natural resource damages, and compensatory, consequential, and punitive damages;

c. A declaration that EWMA is liable for all investigatory, cleanup and removal costs and expenses that BRG has incurred, or may incur in the future, including natural resource damages, due to GE's discharge of Hazardous Substances at the Site and EWMA's breach of the Environmental Services Agreement;

d. Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for Hazardous Substances for which EWMA is legally responsible;

e. Interest, costs and expenses (including attorneys' fees) relating to this litigation; and

f. Such other and further relief as this Court deems just, equitable, and appropriate.

## COUNT ELEVEN

### (RCRA Injunctive Relief: Against GE)

215. BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

216. BRG and GE are "persons" as defined by RCRA. 42 U.S.C. § 6903(15).

217. Mercury is both a "hazardous waste" and a "solid waste" within the meaning of RCRA. 42, U.S.C. §§ 6903(5), (27).

36

218.    GE has disposed of mercury at the Site, within the meaning of RCRA's definition of "disposal." 42 U.S.C. § 6903(3).

219.    GE has handled and stored mercury at the Site, within the meaning of "handling" and "storage" contained in RCRA. 42 U.S.C. §§ 6903(33), 6972(a)(1)(B).

220.    GE's failure to investigate and remediate the mercury contamination at the Site, including in building materials, has caused the mercury to enter the environment.

221.    GE's disposal, handling and storage of mercury at the Site may present an imminent and substantial endangerment to health or the environment.

222.    GE's work at the site, including saw-cutting and partial floor removal activities in Buildings A, B, and C, has presented and is presenting an imminent and substantial endangerment to health or the environment.

223.    Absent remediation of the mercury contamination present at the Site, including in the building materials, the environment or public health may continue to be endangered.

224.    This Court has jurisdiction pursuant to 42 U.S.C. § 6972(a) to order GE to take any action necessary to restrain or abate the endangerment to public health and the environment posed by GE's disposal, handling and storage of mercury at the Site.

225.    Despite timely notice to GE, EPA, and NJDEP, neither EPA, NJDEP, nor GE have commenced or otherwise agreed to be responsible for any permanent remedial action to address mercury contamination at the Site.

226.    BRG has complied with the citizen suit notice provisions of RCRA.

**WHEREFORE**, BRG demands judgment against GE for the following relief:

a. Injunctive relief ordering GE to investigate, remediate and fully abate the mercury contamination at the Site, including in building materials, in order to eliminate the endangerment to the public's health and the environment;

b. Reasonable attorneys' fees, expert witness fees, and costs incurred in bringing this action, as authorized by 42 U.S.C § 6972(e); and

c. Such other and further relief as the Court deems just and proper.

## COUNT TWELVE

### (New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1, et seq.: Against GE)

227. BRG repeats and realleges the allegations contained in the previous paragraphs as if set forth at length herein.

228. BRG and GE are each a "person" within the meaning of the New Jersey Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A-3(a).

229. GE's discharges of mercury at the Site, and GE's failure to remediate that contamination, violates state statutes, regulations and/or ordinances designed to prevent or minimize pollution and the impairment or destruction of property and the environment, including, but not limited to the Spill Act and the SRRA.

230. The Spill Act prohibits the discharge of hazardous substances, including mercury, into the environment and imposes joint and several liability for all cleanup and removal costs on any person who has discharged a hazardous substance or is in any way responsible for the hazardous substance. N.J.S.A. 58:10-23.11g(c)(1).

231.    The SRRA imposes an affirmative obligation to remediate a discharge of hazardous substances, including mercury, on any person liable for the discharge pursuant to the Spill Act. N.J.S.A. 58:10B-1.3a.

232.    Pursuant to the Spill Act and the SRRA, GE is responsible for the remediation of the mercury it discharged at the Site and all costs and expenses related in any way thereto, whether incurred in the past or still to be incurred, and pursuant to N.J.S.A. 58:10B-1.3, GE is obligated to remediate the mercury contamination discharges.

233.    Pursuant to the New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1-14, BRG has the right to maintain this action seeking relief against GE for the protection of the environment from pollution and/or contamination.

234.    Proper written notice was provided to the Attorney General, the New Jersey Department of Environmental Protection, the governing body of the Township of Harrison and GE by letter dated October 7, 2016, which was delivered by Certified Mail, Return Receipt Requested.

WHEREFORE, BRG demands judgment against GE for the following relief:

a.  Injunctive relief ordering GE to investigate, remediate and fully abate the mercury contamination at the Site, including in building materials; and

b.  Indemnification holding BRG harmless against any and all suits or claims by the NJDEP and other state and federal agencies and any other person or entity for Hazardous Substances for which EWMA is legally responsible;

c.  Interest, costs and expenses, including reasonable counsel and expert witness fees pursuant to N.J.S.A. 2A:35A-10; and

d.  Such other and further relief as this Court deems just, equitable, and appropriate.

Dated: West Orange, New Jersey
       November 17, 2016

                             Respectfully submitted,


                             CHIESA SHAHINIAN & GIANTOMASI PC
                             Attorneys for BRG Harrison Lofts Urban Renewal LLC


By: s/Dennis M. Toft_____
      DENNIS M. TOFT
      dtoft@csglaw.com
      One Boland Drive
      West Orange, NJ 07052

      SIVE, PAGET & RIESEL, P.C.
      Attorneys for BRG Harrison Lofts Urban Renewal LLC
      MARK A. CHERTOK, ESQ.
      mchertok@sprlaw.com
      MARGARET C. MACDONALD, ESQ.
      mmacdonald@sprlaw.com
      460 Park Avenue
      New York, New York 10022
      (212) 421-2150
      (212) 421-1891 (fax)
      *Pro hac vice admission pending*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I, Dennis M. Toft, admitted to the bars of the State of New Jersey and this Court, and a member of the law firm of Chiesa Shahinian & Giantomasi PC, attorneys for Plaintiff BRG Harrison Lofts Urban Renewal LLC with respect to the above-referenced matter, hereby certify, upon information and belief, that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: November 17, 2016

<div style="margin-left:40%">

CHIESA SHAHINIAN & GIANTOMASI PC
Attorneys for Plaintiff BRG Harrison Lofts Urban
Renewal LLC


By: s/Dennis M. Toft_____
    DENNIS M. TOFT

</div>

## CERTIFICATION PURSUANT TO L. CIV. R. 201.1

1. I am an attorney-at-law of the State of New Jersey, and a Member of the law firm of Chiesa Shahinian & Giantomasi PC, in the above-captioned matter.  I submit this certification pursuant to L. Civ. R. 201.1.

2. Based upon my review of the file in this matter, it appears that the damages recoverable exceed the sum of $150,000.00, exclusive of interest and costs.

3. Accordingly, it is respectfully submitted that this matter is not subject to compulsory arbitration, pursuant to L. Civ. R. 201.1.

I hereby certify that the foregoing is true and correct.

Dated:  November 17, 2016

        CHIESA SHAHINIAN & GIANTOMASI PC
        Attorneys for Plaintiff BRG Harrison Lofts Urban
        Renewal LLC


        By: s/Dennis M. Toft_____
         DENNIS M. TOFT

EXHIBIT A



Chiesa
Shahinian &
Giantomasi PC

August 2, 2016

**VIA REGISTERED MAIL**

Jeffrey R. Immelt, Chairman of the Board
  And Chief Executive Officer
General Electric Company
3135 Easton Turnpike
Fairfield, CT 06828

See attached List of Recipients

    Re:    **Notice of Intent to Sue General Electric Company for Imminent and
             Substantial Endangerment pursuant to the Resource Conservation and
             Recovery Act from the former General Electric/RCA Plant at 400 South 5th
             Street in Harrison, NJ**

Dear Sirs and Madams:

    Sive, Paget & Riesel P.C. and Chiesa Shahinian & Giantomasi PC jointly represent BRG
Harrison Lofts Urban Renewal, LLC ("BRG") in connection with the above-referenced matter.
This letter constitutes the notice of intent of BRG Harrison Lofts Urban Renewal LLC ("BRG")
to sue General Electric Company ("GE") as the past owner and operator of, and generator of solid
or hazardous waste,[1] at a facility known as the former Edison Lamp Works Site, comprised
principally of three buildings (Building A, B, and C, collectively "Buildings") located at 400 South
5th Street in Harrison, Hudson County, New Jersey (the "Site" depicted in Exhibit A attached
hereto).[2]

    BRG is the current owner of the Site, and has plans to develop the Site into lofts for
residential use.   The contact information for BRG is Christopher Albanese/Thomas A.
Berkenkamp, BRG Harrison Lofts Urban Renewal LLC, c/o Albanese Organization, 1050
Franklin Avenue, Garden City, NY 11530, (516)-746-6000. The Site is contaminated, _inter alia_,
with mercury, a solid or hazardous waste, which may present an imminent and substantial
endangerment to health or the environment.

    This notice letter is being submitted by BRG in accordance with 42 U.S.C. § 6972(b) of
RCRA, and 40 C.F.R. § 254.1 _et seq._, which specify that notice shall be given to, among others,
any person alleged to have contributed to or be contributing to the past or present handling, storage,

---

[1] As defined in the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 _et seq._ ("RCRA").
[2] In addition to the Buildings, the Site includes the parking lot located at the southwest corner of Bergen Street and
South 5th Street.  The Site is comprised of lots designated as Block 131, Lot 17 and Block 156 Lot 1 in the Town of
Harrison.

August 2, 2016
Page 2

treatment, transportation, or disposal of any solid or hazardous waste that may present an imminent and substantial endangerment to health or the environment.

As is set forth below, GE's activities at the Site have contributed to the handling, storage and disposal of mercury at the Site that may present an imminent and substantial endangerment to human health or the environment; GE is therefore liable under RCRA for the investigation and remediation of such contamination at the Site. The information in the letter is derived primarily from certain investigatory work and monitoring conducted by or on behalf of GE, together with information gathered by BRG.

Site characterization activities conducted to date, although limited in scope, demonstrate that the Buildings are an ongoing source of mercury to the environment. Limited samples have been analyzed for concentrations of mercury at the Site in indoor air, soil, groundwater, and certain building materials. Mercury vapor concentrations exceed the federal benchmarks, i.e., the Environmental Protection Agency's ("EPA's") reference concentration ($0.3 \ \mu g/m^3$) and the Agency for Toxic Substances and Disease Registry's ("ATSDR's") chronic minimum risk level ($0.2 \ \mu g/m^3$), on every floor of each of the three Buildings. (See Exhibits B and C hereto, which are measurements of mercury vapor in the Buildings A, B and C taken by Langan Engineering & Environmental Services, Inc. ("Langan") and the SRG Site Remediation Group LLC in October 2015 and January 2016, respectively.)[3] The highest observed mercury vapor concentrations in indoor air at the Site exceeded the measurement range of the instrument used to screen the buildings for mercury vapor ($>50 \ \mu g/m^3$), which demonstrates that such concentration was at least 250 times over ATSDR's chronic minimum risk level. Visible globules of elemental mercury have been observed underneath the first floor slab of Building B and may be present under or within the other Buildings. Furthermore, based on the elevated levels of mercury vapors measured within the Buildings, sources of elemental mercury may be present elsewhere, including the second and third floors of the Buildings. Samples of concrete collected from former equipment sump and pit slabs found elevated concentrations of mercury (up to 650 mg/kg) (see Exhibit D, AOC-L Building B Soil Sample Results, Sumps and Pits, conducted by AMEC Environmental & Infrastructure, Inc. ("AMEC") in June 2014 at Sample SB-PIT-B-SLAB at 1.0-1.5 [L1414459-18]);[4] mercury concentrations in soils underlying these areas (up to 26 mg/kg) exceed New Jersey's Impact to Groundwater Soil Screening Level (0.1 mg/kg). (See Exhibit D and Exhibit E, AOC-L Building B Pits, Soil Sample Results, conducted by AMEC in June 2014.)

The limited sampling conducted to date demonstrates that the Buildings are an ongoing source of mercury to the environment and may pose an imminent and substantial endangerment to human health or the environment. The sampling also demonstrates the need to undertake a comprehensive study to fully characterize conditions within the Buildings, to define the full extent of the contribution of mercury contamination from the Buildings to the environment, and to evaluate and implement appropriate remedial measures.

GE has refused BRG's requests for GE to conduct investigations at the Site to determine the full extent of mercury contamination and to develop and implement a remedial program for

---

[3] Langan was retained by BRG, and SRG was a sub-contractor of EWMA, who was also retained by BRG.
[4] AMEC was retained by GE. Although it conducted the subject sampling in June 2014, Exhibit D is dated January 13, 2015.

August 2, 2016
Page 3

the Site to address such contamination (including a remedial program that would allow residential use of the Buildings).

Site History

In 1882, the Edison Lamp Company acquired 420 South 5th Street (called "Building C" herein), moved onto the Site and utilized the property to design, test and manufacture incandescent light bulbs. In 1889 the Edison Lamp Company was consolidated into the Edison General Electric Company, and in 1892 the Edison General Electric Company and the Thompson-Houston Electric Company were consolidated to create GE. GE constructed the building located at 530 Bergen Street ("Building B") in 1907 and the building located at 400 South Fifth Street ("Building A") in 1913/14. GE owned/operated the Site until approximately 1929 and produced various types of lightbulbs there. GE used mercury pumps in the manufacture of lightbulbs at the Site. In 1930, Radio Corporation of America ("RCA") purchased the Site and manufactured radio vacuum tubes there. RCA owned and operated the Site until approximately 1976; in addition to radio vacuum tubes, RCA also manufactured glass and metal radio receiving and power tubes, phototubes, gas triodes and tetrodes, cathode-ray and television tubes, voltage regulation tubes, acorn tubes, and special amplifier tubes at the Site. RCA's radio vacuum tube manufacturing processes would typically have continued to use mercury during this time.[5]

GE acquired RCA in or about 1986 and thus has succeeded to RCA's liabilities; therefore, GE is liable for the handling, storage, treatment and disposal of solid or hazardous waste at the Site that occurred as a result of Site operations from the late 1800s through 1976.

RCRA Liability

Pursuant to the RCRA citizen suit provision, 42 U.S.C. § 6972, BRG hereby puts GE on notice that BRG intends to sue GE as the prior owner, operator and generator of solid or hazardous waste at the Site for "contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment ...." 42 U.S.C. § 6972(a)(1)(B).

GE and RCA handled, stored and disposed of mercury, which is a solid waste or a hazardous waste. The term "solid waste" means:

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities...

42 U.S.C. § 6903(27). Mercury is also a hazardous waste due to its toxicity (D009), and discarded elemental mercury product, off-specification metallic mercury product, and container or spill residues thereof are listed hazardous wastes (U151).

---

[5] Historical documents provided to BRG ("GE Historical Documents") list mercury as one of the materials used in RCA radio tubes.

August 2, 2016
Page 4

GE and RCA disposed of mercury at the Site, including in the Buildings during their manufacturing operations. "Disposal" is defined as:

a discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

40 C.F.R. § 260.10. In addition to dumping and spilling waste into the environment, RCRA disposal includes (but is not limited to) releasing a solid or hazardous waste in such a way that such waste might enter the environment if left unremediated (e.g., disposal inside a building where there is a pathway for the waste to escape the building).

GE and RCA also stored and handled mercury at the Site. The term "storage," when used in connection with hazardous waste, means "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." 42 U.S.C. § 6903(33).[6] Courts have relied on the common dictionary definition of "handle" to determine whether a defendant will be liable under RCRA for "handling" hazardous wastes. "[I]n ordinary usage, to 'handle' something is 'to deal with or have responsibility' for it."[7] GE and RCA, during the course of their respective operations at the Site, stored and handled mercury that now may present an imminent and substantial endangerment to health or the environment.

The existence of mercury in the Buildings on the Site and in the soils at the Site may present an imminent and substantial endangerment to health or the environment. In particular, mercury may enter the environment directly from building materials, through flaking off of building exterior materials into soils and further dispersion into the environment, migration into and through the building slabs, tracking of mercury-contaminated dust from inside the building to the environment, or through volatilization in the air. For example, GE and the prior owner of the Site operated ventilation fans in Buildings A and B from the fall of 2013 through the fall of 2015. Mercury would have entered the environment during the course of ventilation. The ventilation system principally faced two public streets (Bergen Street and South Sixth Street) – both of which are developed with residential properties. The fans are no longer in operation, but as a result of their operation mercury contamination is expected to be on the exterior and/or in the vicinity of Buildings A and B, which may be washed or blown off from the building exteriors into the environment.

GE knew or should have known about the presence of mercury at the Site based on its knowledge of the Site history and experience in remediating other similar facilities across the country. In fact, AMEC (a consulting firm retained by GE) collected samples from the slab in Building B in June 2014 that showed elevated levels of mercury in at least 10 locations. (See Exhibit D.) Similarly, soil samples taken by AMEC in June 2014 showed mercury below the slab in Building B. (See Exhibit E.) Despite this data in GE's possession, GE saw cut the slabs in all

---

[6] Presumably, the same or similar definition would apply to the storage of solid waste.
[7] Lincoln Properties, Ltd. v. Higgins, No. CIV. S-91-760DFL/GGH, 1993 WL 217429, at *15 (E.D. Cal. Jan. 21, 1993) (citing American Heritage Dictionary 592 (2nd College ed.1985).

August 2, 2016
Page 5

three Buildings in December 2015 and January 2016, and partially removed layers of wooden flooring in Building B and concrete slabs in Building A in the late 2015 to early 2016 timeframe, without taking adequate precautions to prevent mercury from being released to the environment and from permeating into building materials through volatilization, deposition or dispersal of mercury-contaminated dust during saw cutting activities.   GE's actions exacerbated the contamination at the Site, creating another pathway for mercury to enter the environment.

GE and its consultants have had continuous access to the Site to perform GE's obligations under New Jersey law. Most recently, GE's consultants have controlled access to the Site buildings.  GE's failure to take due care and/or implement appropriate precautions in performing these activities at the Site may have caused a release of mercury to the environment, including but not limited to work conducted in late June-early July 2016 in Building B.  For example, GE generated considerable dust from vacuuming operations, which triggered an exceedance of applicable action levels of mercury vapors and a suspension of work; the vacuuming operations were conducted with windows and possibly a large garage door open.

The mercury in the Buildings could also be released to the environment in the event of a fire at the Site, which may pose an imminent and substantial endangerment to human health or the environment.  The high mercury vapor concentrations recorded in indoor air within the Buildings is an indication that elemental mercury is present in one or more of the Buildings.  A fire at the Site, particularly in Building C – a building with a wooden frame and floors – would release mercury via: a) volatilization of elemental mercury due to the heat of fire; b) airborne transport of mercury-contaminated particulates; and c) release of mercury-contaminated runoff water used for firefighting operations.  The only fire suppression system in Building C is a "dry standpipe system," which requires firefighters to hook up water from street level inside the building.  In a similar case at a site where GE had previously manufactured mercury vapor lightbulbs in Hoboken, NJ, EPA recognized a significant threat from the impacts of the mercury vapors released from a potential fire at buildings contaminated with mercury.  In making this determination, EPA cited potential for impacts from acute exposure to high concentrations of mercury vapor, which include severe pulmonary toxicity, and can lead to death.  Modeling conducted by EPA to predict ambient air concentrations in the event of a fire at the building at the Hoboken Site (that was comparable in size to Building C), confirms that a fire in Building C at the Site would cause mercury ambient air concentrations to exceed ATSDR's "Immediately Dangerous to Life or Health" ("IDLH") benchmark.[8]

At the close of the 90-day notice period initiated by this letter and (any agreed forbearance period), BRG intends to file a citizen suit against GE pursuant to 42 U.S.C. § 6972(a)(1)(B).  BRG

---

[8] In the air dispersion modeling at the Hoboken Site, EPA only considered the mass of mercury present in a small portion of the building (1,000 lbs), and predicted downwind mercury concentrations as high as 198 mg/m³ compared to an IDLH of 10 mg/m³.  (See EPA Action Memorandum, an excerpt of which is attached hereto as Exhibit F.) Since mercury vapor concentrations in Building C (as reflected in Exhibits B and C) are on the same order of magnitude as those measured concentrations in the Hoboken building, the mass of mercury in Building C may be comparable to that in the Hoboken Site. (Hoboken vapor concentrations used to initially assess risk to health and the environment are contained in Attachment 3 of the EPA Memorandum for Grand Street Mercury site dated November 8, 1996: mercury vapor survey reports prepared by Roy F. Weston Inc. January 2, and February 13, 1996).  However, even if the mercury mass at Building C were an order of magnitude less than what was assumed by EPA in the air dispersion modeling at Hoboken (i.e., 100 lbs), the resulting mercury concentration in ambient air would still exceed ATSDR's IDLH, and endanger public health.

August 2, 2016
Page 6

intends to seek injunctive and other appropriate relief mandating GE to abate any continuing imminent and substantial endangerment that arises from the mercury contamination at the Site. This Notice of Intent to Sue covers all RCRA violations by GE preceding the date of this letter and covers all future violations.

<u>Conclusion</u>

These claims are not exclusive. On the contrary, this letter is made without waiver of or any prejudice to the right(s) of BRG to advance any legal, equitable and/or factual argument, including any federal claim for relief and/or state law cause of action, based upon information or facts that are now known and/or may become known in the future arising from the same controversy described herein.

During the 90-day RCRA notice period, and during any extended period agreed to by the parties, we will be willing to discuss effective remedies for the mercury contamination described in this letter. At the close of the 90-day notice period, unless significant progress is made in remedying these violations, BRG intends (as noted above) to file a citizen suit against GE under 42 U.S.C. § 6972(a)(1)(B).

This is also to inform you that BRG intends to seek a Directive from the New Jersey Department of Environmental Protection pursuant to the New Jersey Spill Compensation and Control Act unless GE agrees within 30 days to remediate the mercury contamination.

If you wish to discuss these matters further, please do not hesitate to call the undersigned.

Very truly yours,

Sive, Paget & Riesel, P.C.

By: _____
     Mark A. Chertok
     460 Park Avenue, 10th Floor
     New York, New York 10520
     Tel. No.: (212) 421-2150
     mchertok@sprlaw.com
            -And-
Chiesa Shahinian & Giantomasi PC

By: _____
     Dennis M. Toft
     One Boland Drive
     West Orange, NJ 07052
     Tel. No.: (973) 530-2014
     dtoft@csglaw.com

August 2, 2016
Page 7


**Recipient List**

Gina McCarthy
Administrator
United States Environmental Protection Agency
401 Main Street, A-100
Washington, D.C. 20460

Judith Enck
US EPA Regional Administrator
Region 2
290 Broadway
New York, NY 10007-1866

Bob Martin
Commissioner
New Jersey Department of Environmental Protection
401 E. State St., 7th Floor, East Wing
P.O. Box 402
Trenton, NJ 08625-0402

Roger Florio, Esq.
Counsel, Environmental Matters
GE Corporate Environmental Programs
640 Freedom Business Center
King of Prussia, PA 19406

The Corporation Trust Company
820 Bear Tavern Road
West Trenton, NJ 08628

The Corporation Trust Company
P.O. Box 2216
Schenectady, NY 12301-2216

# Exhibit A



RCRA Notice Letter
Exhibit A

# Exhibit B



Case 2:16-cv-06577-SRC-CLW Document 124 Filed 09/02/20 Page 69 of 114 PageID: 2085









BUILDING B
THIRD FLOOR PLAN





BUILDING C
THIRD FLOOR PLAN

# Exhibit C









BUILDING B – FIRST FLOOR

ALBANESE ORGANIZATION
400 SOUTH 5th STREET
HARRISON, NEW JERSEY

SITE REMEDIATION GROUP LLC

FIGURE 4



**BREATHING LEVEL READINGS**

| STAIRS | 1080 | 1999 | 1791 | 1704 | OVERPASS 1316 |
|--------|------|------|------|------|------|

| 1256 | 1351 | 1502 | 1425 | 1424 | 1631 | 1661 | 1731 | 1782 | 1834 | 1906 | 1886 |
| 1220 | 1239 | 1309 | 1353 | 1671 | 1352 | 1544 | 1649 | 1706 | 1741 | 2016 | 1916 |
| 1257 | 1264 | 1316 | 1360 | 1681 | 1553 | 1467 | 1697 | 1810 | 1817 | 1953 | 1985 |
| 1251 | 1212 | 1215 | 2261 STAIRS ELEVATOR | 1591 | 1545 | 1431 | 1601 | 1815 | 1886 | 2002 | 2113 |

**FLOOR LEVEL READINGS**

| STAIRS | 901 | 1981 | 1722 | 1609 | OVERPASS 1381 |
|--------|-----|------|------|------|------|

| 1229 | 1429 | 1528 | 1472 | 1331 | 1691 | 1725 | 1728 | 1791 | 1850 | 1858 | 1701 |
| 1250 | 1261 | 1326 | 1361 | 1861 | 1570 | 1628 | 1769 | 1844 | 1815 | 1499 | 1713 |
| 1238 | 1259 | 1301 | 1349 | 1760 | 1421 | 1402 | 1750 | 1866 | 1811 | 1602 | 1771 |
| 1292 | 1191 | 1187 | 2258 STAIRS ELEVATOR | 1697 | 1532 | 1321 | 1663 | 1822 | 1801 | 1877 | 1781 |

BUILDING A
BUILDING C

SOUTH 6th STREET

BERGEN STREET

**LEGEND:**
— SCREENING GRID LINES
▫ SUPPORT COLUMNS
▨ WOODEN FLOORS

**NOTES:**
-ALL READINGS ARE REPORTED IN mg/m3
-GREEN DENOTES READING IS BELOW NJDEP RESIDENTIAL STANDARD
-ORANGE DENOTES READING IS ABOVE NJDEP RESIDENTIAL STANDARD (1000 mg/m3)

N

SITE REMEDIATION GROUP LLC
485 SCHOOLEY'S MOUNTAIN ROAD, HACKETTSTOWN, NJ 07840
PHONE: (908)850-8400   FAX: (908)850-8401

BUILDING B - SECOND FLOOR

ALBANESE ORGANIZATION
400 SOUTH 5th STREET
HARRISON, NEW JERSEY

| 0    25 | DATE | FIGURE |
| SCALE IN FEET | 1/26/2016 | 5 |

SRG
SITE REMEDIATION GROUP







BREATHING LEVEL READINGS

FLOOR LEVEL READINGS

LEGEND:

—————— SCREENING GRID LINES
□ SUPPORT COLUMNS

NOTES:
–ALL READINGS ARE REPORTED IN mg/m3
–GREEN DENOTES READING IS BELOW NJDEP RESIDENTIAL STANDARD
–ORANGE DENOTES READING IS ABOVE NJDEP RESIDENTIAL STANDARD (3000 mg/m3)

ALL FLOORS ON THIS LEVEL WERE WOOD

SITE REMEDIATION GROUP LLC
486 SCHOOLEY'S MOUNTAIN ROAD, HACKETTSTOWN, NJ 07840
PHONE: (908)850–8400  FAX: (908)850–8401

BUILDING C – SECOND FLOOR

ALBANESES ORGANIZATION
400 SOUTH 5th STREET
HARRISON, NEW JERSEY

| 0 | 15 | DATE | FIGURE |
| SCALE IN FEET | | 1/26/2016 | 8 |

SRG
SITE REMEDIATION GROUP



BREATHING LEVEL READINGS

FLOOR LEVEL READINGS

**LEGEND:**

SCREENING GRID LINES
SUPPORT COLUMNS

NOTES:
-ALL READINGS ARE REPORTED IN ng/m3
-GREEN DENOTES READING IS BELOW NJDEP
 RESIDENTIAL STANDARD
-ORANGE DENOTES READING IS ABOVE NJDEP
 RESIDENTIAL STANDARD (3000 ng/m3)

SITE REMEDIATION GROUP LLC
485 SCHOOLEY'S MOUNTAIN ROAD, HACKETTSTOWN, NJ 07840
PHONE: (908)850-8400  FAX: (908)850-8401

**BUILDING C - THIRD FLOOR**

ALBANESE ORGANIZATION
400 SOUTH 5th STREET
HARRISON, NEW JERSEY

| SCALE IN FEET | DATE 1/26/2016 | FIGURE 9 |

SRG
SITE REMEDIATION GROUP

# Exhibit D



Table 19
ACL Building B
Pit and Wood Areas Slab Sample Results
VOC-Toys Site (PI # 020072)
400 South Fifth Street, Harrison, Hudson County, New Jersey

| Parameter | IGW | R-SRS | SB-PIT-A-SLAB 1.0-1.5 30-Jun-14 L1414459-18 | SB-PIT-B-SLAB 0.5-1.0 30-Jun-14 L1414459-20 | SB-PIT-C-SLAB 0.5-1.0 30-Jun-14 L1414459-24 | SB-PIT-D-SLAB 0.5-1.0 30-Jun-14 L1414459-26 | SB-PIT-E-SLAB 0.5-1.0 30-Jun-14 L1414459-28 | SB-PIT-F-SLAB 0.5-1.0 30-Jun-14** L1414459-29 | SB-PIT-G3-SLAB 0.5-1.0 30-Jun-14 L1414459-30 | SB-VB-01-SLAB 0.5-1.0 30-Jun-14 L1414459-32 | SB-WS-02-SLAB 0.5-1.0 30-Jun-14 L1414459-36 | SB-VS-03-SLAB 0.5-1.0 30-Jun-14 L1414459-35 | SB-WS-04-SLAB 0.5-1.0 30-Jun-14 L1414459-13 | SB-VS-05-SLAB 0.5-1.0 30-Jun-14 L1414459-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Metals (mg/kg)** | | | | | | | | | | | | | | |
| Aluminum, Total | 6,000 | 78,000 | 7,300 | 4,800 | 6,300 | 5,000 | 6,400 | 6,300 | 6,200 | 2,200 | 430 | 3,200 | 4,000 | 3,600 |
| Antimony, Total | 6 | 31 | 1.1 J | 1.9 J | 4.0 U | 3.9 U | 4.0 U | 3.9 U | 3.3 U | 4.0 U | 0.76 J | 4.0 U | 4.0 U | 4.0 U |
| Arsenic, Total | 19 | 19 | 7.1 | 5.3 | 6.0 | 5.7 | 5.8 | 6.4 | 2.5 | 3.4 | 2.8 | 5.2 | 2.4 | 4.8 |
| Barium, Total | 2,100 | 16,000 | 600 | 64 | 59 | 59 | 580 | 76 | 38 | 30 | 30 | 240 | 31 | 58 |
| Beryllium, Total | 0.7 | 16 | 0.16 J | 0.29 J | 0.21 J | 0.21 J | 0.26 J | 0.4 | 0.2 J | 0.09 J | 0.38 U | 0.24 J | 0.13 J | 0.21 J |
| Cadmium, Total | 2.y | 78 | 2.5 | 2.6 | 0.64 | 0.64 | 3.8 | 5.9 | 0.79 U | 1.8 | 4.2 | 140 | 13 | 51 |
| Calcium, Total | NC | NC | 68,000 | 50,000 | 200,000 | 55,000 | 64,000 | 60,000 | 55,000 | 19,000 | 1,600 | 24,000 | 97,000 | 28,000 |
| Chromium, Total | NC | NC | 25 | 12 | 10 | 10 | 12 | 29 | 9.5 | 3.9 | 4.3 | 8.4 | 5.5 | 8.1 |
| Cobalt, Total | 1,500 | 1,600 | 100 | 14 | 12 | 12 | 26 | 31 | 1.9 | 3.6 | 5.6 | 2.3 | 2.0 | 2.8 |
| Copper, Total | 11,000 | 3,100 | 290 | 290 | 290 | 290 | 25 | 170 | 5.0 | 5.0 | 49 | 15 | 15 | 35 |
| Iron, Total | NC | NC | 18,000 | 7,600 | 5,700 | 5,700 | 16,000 | 16,000 | 6,000 | 2,000 | 6,700 | 6,300 | 4,500 | 8,300 |
| Lead, Total | 50 | 400 | 400 | 170 | 3.6 J | 3.6 J | 2,000 | 2,000 | 3.3 U | 67 | 44 | 16 | 8.4 | 18 |
| Magnesium, Total | NC | NC | 2,500 | 4,200 | 14,000 | 14,000 | 3,600 | 3,400 | 2,500 | 1,000 | 170 | 1,500 | 31,000 | 1,600 |
| Manganese, Total | 65 | 11,000 | 140 | 140 | 100 | 100 | 180 | 190 | 160 | 46 | 30 | 71 | 129 | 100 |
| Mercury, Total | 0.1 | 23 | 96 | 650 | 4.8 | 4.8 | 18 | 92 | 3.2 | 110 | 380 | 81 | 94 | 220 |
| Nickel, Total | 49 | 1,600 | 380 | 420 | 16 | 16 | 100 | 450 | 12 | 22 | 38 | 63 | 42 | 8.9 |
| Potassium, Total | NC | NC | 1,400 | 1,000 | 1,100 | 1,100 | 1,000 | 1,100 | 1,100 | 570 | 180 J | 700 | 680 | 880 |
| Selenium, Total | 11 | 390 | 1.4 J | 1.3 J | 2.3 | 2.3 | 1,000 | 2.9 | 0.31 J | 0.64 J | 2.4 | 1.3 J | 1.6 U | 1.6 |
| Silver, Total | 390 | 390 | 1.5 | 8.4 | 0.48 J | 0.78 U | 0.28 J | 1.8 | 0.26 J | 0.8 U | 0.76 U | 0.81 U | 0.79 U | 0.8 U |
| Sodium, Total | NC | NC | 940 | 1,400 | 1,700 | 1,200 | 660 | 660 | 860 | 1,000 | 290 | 860 | 1,500 | 330 |
| Thallium, Total | 3 | 78 | 1.6 U | 1.6 U | 1.6 U | 1.6 U | 1.6 U | 1.6 U | 1.6 U | 1.6 U | 1.5 U | 1.6 U | 1.6 U | 1.6 U |
| Vanadium, Total | NC | NC | 3.8 | 7.1 | 9.4 | 9.4 | 10 | 11 | 8.6 | 6.0 | 2.3 | 8.7 | 1.8 U | 5.7 |
| Zinc, Total | 930 | 23,000 | 400 | 240 | 22 | 22 | 64 | 420 | 11 | 78 | 33 | 28 | 15 | 50 |

Notes:
1. All results are in milligrams per kilogram (mg/kg)
2. **Bold** is a Detection
3. NJDEP Soil Remediation Standards
   IGW — Exceedance of Impact to Ground Water (IGW)
   Yellow Highlight — Exceedance of Residential Soil Remediation Standard (R-SRS)
   (Brackets around cell indicates Reporting Limit (RL) exceeds NJDEP criteria)
4. "NC" designates no NJDEP Screening Level criteria for given compound
5. "U" indicates the analyte is not detected at or above the listed reporting limit
6. "J" designates an estimated value
7. "(y)" designates that blind duplicate sample SB-X-05-063014, was collected at SB-PIT-E-SLAB

# Exhibit E



Figure 19
AOC-L Building B Soil Sample Results
Sumps and Pits

VO-Toys Site
400 South Fifth Street,
Harrison, New Jersey
PI# 020373

Table 20
AOC-L (Building B Pits)
Soil Sampling Results
VO-Toys Site (PI # 020373)
400 South Fifth Street, Harrison, Hudson County, New Jersey

| Parameter | IGW | R-SRS | SB-PIT-A | SB-PIT-B | SB-PIT-B | SB-PIT-B | SB-PIT-C | SB-PIT-D | SB-PIT-E | SB-PIT-F | SB-PIT-G3 | SB-WS-01 | SB-WS-02 | SB-WS-03 | SB-WS-04 | SB-WS-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sample Depth | | | 2.0-3.0 | 1.0-1.5 | 2.0-3.0 | 2.0-3.0[4] | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 1.5-2.5 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 |
| Lab Sample ID | | | L1414459-19 | L1414459-21 | L1414459-22 | L1414459-23 | L1414459-25 | L1414459-27 | L1414459-29 | L1414459-31 | L1414459-33 | L1414459-03 | L1414459-07 | L1414459-11 | L1414459-14 | L1414459-17 |
| **NJ Extractable Petroleum Hydrocarbons (mg/kg)** | | | | | | | | | | | | | | | | |
| C10-C12 Aromatics | NC | NC | NA | 27 U | NA | NA | NA | NA | NA | 113 U | NA | NA | NA | NA | NA | NA |
| C12-C16 Aliphatics | NC | NC | NA | 287 | NA | NA | NA | NA | NA | 113 U | NA | NA | NA | NA | NA | NA |
| C12-C16 Aromatics | NC | NC | NA | 41 U | NA | NA | NA | NA | NA | 169 U | NA | NA | NA | NA | NA | NA |
| C16-C21 Aliphatics | NC | NC | NA | 853 | NA | NA | NA | NA | NA | 273 | NA | NA | NA | NA | NA | NA |
| C16-C21 Aromatics | NC | NC | NA | 358 | NA | NA | NA | NA | NA | 500 | NA | NA | NA | NA | NA | NA |
| C21-C36 Aromatics | NC | NC | NA | 109 U | NA | NA | NA | NA | NA | 4,530 | NA | NA | NA | NA | NA | NA |
| C21-C40 Aliphatics | NC | NC | NA | 136 U | NA | NA | NA | NA | NA | 16,800 | NA | NA | NA | NA | NA | NA |
| C9-C12 Aliphatics | NC | NC | NA | 41 U | NA | NA | NA | NA | NA | 169 U | NA | NA | NA | NA | NA | NA |
| Total EPH | NC | NC | 70 | 1,500 | 328 | 372 | 25 U | 24 | 24 U | 22,100 | 24 U | 110 | 25 U | 37 | 232 | 25 U |
| **Volatile Organic Compounds (mg/kg)** | | | | | | | | | | | | | | | | |
| 1,1,1-Trichloroethane | 0.3 | 290 | 0.001 U | 0.06 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.14 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| 1,1,2,2-Tetrachloroethane | 0.007 | 1 | 0.001 U | 0.06 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| 1,1,2-Trichloro-1,2,2-Trifluoroethane | NC | NC | 0.02 U | 1.2 U | 0.021 U | 0.326 U | 0.028 U | 0.024 U | 0.023 U | 2.7 U | 0.001 U | 0.025 U | 0.024 U | 0.024 U | 0.027 U | 0.023 U |
| 1,1,2-Trichloroethane | 0.02 | 2 | 0.002 U | (0.09) U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | (0.2) U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U |
| 1,1-Dichloroethane | 0.2 | 8 | 0.002 U | 0.09 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.2 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U |
| 1,1-Dichloroethene | 0.008 | 11 | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| 1,2,3-Trichlorobenzene | NC | 5 | 0.005 U | 0.31 U | 0.005 U | 0.307 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.007 U | 0.006 U |
| 1,2,4-Trichlorobenzene | 0.7 | 73 | 0.005 U | 0.31 U | 0.005 U | 0.307 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.007 U | 0.006 U |
| 1,2-Dibromo-3-chloropropane | 0.005 | 0.08 | 0.005 U | (0.31) U | 0.005 U | (0.207) U | (0.007) U | (0.006) U | (0.006) U | (0.68) U | (0.01) U | (0.01) U | (0.01) U | (0.01) U | (0.01) U | (0.01) U |
| 1,2-Dibromoethane | 0.005 | 0.004 | 0.004 U | (0.25) U | 0.004 U | (0.305) U | (0.006) U | 0.005 U | 0.005 U | (0.54) U | 0.005 U | 0.004 U | 0.005 U | 0.005 U | 0.005 U | 0.005 U |
| 1,2-Dichlorobenzene | 17 | 5,300 | 0.005 U | 0.31 U | 0.005 U | 0.307 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.006 U | 0.006 U |
| 1,2-Dichloroethane | 0.005 | 0.9 | 0.001 U | (0.06) U | 0.001 U | 0.301 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| 1,2-Dichloropropane | 0.02 | 4 | 0.004 U | (0.22) U | 0.004 U | 0.005 U | 0.01 U | 0.004 U | 0.004 U | (0.47) U | 0.004 U | 0.004 U | 0.004 U | 0.004 U | 0.004 U | 0.004 U |
| 1,3-Dichlorobenzene | 19 | 5,300 | 0.005 U | 0.31 U | 0.005 U | 0.307 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.006 U | 0.006 U |
| 1,3-Dichloropropene, Total | 0.005 | 2 | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| 1,4-Dichlorobenzene | 2 | 5 | 0.005 U | 0.31 U | 0.005 U | 0.307 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.006 U | 0.006 U |
| 1,4-Dioxane | NC | NC | 0.11 U | 6.2 U | 0.11 U | 0.13 U | 0.14 U | 0.12 U | 0.12 U | 14 U | 0.12 U | 0.120 U | 0.11 U | 0.12 U | 0.14 U | 0.120 U |
| 2-Butanone | 0.8 | 3,100 | 0.01 U | 0.62 U | 0.011 U | 0.213 U | 0.014 U | 0.012 U | 0.012 U | (1.4) U | 0.012 U | 0.012 U | 0.01 U | 0.012 U | 0.014 U | 0.012 U |
| 2-Hexanone | NC | NC | 0.01 U | 0.62 U | 0.011 U | 0.213 U | 0.014 U | 0.012 U | 0.012 U | 1.4 U | 0.012 U | 0.012 U | 0.01 U | 0.012 U | 0.014 U | 0.012 U |
| 4-Methyl-2-pentanone | NC | NC | 0.01 U | 0.62 U | 0.011 U | 0.213 U | 0.014 U | 0.012 U | 0.012 U | 1.4 U | 0.012 U | 0.01 U | 0.01 U | 0.012 U | 0.014 U | 0.012 U |
| Acetone | 19 | 70,000 | 0.003 J | 2.2 U | 0.010 J | 0.006 J | 0.007 J | 0.003 J | 0.003 J | 4.9 U | 0.005 J | 0.004 J | 0.043 U | 0.004 J | 0.004 J | 0.022 J |
| Benzene | 0.005 | 2 | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Bromochloromethane | NC | NC | 0.005 U | 0.31 U | 0.005 U | 0.007 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.007 U | 0.006 U |
| Bromodichloromethane | 0.005 | 1 | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Bromoform | 0.03 | 81 | 0.004 U | (0.25) U | 0.004 U | 0.005 U | 0.005 U | 0.005 U | 0.005 U | (0.54) U | 0.005 U | 0.004 U | 0.005 U | 0.005 U | 0.005 U | 0.005 U |
| Bromomethane | 0.04 | 29 | 0.002 U | (0.12) U | 0.002 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | (0.27) U | 0.003 U | 0.003 U | 0.002 U | 0.003 U | 0.003 U | 0.003 U |
| Carbon disulfide | 6 | 7,800 | 0.01 U | 0.62 U | 0.011 U | 0.213 U | 0.014 U | 0.012 U | 0.012 U | 1.4 U | 0.012 U | 0.012 U | 0.01 U | 0.012 U | 0.014 U | 0.012 U |
| Carbon tetrachloride | 0.005 | 0.6 | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Chlorobenzene | 0.4 | 510 | 0.001 U | 0.06 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.14 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Chloroethane | NC | 220 | 0.002 U | 0.12 U | 0.002 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | 0.27 U | 0.003 U | 0.003 U | 0.002 U | 0.003 U | 0.003 U | 0.002 U |
| Chloroform | 0.4 | 0.6 | 0.002 U | 0.09 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.2 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U |
| Chloromethane | NC | 4 | 0.005 U | 0.31 U | 0.005 U | 0.007 U | 0.006 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.005 U | 0.005 U | 0.006 U | 0.006 U | 0.006 U |
| cis-1,2-Dichloroethene | 0.3 | 230 | 0.001 U | 0.06 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.14 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Cyclohexane | NC | NC | 0.02 U | 1.2 U | 0.021 U | 0.326 U | 0.028 U | 0.024 U | 0.023 U | 2.7 U | 0.025 U | 0.025 U | 0.024 U | 0.024 U | 0.027 U | 0.023 U |
| Dibromochloromethane | 0.005 | 3 | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Dichlorodifluoromethane | 39 | 490 | 0.01 U | 0.62 U | 0.011 U | 0.213 U | 0.014 U | 0.012 U | 0.012 U | 1.4 U | 0.012 U | 0.012 U | 0.01 U | 0.012 U | 0.014 U | 0.012 U |
| Ethylbenzene | 13 | 7,800 | 0.001 U | 0.06 U | 0.0004 J | 0.004 J | 0.001 U | 0.001 U | 0.001 U | 0.14 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Isopropylbenzene | NC | NC | 0.001 U | 0.06 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.14 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Methyl Acetate | 22 | 78,000 | 0.004 U | 0.25 U | 0.004 U | 0.005 U | 0.005 U | 0.005 U | 0.005 U | 0.54 U | 0.005 U | 0.004 U | 0.005 U | 0.005 U | 0.005 U | 0.005 U |
| Methyl cyclohexane | NC | NC | 0.004 U | 0.25 U | 0.004 U | 0.005 U | 0.006 U | 0.005 U | 0.005 U | 0.54 U | 0.005 U | 0.004 U | 0.005 U | 0.005 U | 0.005 U | 0.005 U |
| Methyl tert butyl ether | 0.2 | 110 | 0.002 U | 0.12 U | 0.002 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | (0.27) U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | 0.003 U | 0.002 U |
| Methylene chloride | 0.01 | 34 | 0.003 J | 0.21 J | 0.003 J | 0.007 U | 0.003 U | 0.005 U | 0.006 U | (0.68) U | 0.006 U | 0.003 J | 0.005 U | 0.003 J | 0.003 J | 0.003 J |

Final: 13-Jan-15

Table 20
AOC-L (Building B Pits)
Soil Sampling Results
VC-Toys Site (PI # 020373)
400 South Fifth Street, Harrison, Hudson County, New Jersey

| Parameter | | | Sample Location: | SB-PIT-A | SB-PIT-B | | | SB-PIT-C | SB-PIT-D | SB-PIT-E | SB-PIT-F | SB-PIT-G3 | SB-WS-01 | SB-WS-02 | SB-WS-03 | SB-WS-04 | SB-WS-05 |
| | | | Sample Depth: | 2.0-3.0 | 1.0-1.5 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 1.5-2.5 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 |
| | | | Sample Date: | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14(a) | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 |
| | | | Lab Sample ID: | L1414459-19 | L1414459-21 | L1414459-22 | L1414459-23 | L1414459-25 | L1414459-27 | L1414459-29 | L1414459-31 | L1414459-33 | L1414459-03 | L1414459-07 | L1414459-11 | L1414459-14 | L1414459-17 |
| Parameter | IGW | R-SRS | | | | | | | | | | | | | | |
| Styrene | 3 | 90 | | 0.002 U | 0.12 U | 0.002 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | 0.27 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | 0.003 U | 0.002 U |
| Tetrachloroethene | 0.005 | 2 | | 0.001 U | (0.06) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | (0.14) U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U | 0.001 U |
| Toluene | 7 | 6,300 | | 0.0002 J | 0.02 J | 0.0005 J | 0.0008 J | 0.0008 J | 0.0005 J | 0.001 J | 0.2 U | 0.0004 J | 0.002 U | 0.002 U | 0.002 U | 0.0004 J | 0.0003 J |
| Trichloroethene | 0.6 | 300 | | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.2 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U |
| Trichloroethene | 0.6* | 7 | | 0.002 | 0.72 | 0.039 | 0.009 | 0.002 | 0.001 | 0.004 | 14 | 0.012 | 0.003 | 0.008 | 0.0004 J | 0.001 J | 0.001 U |
| Trichlorofluoromethane | 34 | 23,000 | | 0.005 U | 0.31 U | 0.005 U | 0.007 U | 0.007 U | 0.006 U | 0.006 U | 0.68 U | 0.006 U | 0.006 U | 0.005 U | 0.006 U | 0.007 U | 0.006 U |
| Vinyl chloride | 0.005 | 0.7 | | 0.002 U | (0.12) U | 0.002 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | (0.27) U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | 0.003 U | 0.002 U |
| Xylene (Total) | 19 | 12,000 | | 0.002 U | 0.04 J | 0.032 J | 0.002 J | 0.003 U | 0.002 U | 0.002 U | 0.27 U | 0.003 U | 0.003 U | 0.002 U | 0.002 U | 0.002 U | 0.002 U |
| Total Conc | NC | NC | | 0.007 | 0.99 | 0.024 | 0.019 | 0.013 | 0.005 | 0.007 | 14 | 0.018 | 0.011 | 0.012 | 0.003 | 0.008 | 0.026 |
| Total Tics | NC | NC | | 0.025 J | 7.9 J | 0.032 J | ND | 0.052 J | 0.021 J | 0.043 J | ND | 0.04 J | 0.014 J | 0.033 J | 0.047 J | 0.025 J | 0.062 J |
| **PAHs (mg/kg)** | | | | | | | | | | | | | | | | |
| 2-Chloronaphthalene | NC | NC | | 0.007 U | 0.04 U | 0.01 U | 0.01 U | 0.01 U | NA | 0.01 U | 0.14 U | 0.01 U | NA | NA | NA | NA | NA |
| 2-Methylnaphthalene | 8 | 230 | | 0.002 J | 0.07 | 0.01 J | 0.005 J | 0.01 J | NA | 0.005 J | 0.31 | 0.01 U | NA | NA | NA | NA | NA |
| Acenaphthene | 110 | 3,400 | | 0.003 J | 0.04 U | 0.01 U | 0.01 U | 0.01 U | NA | 0.01 U | 0.06 J | 0.01 U | NA | NA | NA | NA | NA |
| Acenaphthylene | NC | NC | | 0.009 | 0.42 | 0.03 | 0.03 | 0.04 | NA | 0.01 J | 2.5 | 0.005 J | NA | NA | NA | NA | NA |
| Anthracene | 2,400 | 17,000 | | 0.023 | 1.4 | 0.06 | 0.06 | 0.06 | NA | 0.06 | 4.8 | 0.01 | NA | NA | NA | NA | NA |
| Benzo(a)anthracene | 0.8 | 0.6 | | 0.092 | 4.3 D | 0.16 | 0.15 | 0.12 | NA | 0.1 | 11 | 0.03 | NA | NA | NA | NA | NA |
| Benzo(a)pyrene | 0.2 | 0.2 | | 0.075 | 1.3 | 0.09 | 0.08 | 0.08 | NA | 0.06 | 7.8 | 0.02 | NA | NA | NA | NA | NA |
| Benzo(b)fluoranthene | 2 | 0.6 | | 0.12 | 3.2 | 0.14 | 0.13 | 0.11 | NA | 0.1 | 15 D | 0.02 | NA | NA | NA | NA | NA |
| Benzo(ghi)perylene | NC | 380,000 | | 0.053 | 0.78 | 0.06 | 0.05 | 0.04 | NA | 0.04 | 5.7 | 0.01 J | NA | NA | NA | NA | NA |
| Benzo(k)fluoranthene | 25 | 6 | | 0.039 | 1.3 | 0.05 | 0.05 | 0.05 | NA | 0.04 | 5.2 | 0.01 J | NA | NA | NA | NA | NA |
| Chrysene | 80 | 62 | | 0.1 | 3.8 D | 0.14 | 0.14 | 0.12 | NA | 0.09 | 11 | 0.02 | NA | NA | NA | NA | NA |
| Dibenzo(a,h)anthracene | 0.8 | 0.2 | | 0.012 | 0.36 | 0.02 | 0.02 | 0.01 | NA | 0.01 J | 2.0 | 0.01 U | NA | NA | NA | NA | NA |
| Fluoranthene | 1,300 | 2,300 | | 0.21 | 12 D | 0.38 | 0.34 | 0.24 | NA | 0.26 | 17 D | 0.06 | NA | NA | NA | NA | NA |
| Fluorene | 170 | 2,300 | | 0.004 J | 0.2 | 0.01 J | 0.01 J | 0.005 J | NA | 0.01 U | 0.06 J | 0.01 U | NA | NA | NA | NA | NA |
| Indeno[1,2,3-cd]pyrene | 7 | 0.6 | | 0.056 | 1.1 | 0.07 | 0.07 | 0.05 | NA | 0.04 | 7.7 | 0.01 J | NA | NA | NA | NA | NA |
| Naphthalene | 25 | 6 | | 0.006 J | 0.079 | 0.01 J | 0.01 J | 0.03 | NA | 0.02 | 0.96 | 0.01 U | NA | NA | NA | NA | NA |
| Phenanthrene | NC | NC | | 0.11 | 4.7 D | 0.18 | 0.16 | 0.18 | NA | 0.23 | 10 | 0.02 | NA | NA | NA | NA | NA |
| Pyrene | 840 | 1700 | | 0.18 | 9.0 D | 0.27 | 0.25 | 0.19 | NA | 0.18 | 11 | 0.04 | NA | NA | NA | NA | NA |
| **Polychlorinated Biphenyls (mg/kg)** | | | | | | | | | | | | | | | | |
| Aroclor 1016 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1221 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1232 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1242 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.01 J | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1248 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1254 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.04 | 0.07 | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1260 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1262 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| Aroclor 1268 | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.03 U | 0.03 U | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| PCBs, Total | 0.2 | 0.2 | | 0.04 U | 0.03 U | 0.03 U | 0.03 U | 0.04 U | NA | 0.04 | 0.08 J | 0.03 U | 0.04 U | 0.04 U | 0.03 U | 0.04 U | 0.03 U |
| **Total Metals (mg/kg)** | | | | | | | | | | | | | | | | |
| Aluminum, Total | 6,000 | 78,000 | | 10,000 | 10,000 | 10,000 | 8,900 | 9,600 | 11,000 | NA | 6,800 | 9,100 | 8,900 | 12,000 | 11,000 | 11,000 | 12,000 | 11,000 |
| Antimony, Total | 6 | 31 | | 1.5 J | 4.2 U | 4.0 U | 4.1 U | 4.0 U | NA | 3.9 U | 4.2 U | 4.2 U | 4.3 U | 4.4 U | 4.0 U | 4.2 U | 4.1 U |
| Arsenic, Total | 19 | 19 | | 7.9 | 5.0 | 5.0 | 5.7 | 6.4 | NA | 4.5 | 5.2 | 3.6 | 7.4 | 7.2 | 6.4 | 6.7 | 6.6 |
| Barium, Total | 2,100 | 16,000 | | 72 | 91 | 92 | 100 | 110 | NA | 76 | 88 | 100 | 120 | 150 | 110 | 110 | 96 |
| Beryllium, Total | 0.7 | 16 | | 0.4 J | 0.5 | 0.5 | 0.6 | 0.6 | NA | 0.42 | 0.47 | 0.49 | 0.63 | 0.64 | 0.51 | 0.54 | 0.46 |
| Cadmium, Total | 2 | 78 | | 0.9 U | 0.8 U | 0.8 U | 0.8 U | 0.1 J | NA | 0.8 U | 0.9 U | 0.8 U | 0.87 U | 0.84 U | 0.23 J | 0.35 U | 0.81 U |
| Calcium, Total | NC | NC | | 1,800 | 2,100 | 1,100 | 1,100 | 1,300 | NA | 1,000 | 3,300 | 1,200 | 1,400 | 4,300 | 1,700 | 2,000 | 1,000 |
| Chromium, Total | NC | NC | | 16 | 16 | 17 | 19 | 21 | NA | 14 | 14 | 18 | 23 | 23 | 20 | 22 | 19 |
| Cobalt, Total | 90 | 1,600 | | 6.2 | 8.2 | 7.9 | 8.6 | 12 | NA | 6.4 | 34 | 8.1 | 9.5 | 11 | 10 | 11 | 11 |
| Copper, Total | 11,000 | 3,100 | | 16 | 49 | 21 | 25 | 15 | NA | 23 | 24 | 18 | 20 | 23 | 17 | 19 | 14 |
| Iron, Total | NC | NC | | 17,000 | 18,000 | 18,000 | 18,000 | 23,000 | NA | 16,000 | 14,000 | 19,000 | 24,000 | 24,000 | 22,000 | 24,000 | 23,000 |
| Lead, Total | 90 | 400 | | 82 | 56 | 11 | 11 | 12 | NA | 8.0 | 130 | 4.2 U | 13 | 14 | 15 | 18 | 11 |
| Magnesium, Total | NC | NC | | 2,700 | 4,500 | 4,700 | 4,300 | 6,900 | NA | 3,600 | 2,400 | 4,300 | 5,700 | 6,500 | 5,700 | 6,300 | 5,400 |

Page 2 of 3

Final: 13-Jan-15

Table 20
AOC-L (Building B Pits)
Soil Sampling Results
VO-Toys Site (PI # 020373)
400 South Fifth Street, Harrison, Hudson County, New Jersey

| | Sample Location: | | SB-PIT-A | | SB-PIT-B | | SB-PIT-C | SB-PIT-D | SB-PIT-E | SB-PIT-F | SB-PIT-G3 | SB-WS-01 | SB-WS-02 | SB-WS-03 | SB-WS-04 | SB-WS-05 |
| | Sample Depth: | | 2.0-3.0 | 1.0-1.5 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 1.5-2.5 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 | 2.0-3.0 |
| | Sample Date: | | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14(b) | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 | 30-Jun-14 |
| | Lab Sample ID: | | L1414459-19 | L1414459-21 | L1414459-22 | L1414459-23 | L1414459-25 | L1414459-27 | L1414459-29 | L1414459-31 | L1414459-33 | L1414459-03 | L1414459-07 | L1414459-11 | L1414459-14 | L1414459-17 |
| Parameter | IGW | R-SRS | | | | | | | | | | | | | | |
| Manganese, Total | 65 | 11,000 | 370 | 400 | 510 | 550 | 580 | NA | 470 | 420 | 660 | 600 | 630 | 560 | 640 | 520 |
| Mercury, Total | 0.1 | 23 | 0.4 | 26 | 2.1 | 3.2 | 1.2 | NA | 0.1 | 2.1 | 0.6 | 0.92 | 0.18 | 0.21 | 2.7 | 0.04 J |
| Nickel, Total | 48 | 1,600 | 12 | 22 | 17 | 20 | 29 | NA | 13 | 120 | 18 | 21 | 22 | 21 | 27 | 18 |
| Potassium, Total | NC | NC | 1,100 | 1,800 | 1,700 | 1,500 | 2,100 | NA | 1,100 | 880 | 1,500 | 1,800 | 2,100 | 1,600 | 1,800 | 1,600 |
| Selenium, Total | 11 | 390 | 1.8 U | 1.7 U | 1.6 U | 1.6 U | 1.6 U | NA | 1.6 U | 0.6 J | 1.7 U | 1.7 U | 1.7 U | 1.6 U | 1.7 U | 1.6 U |
| Silver, Total | 1 | 390 | 0.9 U | 0.8 U | 0.8 U | 0.8 U | 0.8 U | NA | 0.8 U | 0.8 U | 0.9 U | 0.87 U | 0.84 U | 0.81 U | 0.85 U | 0.81 U |
| Sodium, Total | NC | NC | 360 | 350 | 170 | 180 | 480 | NA | 160 | 290 | 160 J | 220 | 280 | 190 | 250 | 120 J |
| Thallium, Total | 3 | 5 | 1.8 U | 1.7 U | 1.6 U | 1.6 U | 1.6 U | NA | 1.6 U | 1.7 U | 1.7 U | 1.7 U | 1.7 U | 1.6 U | 1.7 U | 1.6 U |
| Vanadium, Total | NC | 78 | 22 | 21 | 19 | 22 | 26 | NA | 17 | 20 | 23 | 28 | 29 | 26 | 24 | 25 |
| Zinc, Total | 930 | 23,000 | 47 | 60 | 45 | 47 | 72 | NA | 34 | 74 | 43 | 53 | 65 | 59 | 66 | 50 |

Notes:
1. All results are in milligrams per kilogram (mg/kg)
2. **Bold** = Detection
3. NJDEP Soil Remediation Standards
   Yellow Highlight- Exceedance of Impact to Ground Water (IGW)
   Underline- Exceedance of Residential Soil Remediation Standard (R-SRS)
   (Brackets around cell indicates Reporting Limit (RL) exceeds NJDEP criteria)
4. 'NC' designates no NJDEP Screening Level criteria for given compound
5. 'U' designates the analyte is not detected at or above the listed reporting limit
6. 'J' designates an estimated value
7. 'ND' designates compound was not detected
8. 'NA' designates that the sample was not analyzed for this compound
9. '*' designates Site Specific IGW Standard for TCE
10. 'D' designates concentration of analyte was quantified from diluted analysis
11. '(a)' designates that blind duplicate sample SB-X-01-063014, was collected at SB-PIT-B-2.0-3.0

Final: 13-Jan-15

# Exhibit F

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION II

DATE:  NOV 18 1996                                  *80849*

SUBJECT: National Priorities List Nomination of the Grand Street
         Mercury, N.J. Site

FROM: Richard L. Caspe, Director
      Emergency and Remedial Response Division

TO: David Evans, Director
    State, Tribal, and Site Identification Center

This memorandum is a request for placement of the Grand Street
Mercury site, Hoboken, New Jersey on the National Priorities List
(NPL) under the provisions in Section 300.425(c)(3) of the National
Contingency Plan (NCP). Attached are the following documents which
support this action:

   1) The Public Health Advisory for the Grand Street Mercury
   site prepared by the Agency for Toxic Substances and Disease
   Registry (ATSDR) (attachment 1);

   2) The Action Memorandum which describes the site history and
   documents the significant threat to public health posed by the
   site (attachment 2);

   3) Sampling analysis for vapor sampling, sampling of personal
   belongings, soil sampling, floor sampling and brick sampling
   (attachment 3);

   4) A cost analysis of several potential response actions at
   the site which demonstrate that it will be more cost effective
   to use remedial rather than removal authority to respond to
   the release (attachment 4).

BACKGROUND

On March 21, 1996, the U.S. Environmental Protection Agency (EPA)
Region II Regional Administrator approved an Action Memorandum (see
attachment 2) to conduct an emergency removal action at the Grand
Street Mercury site in Hoboken, New Jersey. The removal action was
necessary to dissociate the impacted residents from the metallic
mercury and mercury vapors, prevent further off-site migration of
mercury, and to assess the extent of the mercury contamination.

The Grand Street Mercury site is located at 722 Grand Street, Hoboken, Hudson County, New Jersey. The Site is a former industrial building converted into 16 residential/studio spaces with an attached 4 story townhouse that was once used as an office. A parking lot is adjacent to the building. The average area of each residential/studio space exceeds 2,600 square feet. The building is approximately 100 feet by 175 feet, four stories high and is constructed of brick and masonry with interior wooden structural and flooring systems. The surrounding area is a mix of residential/commercial and industrial properties. The Hoboken High School is located across the street to the northeast and there are over 40,000 residents that live in a one-half mile radius from the Site.

The Grand Street Mercury site was the location of various manufacturing and industrial businesses up to 1993. Previous owners of the building include the General Electric Vapor Lamp Company (1911-1939), General Electric Company (1939-1948), Cooper-Hewitt Electric Company (1910-1911 and 1948-1955) and the Quality Tool and Die Company (1955-1979). John Pascale, Sr., and the Quality Tool and Die Company sold the building in 1979 to David and Sherill Pascale. The Pascales sold the building in 1993 to the Grand Street Artists Partnership (GSAP). The GSAP split the building into 16 units and began selling the units to individual partners. After renovation and the construction of apartment and artist studios, residents began moving into the building in mid to late 1994. There were 34 people living in the building as of December 19, 1995.

### SIGNIFICANT THREAT TO PUBLIC HEALTH

On January 4, 1996, the Hoboken Health Department (HHD), based on advice from the New Jersey Department of Health (NJDOH), declared the building unfit for human habitation and ordered the residents to vacate the building by January 9, 1996. Due to inclement weather conditions, the deadline of January 9, 1996 was extended two days. All residents had vacated the building by 1600 hours on January 11, 1996.

The ATSDR, on January 22, 1996, issued a Public Health Advisory (PHA - see attachment 1) that proclaimed "an imminent public health hazard is posed to residents of 722 Grand Street from past, current and potential future exposures via inhalation, direct dermal contact and possible ingestion of metallic (elemental) mercury and mercury vapor." In addition, the PHA states "the potential exists for mercury-contaminated possessions to be taken out of the building to continue to expose residents of 722 Grand Street, contaminate other areas and expose other members of the public." The PHA recommended that the residents be dissociated from mercury exposure in the 722 Grand Street building.

100618

Visible mercury contamination has been observed under the fifth floor of the building. A survey of the air mercury vapor above cracks and holes in floors and walls of lower units indicates that mercury vapors and liquid mercury have migrated throughout the building. Mercury vapors have been detected in indoor air samples at concentrations that exceed a level of public health concern (see attachment 3).

Elevated concentrations of mercury have been detected in urine samples from residents. Adverse health effects are associated with mercury levels greater than 20 $\mu g/L$. Mercury concentrations ranged from 3 to 102 $\mu g/L$, and 20 samples had mercury concentrations equal to or greater than 20 $\mu g/L$. The elevated concentrations of mercury detected in the residents may be associated with subtle neurological changes and renal tubule effects.

There is a threat of a release of mercury vapor from a major fire at the Grand Street Mercury site that would have significant adverse health effects on the surrounding population, possibly resulting in the death of some exposed individuals. Acute exposure to high concentrations of mercury vapor can cause severe pulmonary toxicity, which can lead to death. The NIOSH Immediately Dangerous to Life and Health (IDLH) value for mercury is 10 $mg/m^3$. The IDLH value represents the concentration of a substance which ensures that a worker can escape, within a given amount of time (usually 30 minutes), without suffering injury or irreversible health effects from exposure to that concentration. There are no established lethal doses for mercury vapor, although there are several case reports of humans that have died or exhibited pulmonary toxicity from exposure to very high concentrations of mercury vapor.

Mercury was detected in sub-surface soil samples collected from the parking lot adjacent to the building (see attachment 3). The highest concentration detected was 290 ppm. Mercury was also detected in soil samples taken from the backyard of the neighboring residence (see attachment 3). There is a further threat of mercury being released to the environment by transport of contaminated personal possessions from the site, transport of contaminated construction debris from the site, and volatilization and transport via the sewer system in the building. A private cleanup conducted in a portion of the building has resulted in the generation of 10 to 15 gallons of mercury and mercury contaminated debris. This material is presently being stored at the rear of the building.

ATSDR and NJDOH will continue to provide health consultations to the impacted residents, review environmental and community health related information and concerns, determine appropriate additional health follow-up actions and address citizens health-related concerns. In addition, ATSDR and the NJDOH will provide the residents with follow-up urine sampling and analysis until levels of mercury in urine fall below 20 $\mu g/L$. Based upon the results of

indoor air mercury surveys, urine mercury analysis and the presence of pools of elemental mercury in the floors, ATSDR concluded that the building at 722 Grand Street poses an imminent public health hazard.

## COST EFFECTIVENESS

Region 2 anticipates, based on current information regarding the possible options for cleanup of the Grand Street Mercury site, that it will be more appropriate and more cost effective to use EPA's remedial authority than to use its removal authority to respond to the release. At this time, EPA anticipates that there will be complex issues surrounding remediation of the Grand Street Mercury site. These issues include: assumptions regarding future land use at the site; the extent of off-site contamination; the potential for off-site migration of contaminants (including the potential for a catastrophic release such as in the case of a fire); and, the extent of on-site soil contamination at the site. These issues are best and most cost-effectively analyzed and addressed in the context of the remedial program.

Removal activities often involve responses taken to eliminate an immediate and imminent threat to human health and/or the environment. These actions are typically implemented in the short term to alleviate a threat, on a temporary basis, until remedial or other authority can be used to address the long-term health threat in a cost effective manner. Because the removal authority was meant to be a short term solution, Congress established a 1 year statutory time limit and $2 million statutory cost limit for each removal response. Furthermore, the national removal extramural cleanup budget is limited to approximately $100 million per fiscal year. Of this funding, EPA Region II was allocated approximately $13 million last year. It is the responsibility of the regions to prioritize removal activities in order to maximize the use of these funds. With these limited funds the Region was able to conduct 46 removal actions. However, due to limited funding, the removal program cannot afford to conduct many long-term, extensive responses. Because the complex nature of activities anticipated at the site could prove costly, EPA would risk beginning a response at the site that could not be completed because the cost could exceed the funds available for removal actions.

The investigation and remediation of the contamination at this site is clearly a project that would strain the resources of the removal program. The remediation anticipated for the site will be far beyond that which is typically performed under a removal action. At a minimum, some elements have been identified that EPA anticipates it will need to evaluate as part of the remedy selection process at the site (see attachment 4). These elements include permanent relocation (either with or without acquisition of the property), temporary relocation, building demolition, and building reconstruction. EPA anticipates that it will evaluate the cleanup of the building to residential standards. In addition,

100620

cleanup of the building to industrial standards has also been suggested as an option by one of the potentially responsible parties. The elements and options discussed above will likely involve considerable cost and time periods for study, planning and, if necessary, implementation.

While all of these responses may meet the emergency exemption criteria of Section 104(c) of CERCLA, at this time, it appears that it will be more cost-effective to use EPA's remedial authority rather than EPA's removal authority to respond to the release. EPA anticipates that investigation and clean-up costs could total well over $2 million (see attachment 4). In addition, it is likely that there will be substantial relocation costs (see attachment 4). As a consequence, due to the limited removal funds nationwide and within the Region, other sites which warrant removals may not be addressed in a timely manner. Moreover, using remedial authority rather than removal authority would be more cost effective in that it would require the states' 10% cost sharing and would provide greater flexibility in determining the resources to be used in the eventual remediation of the site. Further, permanent relocation, should it be deemed necessary, will only be undertaken by EPA pursuant to its remedial authority.

EPA cautions that this evaluation of the cleanup elements associated with the Grand Street site is only for the purposes of NPL listing and by no means a definitive evaluation of cleanup options. EPA anticipates it will conduct a complete evaluation of cleanup options as part of the remedial process at the site.

## RECOMMENDATION

The Grand Street Mercury site meets the NPL listing criteria of Section 300.425(c)(3) of the NCP. ATSDR has recommended dissociation of individuals from the release (attachment 1). Region 2, NJDEP and ATSDR concur that the release poses a significant threat to public health (discussion above and attachment 2), and Region 2 anticipates that it will be more cost-effective to use remedial authority rather than removal authority to respond to the release (discussion above and attachment 4). Region 2 recommends the placement of this site on the NPL.

Attachments

cc:  Robert Shinn, Commissioner
     New Jersey Department of
       Environmental Protection
     Barry Johnson, ATSDR
     Richard Gimello, NJDEP
     Arthur Block, ATSDR
     Jim Pasqualo, NJDOH

100621

bcc: J. Malleck, SPB:PRS
     R. Vaughn, SPB
     R. Salkie, RAB
     J. Harmon, RAB
     C. Garypie, ORC
     L. Carson, ERRD

100622

**ATTACHMENT 1**

100625



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Agency for Toxic Substances
and Disease Registry
Atlanta GA 30333

JAN 22 1996

The Honorable Carol M. Browner
Administrator
Environmental Protection Agency
401 M Street, S.W.
Washington, D.C. 20460

Dear Ms. Browner:

Enclosed is a Public Health Advisory concerning past, current, and possible future exposures to mercury by the occupants of building/property on 722 Grand Street, Hoboken, Hudson County, New Jersey.

Based on the environmental (air) and biological (urine) sampling results and the presence of visible mercury contamination under the fifth floor of the building, the Agency for Toxic Substances and Disease Registry (ATSDR) has determined that significant human exposures to mercury vapors have occurred in the building. ATSDR considers these exposures to represent an imminent public health hazard. Two factors warrant this Public Health Advisory: (1) the existing public health hazard, and (2) the potential for mercury-contaminated possessions to be taken out of the building; such possessions can continue to expose residents of 722 Grand Street, contaminate other areas, and expose other members of the public.

The building on 722 Grand Street was the former location of several industrial operations dating back to 1920. The building was renovated into apartments and artist studios--residents began moving into the building in mid to late 1994. Residents, the Environmental Protection Agency (EPA) Region II, and the New Jersey Department of Health, have observed visible mercury contamination under the fifth floor of the building. Testing of the air space above cracks and holes in floors and walls of lower units indicates that mercury contamination has migrated further throughout the building. Mercury has been detected in indoor air samples at concentrations that exceed a level of public health concern.

Furthermore, elevated concentrations of mercury have been detected in urine samples from residents. The urinary mercury concentrations in 20 of 29 residents tested exceeded the range (0-20 μg/L) for an unexposed adult population. Among the

Page 2 - The Honorable Carol M. Browner

residents of the building, the normalized urinary concentrations of mercury ranged from 3 to 135 µg/g creatinine. The elevated concentrations of mercury detected in the residents may be associated with subtle neurological changes and renal tubule effects.

In the Public Health Advisory, ATSDR recommends that appropriate risk management procedures be implemented to dissociate the public from mercury exposure in the 722 Grand Street building and to ensure that occupants' belongings are free of mercury contamination prior to taking the belongings to another place of residence. Based on ATSDR's findings, the EPA Region II, the Hoboken Health Department, and the City of Hoboken have agreed to:

1.  The Hoboken Health Department will issue the necessary orders or institute legal action, as required, to ensure dissociation of the occupants from the building (exposure).

2.  EPA Region II will provide temporary housing for the residents of the building.

3.  The town of Hoboken will provide security for the building upon the departure of residents.

4.  EPA Region II will provide screening and logistics regarding the identification of contaminated personal belongings and perform other testing to determine the scope of the mercury contamination of the building.

The enclosed Public Health Advisory expresses ATSDR's concerns and describes the events associated with the site. Dr. Barry Johnson, Assistant Administrator, ATSDR, has written to the following individuals notifying them of this advisory: Ms. Jeanne Fox, Regional Administrator, EPA Region II; Mr. Leonard Fishman, Commissioner of Health, New Jersey Department of Health; Elin A. Gursky, Sc.D., Senior Assistant Commissioner, New Jersey Department of Health; Mr. Richard Gimello, Assistant Commissioner Site Remediation, New Jersey Department of Environmental Protection; and Frank S. Sasso, M.S., M.SW., Health Officer, Hoboken Health Department.

Sincerely,

David Satcher, M.D., Ph.D.
Administrator

Enclosure

# PUBLIC HEALTH ADVISORY

FOR

## 722 GRAND STREET (A288)

HOBOKEN, HUDSON COUNTY, NEW JERSEY

JANUARY 22, 1996

U.S. Department of Health and Human Services
Public Health Service
AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY
Division of Health Assessment and Consultation
Atlanta, Georgia 30333

100628

## INTRODUCTION

This public health advisory is to notify the Environmental Protection Agency (EPA), the State of New Jersey, the town of Hoboken, and the public of an ongoing imminent health hazard. This hazard is associated with the past, current, and potential future exposures to mercury present in the building and residences of 722 Grand Street located in Hoboken, New Jersey. This public health advisory is issued by the Agency for Toxic Substances and Disease Registry (ATSDR) in response to a request for assistance from Region II EPA, the New Jersey Department of Environmental Protection (NJDEP), the New Jersey Department of Health (NJDOH), the Hudson Regional Health Commission (HRHC), and the Hoboken Health Department (HHD). As a result of this request, ATSDR and NJDOH have provided technical support in reviewing environmental and biological data and providing a health consultation for the HRHC and the HHD [1]. ATSDR and NJDOH, with concurrence from HRHC and HHD, have concluded that the presence of visible metallic mercury in one of the building unit's subflooring, the levels of mercury vapor detected in living space air, and elevated mercury levels in occupants' urine samples, warrant the issuance of a public health advisory.

The 17 residential living/working condominium units and attached townhouse in the 722 Grand Street structure are included in this advisory. There are indications, however, that additional areas, contiguous to the 722 Grand Street building, may need further public health evaluation. ATSDR has determined that an imminent public health hazard is posed to occupants of this building based on the following: 1) urine mercury levels in samples collected from 29 of the 37 occupants by HRHC and HHD on December 27, 1995; 2) breathing zone air mercury levels as determined by EPA Region II on December 27, 1995, and NJDOH on December 22, 1995; 3) breathing zone air mercury levels in selected units (monitored by private consultants in March and November of 1995); and 4) results of November and early December 1995, mercury urine levels in samples from selected residents (from their private physician). The health agencies stress that although liquid metallic mercury has been observed in one unit and in the subflooring of the 5th floor, environmental (air) and biological (urine) data indicate that exposure is occurring throughout the building. Furthermore, the nature of mercury vapors and liquid mercury (i.e., mobility) makes every unit in the building subject to future contamination at levels possibly higher than have been detected by mercury vapor analysis to date. Therefore, this public health advisory applies to all building occupants. The major route of human exposure to the mercury in this building is inhalation of mercury vapor. Secondary routes of exposure include dermal contact with mercury vapors or liquid mercury, and possible ingestion of liquid mercury.

The National Contingency Plan (40 CFR Part 300.400-420) describes the types of activities required and authorized in response to a hazardous substance release at a potentially hazardous site. These activities include notification of a release (section 300.404(f)(1)), evaluation of the site (section 300.410), and factors to be considered related to a removal action (section 300.415). These factors include the migration of contaminants, the threat of fire or explosion, and other events that could threaten public health. In accordance with Section 300.425 and based on the public health implications of the site, ATSDR believes that this site be considered for inclusion on the EPA National Priorities List, and/or use other statutory, regulatory or administrative authorities, as appropriate, to further characterize the areas of concern and take necessary action. ATSDR recommends that actions be taken to:

1.   Dissociate the public as soon as possible from mercury exposure in the 722 Grand Street building.

2.   Ensure that residents' belongings are free of mercury contamination before they are removed from the building; such

100629

possessions can continue to expose residents of 722 Grand Street, contaminate other areas, and expose other members of the public.

## BACKGROUND

The 722 Grand Street building/property is located in the City of Hoboken, Hudson County, New Jersey. Formerly an industrial property, the five-story structure, with attached townhouse, was recently renovated into condominium units and artists studios [2]. Commercial/industrial occupants of the building included the General Electric Vapor Lamp Company (1920 - 1939), the General Electric Corporation (1939 - 1945), the Cooper-Hewitt Corporation (1948 - 1955), and the Quality Tool and Dye Company (1955 - 1993) [3].

This is a brick building with wooden floors and solid wood floor supports. Renovation included the installation of a new elevator, and installation of new plumbing and electrical conduits throughout all floors. There are four living units on each floor [2]. Residential occupation of the building began in mid to late 1994. Currently, there are 37 occupants in this building.

In early 1995, during renovation of one of the fifth floor units, pools of mercury were observed in the subflooring. Subsequently, the tenants' association hired a private contractor to remediate the contamination. During the remediation, some mercury-contaminated debris was removed from the unit [2]. In March 1995, a consultant performed a mercury vapor survey of several units on the 1st through 5th floors [4]. Detectable levels of mercury vapor were found on the 3rd, 4th, and 5th floors. In breathing zone areas, the highest level of mercury was 5 $\mu g/m^3$ (5th floor); in source areas, the highest level of mercury was 888 $\mu g/m^3$ (found in subflooring on the 5th floor).

In late 1995, a 4th floor resident observed drops of mercury in his living space, including on stove and counter top surfaces. The remediation contractor subsequently performed some cleanup of the unit. In November 1995, several residents hired a different consultant to conduct a mercury air survey in their units and common areas of the building [2]. Mercury vapor levels in breathing zone air samples in the 3rd floor unit ranged from 4 - 9 $\mu g/m^3$, and from 24 - 77 $\mu g/m^3$ at wall and floor openings. Mercury vapor levels in the breathing zone air from the 4th floor ranged from 7 - 21 $\mu g/m^3$, and from 14 - 26 $\mu g/m^3$ at wall and floor openings. Common areas of the 3rd through 4th floors detected mercury vapor from 12 - 18 $\mu g/m^3$. Through their private physicians, these residents underwent urine mercury testing in late November and early December of 1995. Mercury results ranged from 11 to 65 micrograms ($\mu g$) of mercury per liter (L) of urine ($\mu g/L$). Urine concentrations of mercury in unexposed adults are less than 20 $\mu g/L$ [8].

At the request of HHD and HRHC, two additional air mercury surveys were conducted: by NJDOH on December 22, 1995; and, by EPA Region II on December 27, 1995 [5]. The December 27 sampling was conducted after residents had been encouraged to increase ventilation and lower heat to reduce possible exposures to mercury vapors. The December 22 survey was conducted on the 3rd through 5th floors. The maximum levels of mercury detected on these floors were 10 - 50 $\mu g/m^3$ (detection limit of the Bacarach Mercury Vapor Analyzer is 10 $\mu g/m^3$). The December 27 sampling event surveyed 15 units, an attached townhouse, and hallways on each floor. Air was sampled in the breathing zone (approximately five feet above the floor) and approximately 6 inches above the floor. Mercury was detected in nine units at levels up to 13 $\mu g/m^3$. Visible puddles of mercury were observed between the second and third layer of wood flooring of a fifth floor condominium unit [5]. Detectable airborne concentrations of mercury were not found in the hallways (detection limit of the Jerome 421 Mercury Vapor Analyzer is 1 $\mu g/m^3$).

On December 27, 1995, the HHD and HRHC collected urine samples from 31 persons for total mercury and creatinine analyses: 29 samples were from residents and

two samples were from workers who had made repairs in the building. Results of total mercury analysis indicated mercury levels ranging from 3-102 $\mu g/L$ (the 3 $\mu g/L$ sample was a unit owner who does not reside in the building). Twenty of the urine samples contained mercury concentrations equal to or greater than 20 $\mu g/L$ [6]. Five of the 6 children tested had urine mercury concentrations greater than 20 $\mu g/L$ [6]. Mercury levels in urine, adjusted for creatinine, ranged from 3 to 134 $\mu g$ mercury/gram creatinine [6].

During the December 27 urine collection, building occupants were encouraged by the HRHC and HHD to increase the ventilation in their homes and lower their heat to reduce their possible exposures to mercury vapor. They were also encouraged to relocate. On December 29, 1995, the HHD, HRHC, and NJDOH met with occupants of 722 Grand Street to provide them with results of their individual urine analysis and to assist them in interpreting the health implications of these results and the air mercury results. The residents were also advised of the health agencies concerns and encouraged to relocate as soon as practicable. On January 4, 1996, ATSDR, NJDOH, EPA, NJDEP, HHD, City of Hoboken, and the HRHC met with the residents to present the findings of the ATSDR and NJDOH health consultation and to discuss relocation issues.

## BASIS FOR THE ADVISORY

This public health advisory is being issued based on the following:

1.  An imminent public health hazard is posed to residents of 722 Grand Street from past, current, and potential future exposures via inhalation of mercury vapors, with minor exposure by direct dermal contact, and possible ingestion of liquid mercury. There are indications, however, that additional areas, contiguous to the 722 Grand Street building, may need further public health evaluation.

2.  The potential exists for mercury-contaminated possessions to be taken out of the building; such possessions can continue to expose residents of 722 Grand Street, contaminate other areas, and expose other members of the public.

Mercury has been detected in indoor air at concentrations that exceed a level of public health concern. The most significant human exposure route of metallic mercury is inhalation of the vapors. Exposure is also possible through direct dermal contact with or ingestion of liquid mercury. Because mercury vapors are heavier than air, they tend to be concentrated near the floor or ground. Therefore, children are especially at risk of mercury vapor inhalation.

The central nervous system is a key target for mercury toxicity, and both neurologic and psychologic effects can result from exposures to elemental mercury. Fine tremors in the fingers, eyelids, and lips are early signs of mercury toxicity. With increasing exposure, tremors in the hands and arms may interfere with precise movements and impair skills such as handwriting. Common psychological symptoms of mercury toxicity include depression, irritability, exaggerated response to stimuli, excessive shyness, insomnia, and emotional instability.

Associations between urinary mercury levels and health effects have been studied in adults with occupational exposures to mercury. Urine mercury concentrations of 20-100 $\mu g/L$ are associated with subtle neurological changes, even before overt symptoms occur [7,8]. Early signs and symptoms of exposure to mercury might include decreased responses on tests of nerve conduction, brain-wave activity, and verbal skills. Early indications of tremors might also be observed upon testing. At higher urinary mercury concentrations (100-500 $\mu g/L$), effects become more severe, and psychological symptoms such as

irritability, depression, memory loss, and other nervous system disorders may appear [7,8].

Indoor air mercury levels in the breathing zone ranged from non-detectable to 50 µg/m³. At floor level, concentrations as high as 888 µg/m³ were detected. At other residential properties contaminated with mercury, ATSDR has recommended that indoor air mercury levels should be below 0.3 µg/m³ (0.0003 mg/m³) in order to protect human health [9,10]. Mercury levels above 0.3 µg/m³ exceed ATSDR's chronic Minimal Risk Level (MRL) and EPA's Reference Concentration (RfC). Therefore, indoor air levels in the breathing zone at the Grand Street property exceed an acceptable level. At floor level, where children might crawl and play, mercury levels were even higher.

Urine concentrations of mercury in unexposed adults are less than 20 µg/L [8]. Because mercury is naturally occurring in the environment, a "small" amount (mean 4-5 µg/L; upper limit 20 µg/L) in the urine is considered normal [8]. This level was exceeded by 69% of the residents of the building who were tested, which indicates that they are being exposed to mercury at levels of health concern. Urinary concentrations of mercury (as µg/L) can be influenced by the rate of urinary output. To correct for variations in urinary output, the concentration of creatinine was also determined in the samples, and the mercury concentrations were calculated as µg mercury/gram creatinine. Among the residents of the building, the normalized urinary concentrations of mercury ranged from 3 to 134 µg/gram creatinine. In occupational exposure studies, urine mercury concentrations of 50 - 100 µg/gram of creatinine were associated with increased tremors and impaired eye-hand coordination [11]. In addition, urine mercury levels of >25 µg/gram of creatinine were associated with renal tubule effects, as evidenced by increased urinary levels of certain proteins [12].

The occurrence of high levels of mercury in the urine of 69% of the residents tested indicates that they are being exposed through a common source, rather than through occupational or other off-site sources. Gross (liquid) mercury contamination inside the 722 Grand Street building is the likely source of mercury exposure, with exposures occurring primarily by inhalation of contaminated indoor air. Moreover, analysis of the urine mercury results indicates that for those persons who reported spending fewer hours in the building, and those who reported living in the building for a shorter time, had lower urine mercury levels than others [13]. Where gross (liquid) mercury contamination is present in the units, secondary exposure could occur by dermal absorption or by direct oral ingestion.

The health agencies stress that although liquid metallic mercury has been observed in one unit and in the subflooring of the 5th floor, environmental (air) and biological (urine) data indicate that exposure to mercury is occurring throughout the building. Furthermore, the nature of mercury vapors and liquid mercury (i.e., mobility) makes other units in the building subject to future contamination at levels possibly higher than have been detected by mercury vapor analysis to date. Therefore, the health concern applies to the building and its occupants.

## CONCLUSIONS

1. Based on the results of indoor air mercury surveys, urine mercury analyses, and the presence of pools of elemental mercury in the subflooring of one 5th floor unit, ATSDR concludes that the building at 722 Grand Street poses an ongoing imminent public health hazard. There are indications, however, that additional areas, contiguous to the 722 Grand Street building, may need further public health evaluation.

2. Visible mercury contamination has been detected under the 5th floor of the building. Testing of the air space above cracks and holes in floors

and walls of lower units indicates that mercury contamination has
migrated further throughout the building.

3.    Mercury has been detected in indoor air samples at concentrations that
      exceed a level of public health concern.

4.    Elevated concentrations of mercury have been detected in urine samples
      from residents.  The urinary mercury concentrations in 20 of 29
      residents exceeded the range (0-20 $\mu$g/L) for an unexposed adult
      population.  The elevated concentrations of mercury detected in the
      residents may be associated with subtle neurological changes and renal
      tubule effects.

5.    The potential exists for mercury-contaminated possessions to be taken
      out of the building; such possessions can continue to expose residents
      of 722 Grand Street, contaminate other areas, and expose other members
      of the public.

## RECOMMENDATIONS AND ACTIONS TAKEN OR PLANNED

The ATSDR recommends that the regulatory/enforcement agencies (EPA, NJDEP,
and/or the City of Hoboken) take the following actions with continued
cooperation and coordination with the health agencies (ATSDR, NJDOH, HRHC, and
HHD):

1.    Dissociate the public as soon as possible from mercury exposure in
      the 722 Grand Street building.

2.    Ensure that occupants' belongings are free of mercury
      contamination before they are removed from the building.

3.    Consider the 722 Grand Street building/property for inclusion on
      the EPA National Priorities List, and/or use other statutory,
      regulatory or administrative authorities as appropriate to further
      characterize the areas of concern and take necessary action.

## OTHER RECOMMENDATIONS

1.    All permanent occupants of the building, including infants and
      children, should be referred, without delay, for evaluation by a
      physician with expertise in environmental and occupational health.
      The purpose of the referral is to identify and follow-up any
      abnormalities of immediate clinical significance, particularly
      those that may be related to mercury exposure.

2.    A systematic assessment of the exposed population, using ATSDR's
      basic test batteries for kidney dysfunction and neurobehavioral
      disorders in adults and children, should be considered after the
      most urgent concerns--such as eliminating exposures and diagnosis
      and treatment of any abnormalities of immediate clinical
      significance--have been addressed.

ATSDR, NJDOH, EPA, NJDEP, HRHC, and HHD have or will perform the following
actions:

1.    ATSDR and NJDOH are available, upon request, to assist the
      enforcement/regulatory agencies in providing public health input
      into risk management decisions.

2.    ATSDR and NJDOH will continue to provide health consultations to
      review environmental, health outcome, and community health concern

100633

5

and walls of lower units indicates that mercury contamination has migrated further throughout the building.

3. Mercury has been detected in indoor air samples at concentrations that exceed a level of public health concern.

4. Elevated concentrations of mercury have been detected in urine samples from residents. The urinary mercury concentrations in 20 of 29 residents exceeded the range (0-20 $\mu g/L$) for an unexposed adult population. The elevated concentrations of mercury detected in the residents may be associated with subtle neurological changes and renal tubule effects.

5. The potential exists for mercury-contaminated possessions to be taken out of the building; such possessions can continue to expose residents of 722 Grand Street, contaminate other areas, and expose other members of the public.

RECOMMENDATIONS AND ACTIONS TAKEN OR PLANNED

The ATSDR recommends that the regulatory/enforcement agencies (EPA, NJDEP, and/or the City of Hoboken) take the following actions with continued cooperation and coordination with the health agencies (ATSDR, NJDOH, HRHC, and HHD):

1. Dissociate the public as soon as possible from mercury exposure in the 722 Grand Street building.

2. Ensure that occupants' belongings are free of mercury contamination before they are removed from the building.

3. Consider the 722 Grand Street building/property for inclusion on the EPA National Priorities List, and/or use other statutory, regulatory or administrative authorities as appropriate to further characterize the areas of concern and take necessary action.

OTHER RECOMMENDATIONS

1. All permanent occupants of the building, including infants and children, should be referred, without delay, for evaluation by a physician with expertise in environmental and occupational health. The purpose of the referral is to identify and follow-up any abnormalities of immediate clinical significance, particularly those that may be related to mercury exposure.

2. A systematic assessment of the exposed population, using ATSDR's basic test batteries for kidney dysfunction and neurobehavioral disorders in adults and children, should be considered after the most urgent concerns--such as eliminating exposures and diagnosis and treatment of any abnormalities of immediate clinical significance--have been addressed.

ATSDR, NJDOH, EPA, NJDEP, HRHC, and HHD have or will perform the following actions:

1. ATSDR and NJDOH are available, upon request, to assist the enforcement/regulatory agencies in providing public health input into risk management decisions.

2. ATSDR and NJDOH will continue to provide health consultations to review environmental, health outcome, and community health concern

100633

information and determine appropriate additional health follow-up actions.

3.    NJDOH, under a cooperative agreement with ATSDR, will work with the HHD and HRHC to continue health professional education to advise local health care providers and public health professionals of the nature and possible consequences of exposure to metallic (elemental) mercury.  The education effort will include providing information on routes of human exposure to metallic mercury, symptoms of exposure, and testing and treatment.  Furthermore, ATSDR will provide technical consultation to HHD and NJDOH on the support needed by residents in response to relocation and personal health concerns.

4.    NJDOH, under a cooperative agreement with ATSDR, will work with the HHD and HRHC to continue community health education efforts. This will include the identifying and providing support for the special needs of the affected tenants of the building.

5.    The Environmental and Occupational Health Institute of New Jersey, in cooperation with ATSDR and NJDOH, will provide to all permanent occupants of the building, including infants and children, an immediate clinical evaluation of their exposures to mercury.

6.    ATSDR and NJDOH, working with HHD, will provide a urine analysis for mercury to current and former residents who did not previously provide a urine sample.

7.    ATSDR and NJDOH will provide to the residents, once relocated, follow-up urine sampling and analysis until levels of mercury in urine fall below 20 $\mu g/L$.

8.    HHD has issued the necessary orders or legal action, as required, to ensure dissociation of the occupants from the building (exposure elimination).  All agencies assisted in the dissociation of the residents from the building.

9.    HHD served as the point of contact for public agencies, affected residents, the media, and the public while the residents vacated the building, but is no longer acting in that capacity.

10.   The town of Hoboken provided for initial security of the building while the residents vacated the building, but that function is now being performed by EPA.

11.   HRHC will provide technical support and advice to the HHD and other agencies, as requested.

12.   HRHC will assist with air monitoring activities at the site, as required.

13.   EPA and NJDEP will provide screening and logistics regarding the identification of contaminated personal belongings.

14.   NJDOH will respond to health questions from former workers at the 722 Grand Street building (including employees of General Electric and Quality Tool and Dye Corporations, and construction contractors involved with building renovation).  Those who inquire will be asked about medical and exposure history, be sent information on consequences of mercury exposure and a list of occupational medical specialists, and be offered urine mercury testing.

7

For additional information, please contact ATSDR at the following address:

Robert C. Williams, P.E., DEE
Director, Division of Health Assessment and Consultation
Agency for Toxic Substances and Disease Registry
1600 Clifton Road, NE, E-32
Atlanta, Georgia 30333
(404) 639-0610

100635

8

REFERENCES

1.  Agency for Toxic Substances and Disease Registry; Health Consultation for 722 Grand Street, Hoboken, NJ; January 3, 1996.

2.  "Mercury Vapor Survey 722 Grand Street, Hoboken, New Jersey," November 8, 1995. Prepared by Detail Associates, Inc., Englewood, NJ.

3.  Personal Communication, Gary Garetano, Assistant Director, Hudson Regional Health Commission, January 2, 1996.

4.  Rough Draft: "An Industrial Hygiene Survey of Mercury Levels Conducted at 720-732 Grand Street, Hoboken, NJ, March 11, 1995," ENPAK Services.

5.  "Mercury Vapor Survey at 722 Grand Street, Hoboken, New Jersey," January 2, 1996. Prepared by Weston, Inc., Edison, NJ, for EPA Region II.

6.  New Jersey Department of Health, Environmental and Chemical Laboratory Services; Urine Mercury Laboratory Results, December 28 and 29, 1995, and January 5, 1996.

7.  Agency for Toxic Substances and Disease Registry. Toxicological profile for mercury (Update). May 1994.

8.  Agency for Toxic Substances and Disease Registry. Case studies in environmental medicine: mercury toxicity. March 1992.

9.  J.M. Malecki, et al. Mercury exposure in a residential community-- Florida, 1994; Morbidity and Mortality Report; 44(23); pages 436-443; June 16, 1995.

10. C. Taueg, et al. Acute and chronic poisoning from residential exposures to Elemental Mercury; Michigan, 1989-1990; Morbidity and Mortality Report; 40 (23); pages 393-395; June 14, 1994.

11. R.G. Smith, et al. Effects of exposure to mercury in the manufacture of chlorine; Am Ind Hyg Assoc J; 31 687-700 (1970).

12. S. Langworth, et al. Renal and immunological effects of occupational exposure to inorganic mercury; Br J Ind Med; 49(6) 394-401 (1992).

13. "Analysis of Urine Mercury Data from 722 Grand Street, Hoboken, NJ: Creatinine-Adjusted Data," January 5, 1996. Memorandum from Jerald Fagliano, NJDOH, to Gregory Ulirsch, ATSDR.

100636

February 16, 1996

To:     Jack Harmon, OSC
Fm:     Rod Turpin, Senior Environmental Scientist

Subj:   Air Quality Modeling for Grand Street Mercury Site
        Hoboken, N.J.

Enclosed is the requested air quality modeling for the subject site
(REAC February 16, 1996 Report).   Please note that this report
reflects the ambient air concentrations of mercury due to
volatization of 1000 pounds of mercury and highlights the mercury
action levels of IDLH (10 mg/m$^3$), and OSHA PEL (0.1 mg/m$^3$).

Three models (INPUFF, ALOHA, and SCREEN) were selected to predict
ambient conditions in this scenario.   INPUFF is an integrated PUFF
model.  ALOHA is an emergency release model and SCREEN is a simple
steady-state Gaussian dispersion model.

Enclosure

100693

## TECHNICAL REPORT ABSTRACT

WORK ASSIGNMENT NO.: 03347-040-0175-01
REPORT TITLE: FINAL REPORT GRAND STREET MERCURY SITE AIR QUALITY MODELING HOBOKEN, NEW JERSEY FEBRUARY 1996
REPORT DATE: 02/16/96
NO. OF PAGES IN REPORT: 45

CONTRACT NO: 68-C4-0022
PRIME CONTRACTOR: ROY F. WESTON, INC.

PROJECT OFFICER: RAJESHMAL SINGHVI
ADDRESS/TELEPHONE: U.S. EPA/ERT
2890 WOODBRIDGE AVENUE
EDISON, NJ 08837
908-321-6761

PROGRAM OFFICE: ENVIRONMENTAL RESPONSE TEAM (ERT)

☐ This report contains confidential business information.

[x] This report does not contain confidential business information.

KEYWORDS/DESCRIPTORS - Air Dispersion Modeling, Mercury, Hoboken, Grand Street, INPUFF, SCREEN, ALOHA

REPORT ABSTRACT - The United States Environmental Protection Agency/ Environmental Response Team (U.S EPA/ERT) requested the Response Engineering and Analytical Contract (REAC) Air Modeling Team to model the dispersion of mercury vapors due to a fire at the Grand Street site in Hoboken, NJ.

The report discusses the modeling techniques which were used to obtain ambient air concentrations of mercury due to volatilization of 1000 pounds of mercury.

The report demonstrates that the ambient concentrations of mercury in air may exceed the Immediately Dangerous to Life and Health (IDLH) [10 milligrams per cubic meter ($mg/m^3$)] and will most assuredly exceed the PEL (0.10 $mg/m^3$) for areas surrounding the building in mention should 1,000 lbs of mercury be available for vaporization. The models indicate that ambient concentrations of mercury may exceed the IDLH level for regions immediately surrounding the site as well as some elevated receptors several hundred meters downwind.