**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRG HARRISON LOFTS URBAN RENEWAL LLC,<br><br>        Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC and ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC.<br><br>        Defendants. | Civil Action No. 2:16-cv-06577 (SRC)<br><br>**OPINION** |
| ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC.,<br><br>        Third-Party Plaintiff,<br><br>v.<br><br>FIELD ENVIRONMENTAL INSTRUMENTS, INC. and ARIZONAINSTRUMENT LLC,<br><br>        Third-Party Defendants. | |
| ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC,<br><br>        Third-Party Plaintiff,<br><br>v. | |

| | |
|---|---|
| LANGAN ENGINEERING AND ENVIRONMENTAL SERVICES, INC.; JOHN WOOD GROUP PLC as successor-in-interest to AMEC PLC,<br><br>        Third-Party Defendants. | |
| EVANSTON INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>v.<br><br>ENVIRONMENTAL WASTE MANAGEMENT ASSOCIATES, LLC, ACCREDITED ENVIRONMENTAL TECHNOLOGIES, INC., and BRG HARRISON LOFTS URBAN RENEWAL LLC,<br><br>        Defendants. | Civil Action No: 2:17-CV-01584 |
| ACCREDITED ENVIRONMENTALTECHNOLOGIES, INC.,<br><br>        Third-Party Plaintiff,<br>v.<br><br>J.S. BRADDOCK AGENCY,<br><br>        Third-Party Defendant. | |
| J.S. BRADDOCK AGENCY,<br><br>        Fourth-Party Plaintiff,<br><br>v.<br><br>EDGEHILL SPECIAL RISK, INC.,<br><br>        Fourth-Party Defendant. | |

**CHESLER, U.S.D.J.**

This matter comes before this Court on two motions to dismiss the Third-Party Complaint ("3PC"), pursuant to Federal Rule of Civil Procedure 12(b)(6), each brought by a Third-Party Defendant: 1) the motion to dismiss the 3PC by Langan Environmental and Engineering Services, Inc. ("Langan"); and 2) the motion to dismiss the 3PC by Wood Environment & Infrastructure Solutions, Inc. ("AMEC").[1]  For the reasons stated below, both motions will be granted.

This case arises from a dispute between a buyer and a former owner of real estate over environmental remediation of mercury contamination.  According to the First Amended Complaint ("FAC"), Thomas Edison established a light bulb factory in Harrison, New Jersey in 1882.  In 1892, Defendant General Electric Company ("GE") was created, and it owned and operated the factory; it is alleged that subsequent manufacturing activity at the property site contaminated it with mercury.  The FAC alleges that GE is the party responsible for remediating mercury contamination at the property site at issue.  In 2012, Plaintiff BRG Harrison Lofts Urban Renewal LLC ("BRG") executed a contract to purchase the site from an owner subsequent to GE.  BRG and GE entered into the Indemnification and Settlement Agreement ("ISA") in 2014 for the purpose of addressing the mercury contamination, and the sale closed in 2015.  In 2016, BRG filed the Complaint which initiated this case, since amended to the FAC.

---

[1] Wood Environment & Infrastructure Solutions, Inc. contends that it is successor-in-interest to Amec Foster Wheeler, referenced in the FAC as "AMEC."  (FAC ¶ 50.)  The 3PC names John Wood Group PLC as the success-in-interest to "AMEC PLC."  The entity "John Wood Group PLC" has appeared in this case, but contends that its name has been improperly pled.  To reduce confusion, this Opinion will refer to the successor-in-interest to Amec Foster Wheeler, the "AMEC" in the FAC, as "AMEC."

EWMA and Langan in the FAC

In the FAC, BRG asserted claims against GE, as well as Environmental Waste Management Associates, LLC ("EWMA") and Accredited Environmental Technologies, Inc. ("AET"). By way of introduction, the FAC alleges:

1. This matter arises out of defendant GE's unlawful refusal to remediate mercury contamination detected in and under certain buildings recently purchased by BRG in Harrison, New Jersey - contamination that GE and/or its predecessors caused from their prior operations on the subject site and which defendants EWMA and AET negligently failed to fully detect when retained to investigate the subject site as part of BRG's due diligence in connection with its purchase.

2. . . . BRG further asserts breach of contract and professional negligence/malpractice claims against EWMA and AET for their careless work (on which BRG relied in moving forward with the purchase of the site) in failing to detect the extent of mercury contamination inside the buildings at the subject site.

. . .

5. . . . BRG retained EWMA to investigate environmental contamination at the subject site in connection with due diligence BRG was performing on the Site in connection with BRG's purchase thereof. EWMA investigated environmental contamination at the subject site in a negligent manner.

(FAC ¶¶ 1, 2, 5.) The FAC alleges that EWMA provided BRG with various reports on mercury contamination at the property site, including the "Asbestos Lead Paint and Mercury Vapor Survey Memo" in August of 2012 (FAC ¶ 46), a mercury remediation estimate of March of 2013 (FAC ¶ 48), and a mercury remediation proposal in March of 2014 (FAC ¶ 49). In November of 2014, BRG and GE executed the "Indemnification and Settlement Agreement." (FAC ¶ 55.) The FAC asserts: "BRG further relied upon the information provided by EWMA and AET in negotiating the Indemnification and Settlement Agreement and would not have entered into this agreement had EWMA and AET provided accurate information regarding the mercury contamination at the Site." (FAC ¶ 58.)

4

Count Nine of the FAC asserts a claim for negligence and malpractice against EWMA and AET, and alleges:

> EWMA was negligent in failing to question AET's mercury survey results in light of the historical operations at the Site and the planned residential use of the Site, coupled with the manner in which those survey results were presented, and, in turn, to either take measures to ensure that AET conducted proper mercury surveying at the Site or retain another qualified professional to do so.

(FAC ¶ 207.) Count Ten essentially transforms this idea into a breach of contract claim, based on the contract between BRG and EWMA. (FAC ¶¶ 210-213.)

Although Langan is not a named defendant in the FAC, the FAC does make allegations about it:

> 59. In August 2014, BRG retained Langan Engineering & Environmental Services, Inc. ("Langan") to conduct miscellaneous environmental consulting services.
>
> 60. On October 9, 2015, following its purchase of the Site in June 2015 and in preparation for conducting the limited mercury abatement on the third floor of Building C, Langan conducted a mercury screening and obtained results inconsistent with the results of the EWMA/AET's investigation and mercury survey in 2012.

(FAC ¶¶ 59, 60.)

EWMA and AMEC in the FAC

AMEC is not a named defendant in the FAC. The FAC alleges that, in July of 2013, GE retained AMEC to perform environmental remediation and investigation at the property site. (FAC ¶ 50.) AMEC, at GE's direction, performed many tasks at the property site. (FAC ¶¶ 74-79, 81-92.) AMEC submitted a "Preliminary Assessment" of the property site to GE, and GE gave it to BRG. (FAC ¶¶ 54, 56.) The FAC alleges: "BRG relied upon the information provided by AMEC (on behalf of GE) in negotiating the Indemnification and Settlement Agreement and

5

would not have entered into this agreement had AMEC provided accurate information regarding the mercury contamination at the Site within the Preliminary Assessment." (FAC ¶ 57.)

The 3PC

In May of 2020, EWMA filed a motion for leave to file a third-party complaint, pursuant to Federal Rule of Civil Procedure 14, which was heard by Magistrate Judge Waldor, and leave was granted.[2] The 3PC was filed in September of 2020, followed by the instant motions to dismiss it.

The 3PC recites some fundamental material from the FAC, and then alleges the following facts. As to AMEC, the 3PC alleges that AMEC and GE had been provided with "EWMA's environmental investigation work, including the mercury vapor survey by AET" (3PC ¶ 23), that AMEC did its own investigations into the mercury contamination at the property site and issued its own reports, which were provided to BRG prior to the execution of the Indemnification and Settlement Agreement, that AMEC should have known that AET's work was problematic but failed to advise EWMA of same, and that the FAC states that Plaintiff BRG relied on the reports from AMEC in negotiating the Indemnification and Settlement Agreement. (3PC ¶¶ 21-40).

As to Langan, the 3PC alleges that, in August 2014, after former EWMA employee Kaufman went to work for Langan, BRG retained "Langan to conduct environmental consulting services in connection with the Property," that Kaufman "took the Plaintiff's business to Langan," that Kaufman had all the information that EWMA had about mercury contamination at

---

[2] EWMA's opposition briefs contend that the Magistrate Judge already decided certain issues that have been raised in the instant motions. There are several reasons to reject this, but one is that AMEC and Langan did not litigate that motion, as they had not yet been impleaded so as to have the opportunity to do so. Allowing that decision to have any preclusive impact on the instant motions is fundamentally unfair: "issue preclusion cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue." United States v. Reyes-Romero, 959 F.3d 80, 93 (3d Cir. 2020).

the property site plus "significant additional information," and that Langan advised BRG about the property site from 2014 to 2015. (3PC ¶¶ 44-52.) "Langan should have advised Plaintiff of the impact of the new data and the need to perform additional testing as to potential mercury contamination." (3PC ¶ 53).

The 3PC asserts two claims against Langan and AMEC, which the parties to the instant motions have characterized as claims for contribution as a joint tortfeasor, and indemnification, based on the principle of implied or common law indemnity.

### I. Langan's motion to dismiss the 3PC

Langan, characterizing the 3PC claims as "vague at best," moves to dismiss the 3PC as failing to state a legally valid claim for relief on several grounds, well-summarized as follows: "EWMA's attempt to point the finger at Langan is fundamentally unavailing as it fails to allege how Langan could be liable for EWMA's breach of contract and professional malpractice vis-a-vis BRG." (Langan's MTD Br. 7.) This Court generally agrees, although it might be better phrased that the 3PC fails to assert sufficient facts to make plausible that Langan is liable for any part of BRG's claims against EWMA, as required by Rule 14.

The Court applies the following legal principles in deciding the instant motions. Rule 14(a)(1) states: "A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

7

the elements of a cause of action will not do." Id. at 1964-65 (internal citations omitted); see also Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Langan correctly contends that the 3PC must plead sufficient facts to make plausible the two claims that, pursuant to Rule 14(a)(1), Langan "is or may be liable to [EWMA] for all or part of the claim against it," and that it fails to do so. The First Count, for contribution as a joint tortfeasor, immediately goes wrong when it states this theory:

> At the time and place mentioned in the FAC, the damages allegedly sustained by Plaintiff resulted *solely* from the Third Party Defendants' negligence and/or other wrongful conduct, acts or omissions, and responsibility for the subject claims and alleged damages are therefore upon the Third Party Defendants . . .

(3PC ¶ 55) (emphasis added). This might state an implied indemnity claim, but not a claim for contribution between joint tortfeasors. The Joint Tortfeasors Contribution Act states:

> Where injury or damage is suffered by any person as a result of the wrongful act, neglect or default of joint tortfeasors, and the person so suffering injury or damage recovers a money judgment or judgments for such injury or damage against one or more of the joint tortfeasors, either in one action or in separate actions, and any one of the joint tortfeasors pays such judgment in whole or in part, he shall be entitled to recover contribution from the other joint tortfeasor or joint tortfeasors for the excess so paid over his pro rata share; but no person shall be entitled to recover contribution under this act from any person entitled to be indemnified by him in respect to the liability for which the contribution is sought.

N.J.S.A. § 2A:53A-3. This, by its express terms, applies only to judgments of damage due to the wrongful acts of joint tortfeasors. If the damages sustained by Plaintiff resulted *solely* from Langan's (or AMEC's) wrongful act, EWMA is not entitled to contribution as a joint tortfeasor. This sounds not like contribution, but rather a theory of vicarious liability and common law

8

indemnity, unless it is an improper third-party theory that Langan is liable to Plaintiff. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 368 n.3 (1978) ("Under Rule 14 (a), a third-party defendant may not be impleaded merely because he may be liable to the *plaintiff*.") The first theory in Count One is legally invalid and fails to state a valid claim for relief.

The second theory in Count One, however, is at least consistent with the concept of joint tortfeasors in the contribution statute:

> . . . or if there was any negligence on the part of EWMA, which it denies, the negligence of the Third Party Defendants was a major contributing factor therein, and the Third Party Defendants are therefore jointly liable."

(3PC ¶ 55). Thus, this theory asserts that Langan is a tortfeasor jointly liable for negligence to BRG. Under federal pleading standards, the 3PC must therefore state facts that make plausible that Langan is a joint tortfeasor, that is, jointly liable for the tort of negligence which has been asserted by BRG against EWMA.

Langan moves to dismiss the contribution claim on the ground that the 3PC does not allege sufficient facts to make plausible that EWMA and Langan are "joint tortfeasors" as defined in New Jersey's Joint Tortfeasors Contribution Act: "For the purpose of this act the term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property." N.J.S.A. § 2A:53A-1. Langan cites the New Jersey Supreme Court's decision in Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 72 (2004) (citations omitted), in which it construed the statutory language:

> It is well settled that the true test [for joint tortfeasor contribution] is joint liability and not joint, common or concurrent negligence. The test's core proposition may be stated succinctly: It is common liability at the time of the accrual of plaintiff's cause of action which is the Sine qua non of defendant's contribution right.

The Cherry Hill Court analyzed the history of the negligent acts of each of the three parties in that case, as well as the history of the accrual of the claims against them, and concluded:

9

> Against that factual backdrop, it simply cannot be said that Tuttle, Mancinelli and Faugno had common liability at the time plaintiff's separate cause of actions accrued. . . . Each of Tuttle's, Mancinelli's and Faugno's alleged malpractice constituted separate torts at disparate times with different damages covering a six-year period. As a result, their separate acts of malpractice cannot constitute the "joint liability" required for the imposition of contribution liability under the JTCL.

Id. at 73. The Court usefully distinguished the case at bar from a previous one:

> The harm visited on plaintiff by Tuttle, Mancinelli and Faugno, although sharing a common core, was different in each instance. Tuttle caused harm to plaintiff by reason of Tuttle's failure to deliver and file a purchase money mortgage securing plaintiff's deposit monies and advances; Mancinelli caused harm to plaintiff by failing to name Tuttle in the suit against the Seller; and Faugno caused harm to plaintiff by failing to include Mancinelli in the suit against Tuttle. In those fundamental respects, the facts here differ from those present in *LaBracio*. . . . Unlike Faugno, who seeks contribution here from those whose allegedly tortious acts occurred before Faugno's now admitted negligence, the two attorney/claimants in *LaBracio* sought contribution from a successor attorney arising from the failure of all three lawyers in the same transaction to insure that a deed and mortgage were filed timely. Under those circumstances, joint tortfeasor contribution liability was rightly apportioned among all three attorneys who shared joint liability (each for failing to file the deed and mortgage in a timely manner as part of the same real estate transaction) and who all caused the same injury (the untimely filing of the deed and mortgage that resulted in liens with priority filing listed against the realty).

Id. at 75-76 (citations omitted). The very quick summary of all of this is that, when three putative joint tortfeasors all failed the same client with the same failure (failing to timely file the deed and mortgage in the same transaction) and caused the same injury to that client, joint tortfeasor contribution liability was rightly apportioned among them; when three putative joint tortfeasors inflicted different injuries on the same client, they were not joint tortfeasors under New Jersey's Joint Tortfeasors Contribution Act.

Applying this to the instant case, the 3PC alleges that BRG and EWMA entered into an agreement for environmental due diligence services (3PC ¶ 16), and that "EWMA retained defendant Accredited Environmental Technologies, Inc. ('AET') to conduct a mercury vapor

10

survey of the buildings on the Property." (3PC ¶ 17). The 3PC alleges EWMA's negligent conduct as follows:

> The FAC claims that EWMA and AET negligently failed to fully detect the extent of the mercury contamination in the buildings, that EWMA knew or should have known the methodology of AET's mercury vapor survey were "questionable", and that EWMA should have "taken measures to ensure that AET conducted a proper mercury survey or retained another qualified professional to do so."

(3PC ¶ 19.)

As to Langan, the 3PC alleges: "Plaintiff retained third party defendant Langan to conduct environmental consulting services in connection with the Property." (3PC ¶ 44.) The 3PC alleges Langan's negligent conduct as follows:

> 52. Langan and Mr. Kaufman continued to provide consulting services to Plaintiff as it received additional environmental reports and data from GE and AMEC in early 2015, and in connection with Plaintiff's entry into the Settlement Agreement and Release in June of 2015.
>
> 53. Langan should have advised Plaintiff of the impact of the new data and the need to perform additional testing as to potential mercury contamination.

Applying the principles stated in Cherry Hill to the 3PC, the Court concludes that the 3PC pleads facts which fail to make plausible the inference that EWMA and Langan are joint tortfeasors in regard to the negligence claim BRG has asserted against EWMA. The 3PC alleges that EWMA retained AET to perform a mercury vapor survey on the buildings, and EWMA negligently failed to fully detect the extent of the mercury contamination. The 3PC does not allege that Langan was retained to perform a mercury vapor survey on the buildings, supervise AET, or do anything with regard to mercury contamination. Rather, the 3PC alleges that Langan received unspecified "new data" – perhaps from Plaintiff, but the 3PC does not say – and should have advised Plaintiff that additional mercury testing was needed.

Langan contends correctly that the allegations in the 3PC are vague, but they make plausible that EWMA was responsible for a negligently-conducted mercury survey by AET; the 3PC alleges only that Langan knew about AET's survey. The 3PC alleges that Langan had "additional information" that EWMA did not have, as well as new data from Plaintiff. This Court finds that the 3PC has alleged, at most, separate tortious activities by EWMA and Langan. There are several features which distinguish the tortious activities alleged, but three will suffice: 1) AET was the agent/consultant to EWMA, but not to Langan; 2) Langan had additional data that EWMA lacked; and 3) EWMA failed to fully detect mercury contamination in a building, while Langan read the reports of others and failed to advise Plaintiff that additional testing was needed.[3] These might be separate torts at disparate times, but the allegations do not make plausible joint liability: the 3PC alleges that EWMA and Langan failed Plaintiff in different ways at different times.

Consider the statement of the case in the first paragraph of the FAC: "EWMA and AET negligently failed to fully detect" the mercury contamination in the buildings. (FAC ¶ 1.) The 3PC alleges, in essence, that Langan failed to advise BRG of the inadequacy of somebody else's

---

[3] Moreover, the FAC alleges the harm to BRG as follows:

> 58.  BRG further relied upon the information provided by EWMA and AET in negotiating the Indemnification and Settlement Agreement and would not have entered into this agreement had EWMA and AET provided accurate information regarding the mercury contamination at the Site.

The FAC alleges that the Indemnification and Settlement Agreement was executed in November of 2014. (FAC ¶ 55.) The harm to BRG alleged in the 3PC stems from Langan's failure to advise BRG based on new data obtained in 2015 – after the FAC alleges that EWMA's injury to BRG occurred.

12

mercury detection.[4] A failure to detect mercury, when one is contracted to do so, is not the same as a failure to advise that others did not do their work adequately on the basis of a larger body of information. Just as in Cherry Hill, the harms to the plaintiff are different. 182 N.J. at 75.

As to Langan, the 3PC fails to plead sufficient facts to make plausible a claim for contribution from a joint tortfeasor.

Count Two asserts a claim for indemnification against both Langan and AMEC:

> While EWMA denies liability for the damages alleged by Plaintiff, if judgment is recovered by Plaintiff as against EWMA, it hereby asserts that the negligence, breach or other alleged wrongful conduct or omission of EWMA was merely constructive, technical, imputed or vicarious and Plaintiff's damages arose through the Third Party Defendants' direct, active and primary negligence, breach and/or other wrongful conduct or omission.

(3PC ¶ 58). Because the 3PC provides no support for a claim for indemnification by reason of express contract, nor does EWMA contend that it does, this Court understands Count Two to assert a claim for implied or common law indemnification – an indemnification obligation that is imposed by operation of the common law of New Jersey.

To the extent that the Second Count asserts a claim for common law implied indemnification of EWMA's liability for breach of contract, implied or common law indemnification applies only to tort claims, not to contract claims. See Ronson v. Talesnick, 33 F. Supp. 2d 347, 357 (D.N.J. 1999) ("common law indemnification is available under New Jersey law to a person who is not at fault, but has become responsible in tort for the conduct of another.") Common law indemnity is unavailable to EWMA based on liability for breach of contract.

---

[4] The 3PC does not allege that Langan did its own mercury detection investigation in the buildings prior to sale. The FAC alleges that, after the sale of the property, Langan did mercury screening in the buildings and got results that were different from AET's. (FAC ¶¶ 59, 60.)

13

Furthermore, EWMA has not pleaded facts to support a claim for vicarious liability based on a negligence claim, either. As Ronson makes clear, the party held vicariously liable must be without fault, but responsible in tort for the conduct of another. Id. "It is the existence of a special legal relationship sufficient to impose certain duties and a subsequent breach of those duties that permits an implied indemnification." Ruvolo v. United States Steel Corp., 133 N.J. Super. 362, 367 (N.J. Super. Ct. App. Div. 1975). As one example of that special legal relationship, Ruvolo cites the agency relationship. Id. EWMA has pled no facts which make such a scenario plausible. EWMA has not pled any facts which make plausible that EWMA and Langan had a special legal relationship that would suffice to impose an indemnification obligation. Nor does the 3PC plead facts which make plausible a scenario in which EWMA is found liable to BRG for negligence as a matter of only vicarious liability, but is entirely free from fault, and Langan is the true wrongdoer.

As to Langan, the 3PC fails to plead sufficient facts to make plausible a claim for common law indemnification.

## II.     AMEC's motion to dismiss the 3PC

AMEC moves to dismiss the 3PC with several arguments. First, AMEC argues that EWMA's claim for contribution fails because the 3PC does not allege facts that support the inference that EWMA and AMEC are "joint tortfeasors" as defined in the Joint Tortfeasors Contribution Act, based on Cherry Hill, as already discussed with regard to the claim against Langan. AMEC is clearly correct. The positions, responsibilities, and conduct of EWMA and AMEC, as alleged in the 3PC, are very different. To start with, EWMA and AMEC were engaged by different clients on opposite sides of a real estate transaction. The claim for contribution must fail.

14

As to the indemnification claim, AMEC argues that it fails to state a valid claim for relief under New Jersey common law because, as already discussed, it fails to plead sufficient facts to make plausible a scenario in which EWMA is determined to be vicariously liable for negligence but free from fault, with AMEC as the wrongdoer at fault. For the reasons already stated, the 3PC does not state a valid claim for common law indemnification.

This Court has determined that the 3PC does not state sufficient facts to make plausible its claims, and the 3PC must be dismissed for failure to satisfy the pleading standards of Twombly and Iqbal. The only question remaining is whether the dismissal should be with or without prejudice.

Both movants have asked that the 3PC be dismissed with prejudice. The Supreme Court has characterized dismissal with prejudice as a "harsh remedy." New York v. Hill, 528 U.S. 110, 118 (2000). Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); see also Connelly v. Steel Valley Sch. Dist., 706 F.3d 209, 217 (3d Cir. 2013) ("It does not matter whether or not a plaintiff seeks leave to amend.") "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000). This Court finds that amendment of the 3PC is futile.

It is clear to this Court that amendment of the common law indemnification claim is futile. Given that New Jersey's common law of indemnification requires that EWMA be free from fault, and merely vicariously liable, with the third-party defendant the actual wrongdoer

15

responsible for EWMA's liability in negligence to BRG, the claim cannot be amended so as to become plausible. Count Nine of the FAC alleges that EWMA engaged in negligent conduct. EWMA has not offered any facts or legal theory which could make plausible a scenario in which EWMA is judged to be vicariously liable in negligence to BRG, free from fault, due to the actual negligence of either AMEC or Langan.[5] The only plausible scenario is one in which judgment is entered against EWMA for negligence based on its negligent conduct. If EWMA is truly free from fault, there will be no judgment in negligence against it. There is no plausible scenario in which EWMA is entitled to common law indemnification from either third-party defendant. Amendment of the indemnification claim is futile.

Amendment of the contribution claim is also futile. As discussed above, the factual allegations do not make plausible that either AMEC or Langan are jointly liable with EWMA as tortfeasors under New Jersey law. The Court sees no possibility that amendment of the 3PC could result in a contribution claim that could withstand a motion to dismiss, pursuant to Rule 12(b)(6).

Both motions to dismiss the 3PC are granted, and the 3PC is dismissed with prejudice in its entirety.

    s/ Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.

Dated: February 5, 2021

---

[5] Perhaps EWMA could be found vicariously liable for the actual negligence of AET, perhaps as principal and agent, but that has no relevance to AMEC or Langan. What relationship has been alleged between EWMA and either AMEC or Langan that would result in vicarious liability?